EISNERAMPER

**Eisner Advisory Group LLC**
One Logan Square
130 North 18th Street, Suite 3000
Philadelphia, PA 19103
**T** 215.881.8800
**F** 215.881.8801
www.eisneramper.com

August 26, 2026

Synergy CHC Corp.
Jack Ross, Chairman and Chief Executive Officer
865 Spring Street
Westbrook, ME 04092

**Re: Synergy CHC Corp. - Chief Restructuring Officer Services**

Dear Mr. Ross:

This letter and the attached Eisner Advisory Group LLC Standard Terms and Conditions of Engagement confirm the agreement between Synergy CHC Corp. (the "Client" or the "Company"), and Eisner Advisory Group LLC ("EA Group") whereby the Client has engaged EA Group to provide the services described herein. This letter and the attached terms and conditions constitute the entire agreement between Client and EA Group.

**Scope of Services**

EA Group will provide certain consulting services to the Client to assist with the restructuring of the Company. EA Group will provide the services of Lauren P. Berret, JD, CPA, ("Ms. Berret") to serve as a temporary consultant with the title "Chief Restructuring Officer" (the "CRO") reporting directly to the Company's Board of Directors (the "Board") and/or you in your capacity as Chief Executive Officer.

We understand, on a pre-Chapter 11 filing basis, the engagement objectives and scope to be as follows:

- Assess the Company's current financial condition, operations, liquidity, and cash requirements.
- Develop and maintain short-term cash flow forecasts and liquidity analyses.
- Evaluate assets, liabilities, contractual obligations, and other commitments.
- Review historical transactions, including executive compensation, bonuses, insider payments, and related-party transactions.
- Evaluate restructuring, sale, wind-down, and liquidation alternatives.
- Develop and, with Company's approval, implement restructuring and wind-down strategies.
- Advise the Company in relation to creditors, lenders, vendors, and other stakeholder communications and negotiations.
- Coordinate with the Company's legal, financial, and other professional advisors.

"EisnerAmper" is the brand name under which EisnerAmper LLP and Eisner Advisory Group LLC and its subsidiary entities provide professional services. EisnerAmper LLP and Eisner Advisory Group LLC are independently owned firms that practice in an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. EisnerAmper LLP is a licensed CPA firm that provides attest services, and Eisner Advisory Group LLC and its subsidiary entities provide tax and business consulting services. Eisner Advisory Group LLC and its subsidiary entities are not licensed CPA firms.

- Assist with preparations for and implementation of a potential Chapter 11 filing, including assessing, developing and negotiating settlement agreements with applicable D&O's of the Company

We understand, on a post-Chapter 11 filing basis, the engagement objectives and scope to be as follows:

- Oversee financial and operational matters during any Chapter 11 proceedings.
- Assist with the preparation of bankruptcy schedules, statements, cash flow reporting, and other required financial information.
- Assist with asset disposition, claims resolution, and other liquidation activities, as applicable.
- Oversee the orderly wind-down of the Company's operations and affairs.
- Evaluate and assist in obtaining appropriate Directors and Officers ("D&O"), CRO, and other applicable insurance coverage.
- Perform such other restructuring and financial advisory services as may be necessary or appropriate in connection with the engagement.

EA Group's CRO Services do not include, and EA Group is not responsible for, the following:

- Performing ongoing evaluations or control activities that affect the execution of transactions or ensure that transactions are properly executed or accounted for.
- Determining which, if any, recommendations made by EA Group should be implemented or prioritized by the Board or you in your capacity as CEO.

In the capacity of CRO, the Company will provide Ms. Berret with full and free access to all employees and retained consultants, and to the Board and its Committees, if applicable. The Company may also grant Ms. Berret the right to attend and participate (but not vote) in the meetings of the Board or its Committees. Ms. Berret will be assisted in this matter by other EA Group personnel.

The Company further agrees that on a post Chapter 11 filing basis, the agent, lenders and their respective advisors will have unfettered access to the CRO and the CRO shall be free to communicate with and discuss and disclose to such parties information relating to the Company, as long as you are afforded the opportunity to observe and/or monitor such communications and discussions.

Our services will consist of CRO services and other consulting services and, therefore, will not contemplate the audit, review or compilation of financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") or with attest standards established by the American Institute of Certified Public Accountants ("AICPA"). We will perform the Services in accordance with applicable professional standards, including the Statements on Standards for Forensic Services issued by the AICPA.

If cases under the Bankruptcy Code are commenced and our retention is approved, EA Group's role will include providing CRO services to the debtors and debtors-in-possession in those cases under a general retainer, subject to court approval. EA Group's role as CRO will encompass all out-of-court planning and negotiations attendant to these tasks. EA Group agrees that it shall make all appropriate disclosures in the Application of any and all facts that may have a bearing on whether EA Group and/or Ms. Berret have any

conflict of interest with case parties or professionals. EA Group and/or Ms. Berret agrees that it will limit the scope of its service to that of Company's CRO.

The services we will provide in connection with the engagement will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations. With respect to all matters of our engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our engagement.

Our engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of the engagement, we may provide information to directors, officers or employees in their corporate capacities.

**Management's Responsibilities and Representations**

It is the Company's responsibility to provide all the information required for our CRO Services. Our CRO Services for the Company will be based on the information made available to us by its representatives. We will not audit or otherwise verify the information submitted to us. However, we may ask for additional documentation and clarification of some of the information. We anticipate that the Company's representatives will furnish all of the requested information in a timely and organized manner.

The CRO Services will be performed under the direction of management and management accepts responsibility for all management decisions. EA Group is advising and will not perform management functions or make management decisions on behalf of the Company. However, we will provide advice and recommendations in an advisory capacity to assist management of the Company in performing its functions and making decisions.

In performing the CRO Services, EA Group will have full access to all of the Company's records, property and personnel relevant to performing the CRO Services. Company personnel will make themselves available when EA Group representatives are on site to perform the CRO Services.

Upon the Company commencing one or more cases under the Bankruptcy Code, the engagement of EA Group to perform the Services shall be subject to the approval of the Bankruptcy Court and shall be substantially as provided in this agreement as modified by the retention order approved by the Bankruptcy Court. The Company agrees, at the Company's expense, to file an application (the "Application") to retain EA Group to provide CRO services, *nunc pro tunc* to the Petition Date pursuant to Section 363 of the Bankruptcy Code. The Company agrees to file all required applications, including the Application, for the retention of EA Group at the earliest practical time.

At all times during which EA Group provides Services to the Company pursuant to this engagement letter, the Company shall maintain Directors and Officers liability insurance coverage and attempt to name Ms. Berret as an additional insured to such policy. Upon execution of this agreement, the Company shall furnish EA Group with a certificate of insurance, setting forth the nature of the coverage, the limits of liability, the name of the insurance carrier, the policy number, and the date of expiration of the policy.

**Conflicts of Interest**

We have performed an internal search for any potential client conflicts based upon the names of the following parties you have provided:

- Synergy CHC Corp.
- Synergy Strips Corp.
- Oro Capital Corporation
- NomadChoice Pty Ltd.
- Hand MD Corp.
- Synergy CHC Inc.
- Synergy CHC Mexico
- Jack Ross
- Jaime Fickett
- Trent MacDonald
- Alfred Baumeler
- Maurice VerStandig: The VerStandig Law Firm, LLC
- Christianna Annette Cathcart: The Belmont Firm
- Knight Therapeutics
- ACP Agency, LLC
- Acme Credit Partners Fund I, LP
- ACME Credit Partners
- Cedar Advance LLC
- Nelson Mullins Riley & Scarborough LLP
- Don Sanders
- Sanders Morris LLC

Based upon this search, we are not aware of any conflicts of interest or relationships that would, in our opinion, preclude us from performing the services in an objective manner. We will notify you immediately if any such relationships subsequently come to our attention. If additional parties to the matter are named, you are obligated to inform us as to the identity of those parties. We reserve the right to resign from this engagement if we believe that any of the additional parties create a conflict that would prevent us from performing the services in an objective manner. You have confirmed that you are not aware of any potential client conflicts.

**Engagement Team**

Ms. Berret is the engagement managing director for the services specified in this letter. Ms. Berret will be assisted by supporting staff experienced in performing the types of services described herein. We can also support certain technical and industry expertise requirements of the engagement with other professionals who will be identified during the course of the engagement, with your approval.

**<u>Fees, Expenses and Invoicing</u>**

The fee for the Services will be on a time and expenses basis with our fee determined by the tasks required, the related time spent, and the hourly rates prevailing at the time of the service. Ms. Berret's billing rate is $775 per hour and other rates range from $295 to $995 per hour. Our rates are adjusted periodically and we will notify you in advance of any future rate increases. If, during the course of providing Services, we identify or you disclose new information or unanticipated circumstances that introduce additional complexity, additional fees will be assessed. Additional Services will be treated as discrete professional engagements. Fees for such additional Services will be assessed based on the scope and complexity of such additional services.
In addition, you shall reimburse us for direct expenses and allocated expenses incurred in connection with the performance of the Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations, investigative reports, and other expenses specifically related to this engagement.

Invoices for services rendered and expenses incurred will be rendered to the Client. Invoices are due and payable within thirty (30) days of the invoice date. In the event that there is a disagreement with or question concerning any amount due under an invoice, such issue shall be communicated to EA Group in writing within thirty (30) days of the invoice date. Any disagreement with any amount not made known to EA Group within that period shall cause such disagreement to be waived.

<u>Cash on Account</u>

Initially, the Company will forward to us the amount of $25,000.00, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the engagement (the "<u>Initial Cash on Account</u>"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the engagement, we will refund any unused portion.

Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice. The Company agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

In the event of a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. The Application shall be accompanied by a proposed order approving the Application (the "Order"). The Order shall provide that:

a) We shall prepare, and counsel for the Company shall file, summary fee statements on a monthly basis, covering work performed for the preceding month (the "Fee Statement");

b) Absent any objections, 100% of our invoices for CRO services shall be payable after 10 days of the filing of the Fee Statement;
c) For CRO services, we shall not be subject to any orders of the Bankruptcy Court setting forth interim compensation procedures; and
d) In the event of an objection, the Fee Statement shall be scheduled for the next omnibus hearing before the Bankruptcy Court.

If any of the Company's entities becomes a debtor in one or more cases under the Bankruptcy Code, some fees, charges and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Initial Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) shall be held by us and applied against the final fee application filed and approved by the court.

**Termination of Engagement:**

EA Group's engagement ends upon the earlier of (i) delivery of the final work product for which EA Group has been engaged, (ii) where applicable, filing of the final work product for which EA Group has been engaged, or (iii) in the event no final work product is delivered or filed, the date on which the last invoice for the services was issued, not including any subsequent account payable reminder, revised bill, or other communications concerning completed services.

Client has the right to terminate EA Group's services at any time, and EA Group has the right to resign at any time, subject in either case to payment for all charges incurred to the date of termination or resignation. In the event the Client or EA Group exercise the right to terminate EA Group's services, such termination shall be in writing and shall be effective upon delivery by mail, overnight mail or email transmission. Because of the prohibitions of our profession regarding contingent fee arrangements, it is understood that in the event invoices are not paid timely, EA Group may resign from the engagement without responsibility to perform any further services and without liability for any such failure to perform. Each of the termination events in this paragraph shall each be referred to as an "Engagement Termination Event."

* * *

Please indicate acceptance of the above terms and attached Eisner Advisory Group LLC Standard Terms and Conditions of Engagement by signing and returning this letter by mail, facsimile, pdf/email or DocuSign, together with payment for the cash on account.

This engagement letter may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this engagement letter by facsimile, email in portable document format (.pdf), or by any other electronic means (including DocuSign) has the same effect as delivery of an executed original of this engagement letter.

Very truly yours,

EISNER ADVISORY GROUP LLC

Signed by:
By: Lauren Berret 98C40255E5484E8... 8/26/2026 | 8:52:14 AM EDT

Lauren P. Berret, Managing Director Date

**Accepted**:

This letter and the attached Eisner Advisory Group LLC Standard Terms and Conditions of Engagement correctly set forth the understanding of Synergy CHC Corp.

DocuSigned by:
By: Jack Ross CAE4FF7E52AA41F... 8/26/2026 | 5:49:57 AM PDT

Jack Ross, Chairman and Chief Executive Officer Date

Jack Ross

Print Name

# EISNER ADVISORY GROUP LLC
## STANDARD TERMS AND CONDITIONS OF ENGAGEMENT

**Client:** Synergy CHC Corp. ("Client")
**Engagement Letter Date:** August 26, 2026 (together with these Standard Terms and Conditions of Engagement, the "Engagement Letter")

1. **Alternative Practice Structure:** Eisner Advisory Group LLC ("EA Group") and EisnerAmper LLP practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. EisnerAmper LLP is a licensed CPA firm and EA Group is not a licensed CPA firm. EA Group has a contractual arrangement with EisnerAmper LLP, whereby EA Group provides EisnerAmper LLP with professional and support personnel and other support services to allow EisnerAmper LLP to perform its professional services. From time to time, EA Group may consult with EisnerAmper LLP in the provision of services pursuant to this Engagement Letter. Client hereby consents to EA Group sharing confidential client information with EisnerAmper LLP in support of the services to be provided by EA Group.

2. **Client Information, Privilege and Confidentiality:**
   a. As part of an alternative practice structure, EA Group agrees to comply with the AICPA Code of Professional Conduct and applicable federal, state and local rules with respect to the confidentiality of client information. EA Group will not disclose confidential client information without Client[1] consent, except that EA Group shall be permitted to disclose confidential client information (i) to any government agency or regulatory body to the extent and in the form or manner necessary or required to comply with any rule, regulation or order of such government agency or regulatory order, or (ii) pursuant to subpoena or other legal process. EA Group utilizes appropriate safeguards, policies and procedures to maintain the confidentiality of confidential client information.
   b. In the event EA Group uses third-party service providers to assist in providing professional services, EA Group may share confidential client information with those service providers. EA Group requires that such third-party service providers utilize appropriate safeguards and procedures to protect confidential client information. Client hereby consents to disclosure of its confidential client information to third-party service providers for the purpose of the third-party service provider assisting with the services provided pursuant to this Engagement Letter.
   c. EA Group is committed to protecting the confidential and personal information entrusted to it and to ensuring that its vendors comply with applicable privacy laws. By entering into this Engagement Letter, you consent to the terms and conditions of EA Group's privacy law notices and contract terms located at https://www.eisneramper.com/privacy-law-resource-center.
   d. It may be necessary for Law Firm to share theories of the matter, strategy considerations, mental impressions, conclusions and other thought processes that relate to Law Firm's legal services to the Client or that relate to or include EA Group in communications between the Law Firm and Client. Consequently, any opinions, conclusions, communications, work papers and other documents prepared by EA Group pursuant to this engagement, will be covered by the attorney-client privilege and attorney work product privilege to the extent provided by law. EA

Group further understands that if it is engaged such that one of its partners or employees shall testify as expert witnesses, then such privileges may no longer apply.

e. EA Group may use Client information provided by or on behalf of the Client to EA Group in connection with the Services set forth in this Engagement Letter ("Client Data") to provide the Services, and for internal business purposes, including for recommending additional products or services to Client, for analyzing, summarizing and developing insights based on such Client Data, and for the purpose of creating Aggregated Data. "Aggregated Data" means Client Data that EA Group has consolidated, summarized, or combined with similar data from other EA Group clients and/or with similar data purchased from industry sources. With respect to Aggregated Data created by EA Group, EA Group owns all right, title and interest in and to the Aggregated Data that EA Group creates, provided that Client shall at all times own all right, title and interest in and to the Client Data incorporated into the Aggregated Data.

All Client Data and Aggregated Data shall be maintained by EA Group on a secure database. Client Data shall be "confidential client information" in accordance with this Section 2. Notwithstanding the foregoing, EA Group may disclose Aggregated Data, masked to remove identification of any client, to third-parties, which in EA Group's sole discretion have an interest in the Aggregated Data for business purposes. Any and all such Aggregated Data shall be anonymized and de-identified before sharing with third parties, such that no third party recipient of Aggregated Data will be able to access or identify individual data points of any specific client.

3. **Representations and Warranties:** It is common for litigants to challenge the basis, experience and credentials of opposition experts. The admissibility of testimony is a legal matter, and EA Group makes no warranties that its testimony or work product will be admitted into evidence by the court or trier of fact. If EA Group's expert report and/or expert witness testimony, or any part thereof, is excluded, any and all professional fees and expenses are still due and owed upon presentation of EA Group invoice(s), and Client is not relieved of liability of such fees and expenses.

4. **Work Product**: All documents, including but not limited to work papers, written reports, memoranda, financial analysis and summaries that EA Group prepares in connection with this engagement will be maintained in accordance with EA Group's retention procedures. EA Group's document retention period for litigation and valuation services engagements is seven (7) years, subject to any Confidentiality Agreements in this matter. Client authorizes EA Group to destroy all files and documents seven (7) years after completion of this engagement or earlier if it is done so pursuant to a Confidentiality Agreement. Please note that it is not EA Group's practice to retain email correspondence, drafts, superseded work papers, schedules, reports or data files that have been updated.

5. **Employees and Subsidiaries:** EA Group may assign employees or employees of EA Group's subsidiaries and affiliates, including employees located outside the United States to work on Client's engagement, and to provide operational support services to EA Group. Client hereby consents to EA Group assigning employees and affiliated entities, including those located outside the United States to this engagement, and to EA Group transmitting Client information to such employees and affiliated entities as needed to perform the services for Client and to perform operational services.

6. **<u>No Third-Party Beneficiary:</u>** The engagement is being undertaken solely for Client's benefit and the parties do not intend to benefit or provide contractual equitable or other rights to any other person or entity.

7. **<u>Out-of-Scope Services</u>**: Any services outside the services set forth in this Engagement Letter will be a separate, new engagement. The terms and conditions of that new engagement will be governed by a new, specific Engagement Letter for that service. In the event an Engagement Letter for the out-of-scope services is not issued, each such out-of-scope service shall be a separate and new engagement performed pursuant to these Standard Terms and Conditions of Engagement and billed at our standard hourly rates.

8. **<u>Limitations of Liability and Indemnification</u>:**
   a. **<u>Limitation of Liability</u>**: EA Group's maximum liability for damages relating to the services provided pursuant to this Engagement Letter, whether the liability is based upon EA Group's negligence or otherwise, shall be limited to the fees paid for the service or work product giving rise to liability, provided that such limitation shall not apply where damages are judicially determined to have been caused by EA Group's gross negligence or willful misconduct.
   b. **<u>Special Damages:</u>** In no event shall EA Group or its personnel be liable to Client for any consequential, incidental, indirect, exemplary, punitive or special damages in connection with claims arising out of or related to this Engagement Letter or the services described herein, including any amount for loss of profit, data or goodwill, whether or not the likelihood of such loss or damage was contemplated.
   c. **<u>Indemnification</u>:** The services, work product, deliverables, advice and/or recommendations provided under this Engagement Letter are for the use and benefit of Client only. Client shall indemnify and hold harmless EA Group for any time expended, expenses (including reasonable legal fees and costs), costs and/or losses incurred in connection with any lawsuit or other legal or regulatory action or proceeding brought by a third party (including Client's affiliates, members and/or partners) involving or relating to the services under this letter, whether or not such costs and/or losses are due to the negligence of EA Group, provided that such indemnification shall not apply where such expenses or losses are judicially determined to have been caused by EA Group's gross negligence or willful misconduct.
   d. **<u>Client Representations</u>:** Because of the importance of Client's representations to the services, Client agrees to release and indemnify EA Group and its personnel from and against any liability and costs relating to EA Group's services under this letter attributable to any misrepresentations by Client.

9. **<u>Reimbursement of Expenses Related to Compliance with Subpoenas:</u>** In the event that EA Group or EisnerAmper LLP receive a subpoena or other legal process in an action or proceeding in which neither EA Group nor EisnerAmper LLP are a party (other than the litigation for which the services are rendered) that seeks testimony, documents or information related to the services provided pursuant to this Engagement Letter, Client shall reimburse EA Group for all costs and expenses (including reasonable legal fees and costs) associated with providing such testimony, documents or information, including any time expended at EA Group's then standard rates.

10. **Employment of EA Group Staff:** In the event Client hires a member of EA Group's professional staff, Client shall pay a fee equal to the annual compensation being paid to the individual by EA Group. Such fee is payable when the employee accepts the position.

11. **Statute of Limitations:** Any legal action or proceeding asserting a claim against EA Group arising out of or relating to this Engagement Letter or the services provided under this Engagement Letter shall be asserted within one (1) year from the Engagement Termination Event, as defined in the Engagement Letter.

12. **Jurisdiction, Choice of Law and Jury Waiver:**
    a. **New York Law and Jurisdiction:** The terms of this Engagement Letter and all related matters, including any dispute or claim that may arise between us related to the services provided hereunder, shall be governed by the laws of the State of New York without giving effect to choice of law principles and any legal action or proceeding related to this Engagement Letter or the services performed or to be performed pursuant hereto shall be brought in any appropriate court in the State of New York, County of New York.
    b. **Jury Waiver:** EA Group and Client, to the extent permitted by law, each knowingly, voluntarily and intentionally waive the right to a trial by jury in any action arising out of or relating to this Engagement Letter or the services to be performed by EA Group pursuant hereto. This waiver applies to any legal action or proceeding whether sounding in contract, tort, negligence or otherwise.

13. **Technology**
    a. EA Group may transmit or receive information or documents through electronic means, including through the firm's secure portal ("EA Group's Portal"). If Client will be using EA Group's Portal to transmit or receive information or documents, Client agrees that it shall at all times comply with the terms of use of EA Group's Portal and shall only permit authorized users to access or transmit information or documents through the portal. In the event that Client creates one or more user accounts to access information or documents transmitted through EA Group's Portal, Client shall notify EA Group to disable any user account for which an individual(s) is no longer authorized to access Client information transmitted through EA Group's Portal. Client is solely responsible for maintaining their books and records and should not rely on EA Group as their record-keeper or repository for any final work product for which EA Group has been engaged. Client agrees to retrieve final work product from EA Group's Portal within a reasonable period of time after the conclusion of the engagement.
    b. If Client's technology, including but not limited to collaboration sites, email systems and mailboxes, file transfer servers and requested remote access protocols including VPN, is utilized for the Services ("Client Technology"), EA Group shall have no responsibility for the confidentiality, security, integrity, or availability of documents, applications and information stored, transmitted, modified or accessed via Client Technology. Where Client provides access credentials for Client Technology, including credentials lacking multi-factor authentication, Client assumes full responsibility for the security posture of such access and any resulting exposure. EA Group shall have no liability to Client or to any third party for any expenses, costs, losses, inoperability or damages incurred as a result of the use of Client Technology

("Technology Losses"), and Client shall defend, indemnify, and hold harmless EA Group for any Technology Losses incurred in connection with EA Group's use of Client Technology. EA Group shall not have any administrative rights or auditing capability with respect to Client Technology, and shall not utilize Client Technology or have the right to access Client Technology for any purpose other than to provide the Services. EA Group reserves the right to decline to use Client Technology in its sole discretion.

c. Any recordings, transcripts, AI-generated notes or any similar outputs created in connection with the Services provided hereunder are EA Group proprietary information, do not constitute EA Group work product or deliverables, and may not be relied upon as advice, guidance, or a substitute for any final deliverables to be delivered in accordance with this Engagement Letter.

**14. <u>Miscellaneous:</u>**

a. The Engagement Letter and these Standard Terms and Conditions of Engagement shall not be amended, unless in writing and signed by authorized representatives of all parties.

b. The Engagement Letter and these Standard Terms and Conditions of Engagement contain the full and complete understanding of EA Group and Client with respect to the subject matter and services described in the Engagement Letter and supersede all prior representations, agreements, contracts, and understandings concerning such subject matter and services, whether they be oral or written, including but not limited to any prior non-disclosure agreements.

c. The signatories to the Engagement Letter represent and warrant that such person is lawfully authorized and empowered to execute the Engagement Letter on behalf of the party on whose behalf such person is signing, and that upon execution, the Engagement Letter will be binding upon such party, without any further approval, ratification, or other action.

d. Any provision of this Engagement Letter and these Standard Terms and Conditions of Engagement which is prohibited or unenforceable in any jurisdiction shall be so only as to such jurisdiction and only to the extent of such prohibition or unenforceability, but all the remaining provisions of this Engagement Letter shall remain valid and enforceable.

e. Provisions of this Engagement Letter and the attached Standard Terms and Conditions that by their nature are intended to survive termination shall so survive, including but not limited to the indemnification and limitation of liability obligations herein.

**15. <u>Allinial Global and EisnerAmper Global Ltd:</u>** EA Group is a member firm of EisnerAmper Global Ltd., a network of legally independent firms. EA Group is also a member firm of Allinial Global, an association of legally independent accounting and consulting firms. EisnerAmper Global Ltd., Allinial Global, and their respective member firms and correspondent firms are not responsible for and do not accept liability for the work or advice which EA Group provides to its clients and do not owe any duty in relation to the work or advice which EA Group provides.

docusign

## Certificate Of Completion

Envelope Id: 6E8F4320-8E34-8F52-8215-978317DEA601 Status: Completed

Subject: Complete with Docusign: Synergy CHC Corp - EisnerAmper CRO Engagement Letter

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 12 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | DelMarie Rodriguez |
| AutoNav: Enabled | | 111 Wood Avenue South |
| EnvelopeId Stamping: Enabled | | Iselin, NJ 08830-2700 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | delmarie.rodriguez@eisneramper.com |
| | | IP Address: 165.225.222.172 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>8/26/2026 8:39:42 AM | Holder: DelMarie Rodriguez<br>delmarie.rodriguez@eisneramper.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jack Ross<br>jack@synergychc.com<br>ceo<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Jack Ross<br>CAE4FF7E52AA41F...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 24.215.66.168 | Sent: 8/26/2026 8:42:02 AM<br>Viewed: 8/26/2026 8:44:37 AM<br>Signed: 8/26/2026 8:49:57 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 8/26/2026 8:44:37 AM
ID: c08f687d-2787-4c20-a74d-7e18ddfd5a59
Company Name: EisnerAmper LLP

| | | |
|---|---|---|
| Lauren Berret<br>lauren.berret@eisneramper.com<br>Security Level: Email, Account Authentication (None) | Signed by:<br>Lauren Berret<br>98C40255E5484E8...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 136.226.48.177 | Sent: 8/26/2026 8:42:02 AM<br>Viewed: 8/26/2026 8:51:37 AM<br>Signed: 8/26/2026 8:52:14 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 8/26/2026 8:51:37 AM
ID: 2d6bb827-c60c-4a73-9f19-e145a45ae4bf
Company Name: EisnerAmper LLP

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/26/2026 8:42:02 AM |
| Certified Delivered | Security Checked | 8/26/2026 8:51:37 AM |
| Signing Complete | Security Checked | 8/26/2026 8:52:14 AM |
| Completed | Security Checked | 8/26/2026 8:52:14 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Eisner Advisory Group LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Eisner Advisory Group LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: helpdesk@eisneramper.com

**To advise Eisner Advisory Group LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at helpdesk@eisneramper.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Eisner Advisory Group LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to helpdesk@eisneramper.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Eisner Advisory Group LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to helpdesk@eisneramper.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Eisner Advisory Group LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Eisner Advisory Group LLC during the course of your relationship with Eisner Advisory Group LLC.