**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered)<br><br>**Hearing Date: Dec. 3, 2024 at 11:00 a.m. (ET)**<br>**Obj. Deadline: Nov. 26, 2024 at 4:00 p.m. (ET)** |

# DEBTORS' APPLICATION FOR AN ORDER (I) AUTHORIZING DEBTORS TO RETAIN ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this application (this "Application"):

## RELIEF REQUESTED

1. The Debtors seek entry of the proposed order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), granting, among other things, the following relief:

   a. authorizing the Debtors to retain and employ Ankura Consulting Group, LLC ("Ankura") as their restructuring advisor and designate John Shepherd as their Chief Restructuring Officer (the "CRO") in connection with the above chapter 11

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

cases (collectively, the "Chapter 11 Cases"), effective as of the Petition Date (as defined below) and utilize other supporting Ankura personnel as needed;

b. approving the engagement pursuant to the terms of the engagement letter dated August 6, 2024 (the "Engagement Letter"), a true and correct copy which is attached hereto as **Exhibit B**; and

c. granting related relief.

In support of this Application, the Debtors rely upon the declaration of John Shepherd attached hereto as **Exhibit C** (the "Shepherd Declaration").

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory and legal bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Local Rule 2016-2(h).

## BACKGROUND

5. The Debtors own a portfolio of operating solar projects and projects in various stages of development in North America. The Debtors deliver distributed energy and long-term renewable energy solutions to local communities. The Debtors' objective is to provide the economic and environmental benefits of solar power, working closely with landowners, municipalities, utilities, and local communities.

6. On November 6, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

7. Additional information regarding the Debtors' businesses, capital structures, and circumstances preceding the Petition Date may be found in the *Declaration of John Shepherd in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "First Day Declaration").

## RELEVANT INFORMATION

### A. Qualifications

8. Since 2016, Ankura has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. Ankura's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position. Ankura's expertise relevant to the Chapter 11 Cases includes: (a) turnaround and restructuring consulting; (b) interim management, including serving in executive and other managerial roles; (c) managing communications with

lenders, board members, employees, investors, and creditor constituencies, (d) cash management and liquidity enhancement, (e) financial modeling and forecasting, (f) operational oversight and improvement, (g) strategic business plan development, (h) customer and vendor management; and (i) bankruptcy services, including contingency planning, preparing schedules and statements, preference analysis, claims resolution, and executory contract analysis.

9. In addition, Ankura and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings and liquidations, both out of court and in chapter 11 cases. Ankura and its professionals have provided restructuring or crisis management services in numerous bankruptcy cases, including: *In re Amyris*, *Inc. et al*, No. 23-11131 (TMH) (Bankr, D. Del. 2023); *In re FB Debt Financing Guarantor, LLC et al*, No. 23-10025 (KBO) (Bankr, D. Del. 2023); *In re Country Fresh Holding Co.*, No. 21-30574 (MI) (Bankr. S.D. Tex. Mar. 31, 2021); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. 2020); *In re Brooks Brothers Grp., Inc.*, No. 20–11785 (CSS) (Bankr. D. Del. 2020); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 19, 2020); *In re Elk Petroleum, Inc.*, No. 19- 11157 (LSS) (Bankr. D. Del. 2019); In re MTE Holdings LLC, No. 19-12269 (CTG) (Bankr. D. Del. 2019); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Dec. 18, 2019); *In re Emerge Energy Services LP*, No. 19-11563 (KBO) (Bankr. D. Del. Dec. 18, 2019); *In re Fallbrook Techs. Inc.*, No. 18-10384 (MFW) (Bankr. D. Del. Feb. 26, 2018); *In re Payless Holdings LLC*, No. 19- 40883-659 (Bankr. E.D. Mo. Feb. 18, 2019); *In re Model Reorg Acquisition, LLC*, No. 17-11794 (CSS) (Bankr. D. Del. 2017); In re Last Call Guarantor, LLC, No. 16-11844 (KG) (Bankr. D. Del. Sept. 2, 2016); In re SynCardia Systems, Inc., No. 16-11599 (MFW) (Bankr. D. Del. Aug. 1, 2016); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 11, 2016); *In re C. Wonder LLC*, No. 16-11127 (MBK) (Bankr. D.N.J. Jan. 28,

2015); *In re The SCOOTER Store Holdings, Inc.*, No. 13-10904 (PJW) (Bankr. D. Del. April 15, 2013); *In re Vivaro Corp.*, No. 12-13810 (MG) (Bankr. S.D.N.Y. Sept. 5, 2012); *In re Am. Commercial Lines LLC*, No. 03-90305 (Bankr. S.D. Ind. 2003).

10. As set forth in the Engagement Letter, Ankura has made Mr. Shepherd available to serve as CRO to the Debtors and has made additional individuals available who will provide various other critical management services to the Debtors (the "Engagement Personnel").

11. Since August 6, 2024, Mr. Shepherd has served as the Debtors' Chief Restructuring Officer. Mr. Shepherd has more than 30 years' worth of experience in energy private equity, corporate finance, strategy, corporate development, mergers and acquisitions and corporate restructuring. Currently, Mr. Shepherd is a Senior Managing Director in the Turnaround and Restructuring group at Ankura. He has held numerous senior positions and served on the board of directors for several energy companies. Throughout his career, Mr. Shepherd has garnered significant transactional, advisory and management experience spanning the full spectrum of the energy industry, including oil and gas upstream, energy infrastructure, oilfield services, power and renewable energy.

12. Ankura has significant relevant experience and expertise regarding the Debtors, their operations, and the unique circumstances of the Chapter 11 Cases. Ankura is well- qualified to deal effectively and efficiently with matters that may arise in the context of the Chapter 11 Cases. Ankura has advised the Debtors that it will endeavor to coordinate with the other professionals retained in the Chapter 11 Cases to eliminate unnecessary duplication of work. Accordingly, the Debtors submit that the retention of Ankura and the designation of Mr. Shepherd as CRO on the terms and conditions set forth herein is necessary and appropriate, is in the best interests of the Debtors' estates, creditors, and all other parties in interest, and should be granted.

Case 24-11552-LKG Document 75-4 Filed 11/10/24 Page 6 of 16

**B. Services to Be Provided**

13. As stated above, under the Engagement Letter, Ankura has assigned Mr. Shepherd to serve as the Debtors' CRO and has assigned Engagement Personnel to perform other services set forth in the Engagement Letter. The terms and conditions of the Engagement Letter were negotiated between the Debtors and Ankura and reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement. Subject to the Court's approval, the Debtors anticipate that Ankura will perform the following services (collectively, the "Services"), among others, pursuant to the terms and provisions of the Engagement Letter, as necessary and appropriate, and as mutually agreed upon by Ankura and the Debtors[2]:

a. Provide John Shepherd as Chief Restructuring Officer and other professionals as needed to support the scope of services;

b. Perform general due diligence on the Debtors in order to gain an understanding of the Debtors, capital structure, contractual commitments and current situation;

c. Review and modify the Debtors existing cash management systems and cash flow forecasts, including updating or refining the cash flow forecasts as needed, consistent with the reporting requirements;

d. Assist Debtors in producing financial analyses and reporting for the lenders and other constituents;

e. Report to the Independent Manager of the Debtors and work closely with the Independent Manager in conducting Ankura's scope of services;

f. Review the Debtors existing business plans and financial forecasts and to the extent necessary, assist in updating or refining the plans and forecasts to take into account various scenarios to pressure test the plan;

g. Assist the Debtors in developing, evaluating and executing various restructuring strategies, including assisting with negotiation with creditors and other constituents, as requested;

---

[2] The summaries of the Engagement Letter contained in this Application are provided for purposes of convenience only. In the event of any inconsistency between the summaries contained herein and the terms and provisions of the Engagement Letter, the terms of the Engagement Letter shall control.

h. Assist the Debtors in contingency planning and preparations, as may be requested by the Debtors;

i. Assist the Debtors in the administration of its Chapter 11 Cases, including DIP financing and chapter 11 reporting, vendor analysis and negotiations, witness testimony, and other transition service workstreams, as may be requested by the Debtors;

j. Assist and prepare the Debtors for asset sales pursuant to section 363 of the Bankruptcy Code or other sale process as requested by Debtors; and

k. Perform such other professional services as may be requested by the Debtors and agreed to by Ankura in writing.

14. These Services are necessary to the Debtors' efforts to conduct a value-maximizing sale process. When necessary, the individuals working on this matter will be assisted by or replaced by various professionals at various levels.

15. The Services provided by Ankura will complement, and not duplicate, the services to be rendered by any other professional retained in these Chapter 11 Cases.

**C. <u>Professional Compensation</u>**

16. Mr. Shepherd's monthly fixed fee for the role of CRO is $100,000, as provided for in the Engagement Letter.

17. Ankura's hourly rates vary with the experience and seniority of the individuals assigned. Ankura's current standard hourly rates for the advisors who are expected to be providing services to the Debtors are set forth below. Ankura adjusts its rates periodically, typically on January 1 of each year. The Ankura hourly rates are as follows[3]:

[3] To the extent there is any inconsistency between the summary of the Fee and Expense Structure set forth in this Application and the Fee and Expense Structure as set forth in the Engagement Letter, the terms of the Engagement Letter shall control.

| Professional Level | Rates Per Hour |
|---|---|
| Senior Managing Director | $1,205 – $1,350 |
| Managing Director | $1,000 – $1,120 |
| Director/Senior Director | $685 – $945 |
| Associate/Senior Associate | $460 – $630 |
| Paraprofessionals | $360 – $415 |

18. In addition, the Debtors propose to reimburse Ankura for all of Ankura's reasonable out-of-pocket and direct expenses incurred in connection with the Services to be provided under the Engagement Letter (including for Ankura's reasonable out-of-pocket fees and expenses for outside legal counsel and other third-party advisors) incurred in connection with the Engagement Letter. All fees and expenses will be billed on a monthly basis.

19. The Debtors submit that the fee and expense structure is reasonable, market-based, and designed to compensate Ankura fairly for its work and to cover fixed and routine overhead expenses. The fee and expense structure appropriately reflects the nature of the services to be provided by Ankura and the fee structures typically utilized by leading financial advisory firms of similar stature to Ankura for comparable engagements, with respect to both in- and out-of-court restructurings. The fee and expense structure is consistent with Ankura's normal and customary billing practices for cases of this size and complexity and that require the level and scope of services outlined herein.

20. For the 90 days prior to the Petition Date, Ankura received payments and advances in the aggregate amount of $825,202.38 for professional services performed and to be performed, including services related to the commencement and administration of these Chapter 11 Cases. In addition, Ankura has a credit balance in favor of the Debtors for professional services performed and to be performed, and expenses incurred and to be incurred, in connection with these Chapter 11 Cases in the amount of approximately $32,200 (the "Retainer"). Ankura intends to apply the

Retainer, or add to the retainer, any outstanding amounts or unused advances, relating to the period prior to the Petition Date. Ankura intends to retain the revised balance of the Retainer on account for services rendered and expenses incurred, subsequent to the Petition Date. All invoices for prepetition services have been paid in full or will be satisfied by the remaining Retainer. Accordingly, as of the Petition Date, Ankura does not hold any prepetition claim against the Debtors for fees or expenses.

**D. Reporting Requirements**

21. If the Court grants the relief requested herein, Ankura will be employed in these Chapter 11 Cases pursuant to section 363 of the Bankruptcy Code. Because Ankura is not being employed as a professional under section 327 of the Bankruptcy Code, Ankura shall not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. However, to maintain transparency and to comply with the U.S. Trustee's protocol applicable to the retention of personnel under section 363 of the Bankruptcy Code (sometimes referred to as the "J. Alix Protocol"), Ankura will file reports of compensation earned and expenses incurred on a monthly basis (each a "Monthly Staffing Report," and collectively, the "Monthly Staffing Reports") with the Court and provide notice to the United States Trustee for the District of Delaware ("U.S. Trustee"), counsel to the DIP Lender (as defined in the First Day Declaration), and counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee", and collectively, the "Notice Parties"). Such reports will (a) summarize the services provided to the Debtors by discrete task, (b) summarize the compensation earned by each of the Ankura personnel, (c) identify the daily time expended by Ankura personnel, by discrete task, reported in tenth of an hour increments, and (d) itemize the expenses incurred. Notice for the

Case 24-12574-KBO Document 735-4 Filed 11/12/24 Page 10 of 16

Monthly Staffing Reports will provide for a time period of at least fourteen (14) days for objections by parties in interest.

22. Monthly Staffing Reports shall be due no later than twenty (20) days after the end of a month with the first Monthly Staffing Report, covering the period from the Petition Date through October 31, 2024, due on or before November 20, 2024. This procedure shall continue for any subsequent Monthly Staffing Reports. In the event that a party in interest objects to a Monthly Staffing Report, Ankura's fees and expenses shall be subject to review by this Court.

**E. Duplication of Services**

23. Ankura is aware that the Debtors seek to retain Sidley Austin LLP as their bankruptcy counsel, Young Conaway Stargatt & Taylor, LLP as their local bankruptcy counsel, Agentis Capital Advisors and SenaHill Securities, LLC, as their investment bankers, and Kroll Restructuring Administration LLC, as their administrative agent, and that the Debtors may retain additional professionals during the term of the engagement. Ankura will work cooperatively with, and not duplicate the services of, the other professionals in order to integrate any respective work performed by Ankura on behalf of the Debtors with the work performed by the other professionals

**F. Indemnification[4]**

23. The Engagement Letter contains standard indemnification language with respect to Ankura's services including, without limitation, an agreement by the Debtors to indemnify Ankura and its affiliates and their respective directors, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (each, an "Indemnified Person"), from and against any losses, claims, damages,

[4] This section is intended to be summary in nature. Parties are directed to the Engagement Letter for the full terms of the Debtors' indemnification obligations. In the case of any conflict between this Application and the Engagement Letter, the Engagement Letter shall control.

judgments, assessments, costs and other liabilities and will reimburse each Indemnified Person for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party, in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Engagement Letter or any Indemnified Persons' actions or inactions in connection with any such Services. The Debtors are not responsible for any of the foregoing to the extent that they are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review, to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct in connection with any of the Services. In the event that any indemnification claim is brought by Ankura against the Debtors during or as a result of these bankruptcy cases, Ankura will seek approval of any such claim in this Court.

24. The terms of the Indemnification Provisions were fully negotiated between the Debtors and Ankura at arm's length and the Debtors respectfully submit that the Indemnification Provisions are reasonable and appropriate. Ankura and the Debtors believe that the indemnity provisions are comparable to those indemnification provisions generally obtained in comparable engagements, both in and out of court. Accordingly, as part of this Application, the Debtors request that this Court approve the Indemnification Agreement.

**G. <u>Ankura's Connections with the Debtors</u>**

25. To the best of the Debtors' knowledge, information, and belief, Ankura does not have any connection with or any interest adverse to the Debtors, their significant creditors, or any other significant party in interest known to Ankura, or their respective attorneys and

Case 24-12574-KBO Document 735-4 Filed 11/12/24 Page 12 of 16

accountants, except as may be set forth in the Shepherd Declaration. Although the Debtors submit that the retention of Ankura is not governed by section 327 of the Bankruptcy Code, the Debtors attach the Shepherd Declaration, which discloses, among other things, any relationship that Ankura has with the Debtors, their significant creditors, or other significant parties in interest known to Ankura. Based on the disclosures set forth in the Shepherd Declaration, the Debtors do not believe that Ankura has any conflict of interest or a material adverse interest to the Debtors.

**BASIS FOR RELIEF REQUESTED**

26. The Debtors request authority to retain Ankura under the terms of the Engagement Letter pursuant to section 363 of the Bankruptcy Code, which provides in pertinent part that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b). Courts interpreting section 363(b) have held that transactions should be approved pursuant to such provision where, as here, they are supported by management's sound business judgment. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.2d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit had adopted the "sound business purpose" test for section 363(b)).

27. Under the business judgment rule, a court will not interfere with the judgment of a board of directors unless there is a showing of "gross and palpable overreaching." *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002) ("under the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' and a

court 'will not substitute its own notions of what is or is not sound business judgment'") (*citing Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 719–20 (Del. 1971)).

28. The retention of corporate officers is proper under section 363 of the Bankruptcy Code. Courts recognize the applicability of section 363(b) of the Bankruptcy Code to the use of estate property to compensate individuals employed outside the ordinary course of business. *See In re First Int'l Services Corp.*, 25 B.R. 66, 69 (Bankr. D. Conn. 1982). Indeed, courts have relied upon section 363(b) as the basis upon which to employ and compensate professionals to serve as officers or other management-level personnel employed by the debtors. *See, e.g.*, *In re Spansion Inc.*, Case No. 0-10690 (KJC) (Bankr. D. Del. Apr. 13, 2009); *In re Verasun Energy Corp.*, Case No. 08-12687 (PJW) (Bankr. D. Del. Dec. 17, 2008); *In re WorldSpace, Inc.*, Case No. 08-12412 (KJC) (Bankr. D. Del. Nov. 10. 2008); *In re Hines Horticulture, Inc.*, Case No. 08-11922 (KJC) (Bankr. D. Del. October 2, 2008).

29. The Debtors submit that the retention and employment of Ankura is a sound exercise of their business judgment pursuant to section 363 of the Bankruptcy Code, as Ankura's services are necessary and essential to the Debtors' Chapter 11 Cases. In addition to the specific knowledge Mr. Shepherd and the Engagement Personnel have acquired about the Debtors' business, Mr. Shepherd and the Engagement Personnel also have extensive experience providing restructuring services to distressed companies. In essence, the Debtors are seeking to continue to employ Ankura to advise and guide them through challenging times and to assist with the prosecution of these Chapter 11 Cases. Moreover, numerous bankruptcy courts in this district have analyzed the propriety of a debtor's employment of corporate restructuring officers, advisors, and professionals under section 363 of the Bankruptcy Code on numerous occasions and have

determined it is an appropriate exercise of the debtor's business judgment to employ a restructuring professional in this manner

30. Denying the relief requested herein would deprive the Debtors of the assistance of a highly qualified CRO and disadvantage the Debtors and all parties-in-interest. Indeed, the Debtors would be forced to engage a new chief restructuring officer and new restructuring personnel who lack a thorough understanding of the Debtors' business and the turnaround and restructuring strategy the Debtors implemented prior to the Petition Date. Further, hiring a new chief restructuring officer and new restructuring personnel would involve a steep learning curve, significant time, and additional resources—all of which are in short supply given the brief timeframe within which the Debtors seek to effect a sale of their assets, as described in the First Day Declaration. Accordingly, the Debtors respectfully submit that the services provided by Ankura, Mr. Shepherd and additional restructuring personnel are critical to the Chapter 11 Cases and request that the Court approve the Engagement Letter in substantially the form attached hereto

31. The Debtors have determined, in the exercise of their business judgment, that the fee structure set forth in the Engagement Letter appropriately reflects the nature of the services to be provided by Ankura, contains reasonable terms and conditions of employment, and should be approved under section 363 of the Bankruptcy Code. Additionally, the Debtors submit that the employment of Ankura as CRO is consistent with the "J. Alix Protocol" established by the U.S. Trustee.

**NOTICE**

32. Notice of this Application has been given to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) GDEV OYA Lender I, LLC, in its capacity as administrative agent and collateral agent; and (d) any party that has requested notice

pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: November 12, 2024
Wilmington, Delaware

*/s/ Rebecca L. Lamb*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
emorton@ycst.com
kenos@ycst.com
rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (admitted *pro hac vice*)
Maegan Quejada (admitted *pro hac vice*)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

Nathan C. Elner (admitted *pro hac vice*)
Chelsea M. McManus (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
Email: nelner@sidley.com
cmcmanus@sidley.com

Ian C. Ferrell (admitted *pro hac vice*)
Hayden Ross Golemon (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: iferrell@sidley.com
hgolemon@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered)<br><br>**Hearing Date: Dec. 3, 2024 at 11:00 a.m. (ET)**<br>**Obj. Deadline: Nov. 26, 2024 at 4:00 p.m. (ET)** |

**NOTICE OF APPLICATION**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") have filed the *Debtors' Application for an Order (I) Authorizing Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief* (the "Application") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Application must be filed on or before **November 26, 2024 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801. At the same time, copies of any responses or objections must be served upon the undersigned proposed counsel to the Debtors so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER APPROVAL OF THE APPLICATION IS SCHEDULED FOR **DECEMBER 3, 2024 AT 11:00 A.M. (ET)** BEFORE THE HONORABLE KAREN B. OWENS, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 6TH FLOOR, COURTROOM NO. 3, WILMINGTON, DELAWARE 19801.

**PLEASE TAKE FURTHER NOTICE** THAT IF NO OBJECTIONS OR RESPONSES TO THE APPLICATION ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED THEREIN WITHOUT FURTHER NOTICE OR HEARING.

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

Dated: November 12, 2024
Wilmington, Delaware

*/s/ Rebecca L. Lamb*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
emorton@ycst.com
kenos@ycst.com
rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (admitted *pro hac vice*)
Maegan Quejada (admitted *pro hac vice*)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

Nathan C. Elner (admitted *pro hac vice*)
Chelsea M. McManus (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
Email: nelner@sidley.com
cmcmanus@sidley.com

Ian C. Ferrell (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered)<br><br>**Ref. Docket No.** |

**ORDER (I) AUTHORIZING DEBTORS TO RETAIN ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE, AND (II) GRANTING RELATED RELIEF**

Upon consideration of the application (the "Application")[2] of the Debtors as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order authorizing the Debtors to retain and employ Ankura Consulting Group, LLC ("**Ankura**") effective as of the Petition Date to provide the Debtors with a Chief Restructuring Officer ("**CRO**") and other additional personnel (the "**Engagement Personnel**" and together, the "**Ankura Professionals**"), all as more fully set forth in the Application; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), and the Amended Standing Order of Reference from the United

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Application.

States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and this Court having held a hearing to consider the relief requested in the Application (the "Hearing"), if necessary; and upon the Shepherd Declaration; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and it appearing that the relief requested in the Application is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1. The Application is granted effective as of the Petition Date as modified herein.

2. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors are hereby authorized to retain Ankura to provide the Debtors with John Shepherd as CRO and the Engagement Personnel, in each case effective as of the Petition Date, on the terms set forth in the Application and the Engagement Letter, except as modified herein.

3. The terms of the Engagement Letter, including without limitation, the fee provisions and the indemnification provisions, as modified by this Order, are reasonable terms and conditions of employment and are hereby approved; subject to the following terms, which apply notwithstanding anything in the Engagement Letter or the Application to the contrary:

a. Ankura and its controlled affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor, claims agent/claims

administrator, or investor/acquirer) in connection with these Chapter 11 Cases;

b. In the event the Debtors seek to have the Ankura Professionals assume executive officer positions that are different than the positions disclosed in the Application, or to materially change the terms of the engagement by (i) either modifying the functions of personnel, (ii) adding new personnel, or (iii) altering or expanding the scope of the engagement, a application to modify the retention shall be filed;

c. Ankura shall file with the Court, and provide copies to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and any statutory committee appointed in these cases, a report of staffing on the engagement for the previous month. Such report shall include the names and functions filled of the individuals assigned. All staffing shall be subject to review by the Court in the event an objection is filed;

d. Ankura shall file with the Court, and provide copies to the U.S. Trustee and any statutory committee appointed in these cases, reports of compensation earned and expenses incurred on a monthly basis. Such reports shall contain summary charts, which describe the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred. Time records shall (i) be appended to the reports, (ii) contain a breakdown of hours worked, by individual, and rates charged according to defined project categories, and (iii) be organized by project category. Where personnel are providing services at an hourly rate, the time entries shall identify the time spent daily completing work efforts by project code in one-tenth (.10) of an hour increments and the corresponding charge (time multiplied by hourly rate) for each project. Parties in interest shall have fourteen (14) days after the date each report is served to object to such report. In the event an objection is raised and not consensually resolved, the portion of the staffing report to which an objection is raised shall be subject to review by the Court. No payments shall be made to Ankura until the objection period has passed, and in the event an objection is raised, no payment shall be made to Ankura on account of the portion of such staffing report to which an objection is raised until such objection is resolved;

e. No principal, employees or independent contractor of Ankura and its controlled affiliates shall serve as a director of any of the Debtors during the pendency of these Chapter 11 Cases;

f. The Debtors are permitted to indemnify those persons acting as executive officers as well as other restructuring personnel on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, in addition to insurance coverage under the Debtors' director and officer insurance policies;

g. Success fees, transaction fees, or other back-end fees shall be approved by the Court at the conclusion of these Chapter 11 Cases on a reasonableness standard and are not being pre-approved by entry of this Order. No success fee, transaction fee, or back-end fee shall be sought upon conversion of these Chapter 11 Cases, dismissal of these Chapter 11 Cases for cause, or appointment of a trustee;

h. For a period of three years after the conclusion of Ankura's engagement, neither Ankura nor any of its controlled affiliates shall make any investments in the Debtors or, if applicable, the reorganized Debtors;

i. Ankura shall disclose any and all facts that may have a bearing on whether Ankura, its controlled affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest. If any new parties-in-interest are provided to Ankura and in connection therewith, Ankura discovers new material relevant facts or relationships, Ankura will promptly file a supplemental declaration;

j. Any independent contractor or affiliate of Ankura employed in connection with the engagement shall disclose any and all facts that may have a bearing on whether such independent contractor or affiliate of Ankura, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest. The obligation to disclose identified in this subparagraph is a continuing obligation.

k. Further, Ankura shall be deemed to have waived, and shall not raise or assert any defense, based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of this Court or (if the reference is withdrawn) the District Court for the District of Delaware to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to Ankura's engagement in this case; and

l. Ankura shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.

4. Ankura is authorized to apply the Retainer to satisfy any unbilled or other remaining prepetition fees and expenses that Ankura becomes aware of during its ordinary course billing review and reconciliation.

5. In the event that, during the pendency of these Chapter 11 Cases, Ankura seeks reimbursement for any attorneys' fees and/or expenses, the invoices and supporting time

records from such attorneys shall be included in Ankura's reports of compensation earned and expenses incurred, and such attorney's invoices and time records shall be in compliance with Rule 2016- 2(f) of the Local Rules of this Court, and shall be subject to the U.S. Trustee Guidelines and approval of the Bankruptcy Court under the standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that Ankura shall not seek reimbursement of any fees incurred defending any of Ankura's reports of compensation earned and expenses incurred in these Chapter 11 Cases.

6. To the extent there is inconsistency between the terms of the Engagement Letter, the Application, the Shepherd Declaration, and this Order, the terms of this Order shall govern.

7. The Debtors are authorized to take all action necessary to the relief granted in this Order.

8. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**<u>Exhibit B</u>**

**Engagement Letter**

ankura

Confidential

April 17, 2024

OYA Renewables Development LLC
OYA Renewables Construction and Yield Holdings LLC
OYA Renewables EquipmentCo LLC

Re: Retention of a Board Member

Dear Mr. Millard:

This letter agreement (this "Agreement"), entered into as of April 17, 2024 (the "Effective Date"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("Ankura") and OYA Renewables Development LLC ("ORD"), OYA Renewables Construction and Yield Holdings LLC ("ORCYH") and OYA Renewables EquipmentCo LLC ("ORE" and, together with ORD and ORCYH, collectively, the "Companies" and each, a "Company") pursuant to which Ankura has been engaged by each Company to act as an independent member of each Company's board of directors (collectively, the "Boards" and each a "Board").

1. Scope of Engagement: On the terms and subject to the conditions of this Agreement, Ankura will provide to the Companies the following Services (the "Services"), as requested by each Company and agreed to by Ankura:

A. Provide John Shepherd to serve as an independent manager of each Company ("Board Member");
B. Provide Ankura professional resources, as needed, to support John Shepherd in the performance of his role as a Board Member ("Engagement Personnel"); and
C. Perform such other professional services as may be requested by the Companies and agreed to by Ankura in writing.

The Services and compensation arrangements set forth herein do not encompass other services not set forth in this Section 1. If the Companies and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

Notwithstanding anything to the contrary in this Agreement, each Company agrees that the Board Member shall be authorized, in such capacity, to make decisions with respect to all aspects of each Company appropriate for a Board Member and consistent with each Company's organizational documents.

2. Fees and Expenses: For Ankura's Services hereunder, ORD and ORCYH agree to pay to Ankura the following non-refundable fee (the "Fee"):

A. Board Member Fee: a monthly fee for the Board Member in the amount of $62,500 (the "Board Member Fee");

Confidential

B. Advisory Fees: Our fees for the Services set forth above for the Engagement Personnel (the "Advisory Fees") will be based on the actual hours expended at our standard hourly rates that are in effect when the Services are rendered. Our rates are typically revised annually. Our current hourly rates are as follows:

| US RATES | | |
|---|---|---|
| **Title** | **2024 - RATE RANGE** | |
| Senior Managing Director | $ 1,205 | $ 1,350 |
| Managing Director | $ 1,000 | $ 1,120 |
| Senior Director | $ 820 | $ 945 |
| Director | $ 685 | $ 790 |
| Senior Associate | $ 560 | $ 630 |
| Associate | $ 460 | $ 520 |
| Paraprofessional | $ 360 | $ 415 |

C. Expense Reimbursement: Ankura shall be entitled to reimbursement of reasonable out-of-pocket and direct expenses (not to exceed $5,000 in any calendar month without the written consent of GDEV OYA Lender I, LLC) incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable out-of-pocket fees and expenses for outside legal counsel and other third-party advisors), including the negotiation and performance of this Agreement and the matters contemplated hereby (collectively, "Expenses").

D. Testimony; Subpoena Requests. If Ankura is requested or required to appear as a witness in any action that is brought by, on behalf of, or against any of the Companies or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, ORD and ORCYH agree to (i) compensate Ankura for its associated time charges at our regular rates in effect at the time and (ii) reimburse Ankura for all reasonable, documented, actual out-of-pocket expenses incurred by Ankura in connection with such appearance or preparing to appear as a witness, including without limitation, the fees and disbursements of legal counsel of Ankura's choosing. In addition, Ankura will be compensated and reimbursed for any time and reasonable expense (including without limitation, fees and expenses of legal counsel of Ankura'schoosing) that Ankura may incur in considering or responding to discovery requests or other formal information requests for documents or information made in connection with any action or in connection with the Services.

3. Retainer

A. In connection with the foregoing, it is Ankura's policy to receive an advance retainer for the Fees and Expenses. Upon execution of this Agreement, ORD and ORCYH shall provide Ankura with such retainer in the amount of $62,500 (the "Retainer"), which shall be credited against any Fees and Expenses payable to Ankura hereunder, and ORD and ORCYH agree to replenish the Retainer upon the request of Ankura. ORD and ORCYH understand and acknowledge that any Retainer becomes the property of Ankura when it is earned and neither ORD nor ORCYH no longer has a property interest in any Retainer upon Ankura's earning of the Retainer, any Retainer will be placed

in Ankura's general account and will not be held in a client trust account, and ORD and ORCYH will not earn any interest on any Retainer; *provided, however*, that at the conclusion of the Services, if the amount of any Retainer held by Ankura is in excess of the amount of Ankura's outstanding and estimated Fees and Expenses, any such excess Retainer amount will be returned to ORD and ORCYH.

B. If any of the Companies file a petition or any proceedings are commenced against such entities under Title 11 of the United States Code (the "Bankruptcy Code"), some Fees and Expenses (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Retainer will be applied to any such unpaid pre-petition Fees and Expenses. Ankura will hold any portion of the Retainer not otherwise properly applied for payment of any such unpaid pre-filing Fees and Expenses (whether or not billed) to be applied to Ankura's final invoice.

4. Invoices and Payment: The obligations of ORD and ORCYH under this Agreement shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of ORD and ORCYH. Prior to commencing any proceedings under any insolvency regime, ORD and ORCYH shall pay all invoiced amounts, whether for Fees or Expenses or otherwise, to Ankura by wire transfer of immediately available funds. In the event that ORD and ORCYH does not pay Ankura's invoices in accordance with the terms hereof, Ankura has the discretion to (i) terminate or suspend the engagement and the performance of Services, and (ii) deduct any outstanding amounts owed from the Retainer. Under these circumstances, ORD and ORCYH will also be responsible for any reasonable costs, including legal fees, associated with the collection of outstanding and overdue fees and expenses. ORD and ORCYH agree that it will pay the full amount of any invoices in accordance with the terms hereof regardless of any deduction that it is required by law to make. Ankura will pay any local, state or federal income taxes due and payable by Ankura relating to the Services.

5. Term of Agreement: If any one of the Companies on the one hand and Annkura on the other hand desires to terminate its relationship with the other or the engagement, it may do so at any time for any reason by giving written notice to the other party. In such event, Ankura will be paid for amounts owed through the termination date. Any one of the Companies may terminate Ankura without the other Companies terminating Ankura; *provided*, that if both ORD and ORCYH terminate Ankura, Ankura will be automatically terminated by ORE.

6. Nature of Services; Use of Advice:

A. The Services, including the deliverables and reports, are provided solely for your use for the purposes set forth herein. You may not disclose or discuss the Services or any deliverable or report to anyone else (other than GDEV OYA Lender I, LLC and CVI CEF Master Fund I LP and their respective affiliates and their respective directors, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors, in each case that have a need to know such information and agree to confidentiality terms at least as restrictive as those herein (collectively, the "Agent Representatives") or refer to the contents of a deliverable or report or the findings of our work except (i) as specifically stated herein, (ii) with our prior

written consent on terms to be agreed in writing, or (iii) where required by law or regulation. The Services and all deliverables are not for a third party's use, benefit or reliance and Ankura disclaims any contractual or other responsibility or duty of care to any third party based upon the Services or deliverables. ORD and ORCYH will indemnify and hold Ankura harmless from any and all claims asserted by a third party as a result of such unauthorized release of any deliverables or reliance on the Services. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in Schedule I) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

B. At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Company.

C. The Services and any deliverables, including any oral advice or comments, should not be associated with, referred to or quoted in any manner in any financial statements or any offering memorandum, prospectus, registration statement, public filing, loan or other agreements.

7. Intellectual Property:

Ankura owns the intellectual property rights in the deliverables and reports and any materials created under this Agreement. Ankura agrees that upon payment in full for the Services, you will have a non-exclusive, non-transferable license to use the deliverables for your own internal use in accordance with the terms of this Agreement. Notwithstanding the foregoing, (i) any patent, copyright, trademark and other intellectual property rights of Ankura contained in any deliverable or report shall remain the sole and exclusive property of Ankura, and (ii) all methodologies, processes, techniques, ideas, concepts, trade secrets and know-how and other intellectual property embedded in the deliverable or reports that we may develop or supply in connection with our Services shall remain the sole and exclusive property of Ankura.

8. Court Approval:

In the event that a filing under the Bankruptcy Code is necessary or required, ORD and ORCYH will use its best efforts to ensure that the court authorizes ORD and ORCYH to continue to honor its obligations under this Agreement, including all indemnification obligations hereunder and payment by ORD and ORCYH of all Fees and Expenses in accordance with the terms hereunder (including Ankura's counsel's fees and expenses) and, if necessary, approves this Agreement, *nunc pro tunc* to the date the insolvency proceeding was commenced.

9. Confidentiality:

A. Generally. In connection with this engagement, either party (the "Receiving Party") may come into the possession, whether orally or in writing, of Confidential Information (as defined below) of the other party (the "Disclosing Party"). The Receiving Party hereby agrees that it will not disclose,

publish or distribute such Confidential Information to any third party without the Disclosing Party's consent, which consent shall not be unreasonably withheld, other than (i) to the Receiving Party's affiliates and its and their employees, officers, directors, auditors, and advisors; (ii) if such disclosure is requested or required by a governmental agency having regulatory authority or other authority over the Receiving Party; (iii) pursuant to court order, subpoena or legal process requiring disclosure, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice (if legally permissible) of any disclosure under this clause (iii) so that Disclosing Party can seek a protective order; (iv) to tax advisors regarding the tax treatment or tax structure of any transaction; provided that such advisors are informed of the confidential obligations hereunder; or (v) in the case of the Company, to the Agent Representatives that have a need to know such Confidential Information in connection with this engagement and agree to confidentiality terms at least as restrictive as those herein.

B. Definition of Confidential Information. "Confidential Information" means any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include information that: (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; or (iv) is independently developed without use of or reference to any Confidential Information.

10. Company Access and Information:

To fulfill the Services under this Agreement, it will be necessary for Ankura to have access to each Company's facilities and certain books, records and reports of each Company. In addition, Ankura will need to have discussions with each Company's management and certain other personnel. Ankura will perform the Services in a manner that will permit the business operations of the Companies to proceed in an orderly fashion, subject to the requirements of this engagement. Each Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the "Information"). Each Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of each applicable Company. Each Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading, with respect to such Company that provided the information. To the best of each Company's knowledge, the Information to be furnished by or on behalf of each Company, when delivered, will be true and correct in all material respects and will not contain any material

Case 24-12574-KBO Doc 7 3-5 Filed 11/02/24 Page 7 of 32



misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of each Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will state that we have no obligation to, and will not update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

11. Indemnification; Limitation of Liability: ORD and ORCYH shall provide indemnification, contribution and reimbursement as set forth in Schedule I hereto. The terms and provisions of Schedule I are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in Schedule I) is requested or required to appear as a witness in any Action (as defined in Schedule I) that is brought by or on behalf of or against any of the Companies or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, ORD and ORCYH shall, jointly and severally, reimburse Ankura and the Indemnified Person for all documented, actual out-of-pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the fees and disbursements of legal counsel. Neither the Companies nor any other party acting on their behalf shall hold Ankura liable for any matter in connection with the engagement or the Agreement, absent gross negligence, willful misconduct or bad faith, in each case as finally determined by a judgment of a court of competent jurisdiction. In no event shall Ankura be liable (i) under this Agreement or in connection with the Services or this engagement for damages in excess of the total amount of Fees collected; (ii) for loss or corruption of data from the Client's systems; or (iii) for any claim whatsoever for any loss of profit, goodwill, business opportunity, anticipated savings or benefits, special, consequential, exemplary, incidental, punitive or indirect damages of any kind.

12. Entire Agreement; Amendments: This Agreement represents the entire agreement between the parties in relation to the Services, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

13. Counterparts: This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

14. Severability: The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

15. Announcements: Ankura shall be entitled to identify each Company and use each Company's name and logo in connection with marketing and pitch materials upon conclusion of the Services with the prior written consent (email being sufficient) of each Company. In addition, if requested by Ankura and applicable to each Company, each Company agrees that in any press release related to the Services or outcome of the Services provided hereunder, each Company will include in such press release a mutually acceptable reference to Ankura's role as Board Member.

16. Governing Law; Jury Trial Waiver; Jurisdiction: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE. ANKURA AND THE COMPANIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN ANY FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE SOUTHERN DISTRICT OF NEW YORK, NEW YORK OR, IF SUCH COURTS DO NOT HAVE JURISDICTION, THEN THE COMMERCIAL DIVISION OF THE STATE COURTS SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING EACH OF THE COMPANIES BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND IF A COMPANY ENTITY IS A PARTY TO SUCH DISPUTE WITH RESPECT TO THIS AGREEMENT, ANKURA AND SUCH COMPANY IRREVOCABLY AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION THAT IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS. EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN THIS AGREEMENT. EACH OF

Confidential

THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER. EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.

17. Notices: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below. Notices shall be deemed provided on the date sent.

18. Miscellaneous:

(a) Conflicts:

i. Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify the applicable Company and take appropriate actions, as necessary. Each Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement that are directly adverse to any Company shall not be provided by personnel working on this engagement without prior written consent of the applicable Company.

ii. Each Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. Each Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to each Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to any applicable Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the applicable Company under this engagement. Ankura will not have any duty to disclose to the Companies or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

Confidential

(b) Exculpation: Each Company agrees not to bring any claim in connection with this Agreement or the Services against (i) a direct or indirect holder of any equity interests or securities of Ankura, whether such holder is a limited or general partner, member, stockholder or otherwise; (ii) an affiliate of Ankura not providing Services under this Agreement; or (iii) a director, officer, employee, representative or agent of Ankura or its affiliates ((i), (ii) and (iii) collectively, the "Party Affiliates"). Each Company further agrees that no Party Affiliate shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or the Services contemplated thereby, and each Company waives and releases all claims against such Party Affiliates related to any such liability or obligation.

(c) Authority; Due Authorization; Enforceability: Each Company represents and warrants that the it has duly approved the retention of Ankura and approved the terms of this Agreement, including the appointment and authorization of the Board Member. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such party and constitutes the legal, valid and binding agreement of each such party, enforceable in accordance with its terms.

(d) Independent Contractors: In connection with the Services, Ankura may utilize employees, agents or independent contractors or its own affiliates (each of which is a separate and independent legal entity) or its own agents or independent contractors. References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. Ankura shall act as an independent contractor under this Agreement, and not in any other capacity including as a fiduciary, and any obligations arising out of its engagement shall be owed solely to the Companies. As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Ankura will remain solely responsible for the Services.

(e) Limitations of Engagement: Each Company acknowledges that Ankura is being retained solely to assist the Companies as described in this Agreement. Each Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. Each Company understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and each Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to each Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or

Confidential

otherwise, or any transaction contemplated thereby or incidental thereto. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) Limitations on Actions. Except for an action for nonpayment of Fees and Expenses, no action, regardless of form, relating to the Agreement or the Services provided thereunder, may be brought by either party more than one (1) year after the cause of action has accrued.

(g) Counsel Representation: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel. There shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.

(h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties. Notwithstanding the foregoing, Ankura may transfer or deal with its right to receive any unpaid invoices under this Agreement without the prior consent of each of the Companies; provided, that if such assignment results in ORD and ORCYH having to pay a party other than Ankura, then Ankura shall provide ORD and ORCYH with such information.

(i) Headings: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) Survival: Those provisions that by their nature are intended to survive termination or expiration of this Agreement and any right or obligation of the parties in this Agreement which, by its express terms of nature and context is intended to survive termination or expiration of this Agreement, shall so survive any such termination or expiration. For the avoidance of doubt, upon any termination of this Agreement, Sections 2-12 and 14-18 shall survive such termination and shall remain in effect. Notwithstanding the foregoing, the obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) Force Majeure: Ankura shall not be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) Non-Solicitation: Each Company will not, during the term of the engagement or for twelve (12) months thereafter, solicit (directly or indirectly) any employee of Ankura or attempt to induce or cooperate with any other firm in an attempt to induce any employee to leave the employ of Ankura;

Confidential

provided that the foregoing shall not be violated by general advertising not targeted at Ankura employees.

(m) Insurance: The Companies, collectively, shall maintain directors, officers and corporate liability insurance policy (the "Policy"), with at least $7,500,000 in coverage to be shared among the Companies, to cover the Board Member in addition to the existing officers and directors serving in such positions. The Companies shall cause the insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the Board Member. Upon any cancellation or nonrenewal of the Policy by the insurer, the Companies shall exercise their rights to extend the claim period to a six-year "discovery period" and shall exercise such rights and pay the premium required thereunder.

(n) Money Laundering. Ankura may, in addition to making searches of appropriate databases, request from each Company, each Company's affiliates or each Company's advisors, certain information and documentation for the purposes of verifying each Company's identity in order to comply with our obligations under applicable money-laundering regulation, legislation and our internal policies. When each Company is acting on behalf of a third-party client, we may request from each Company, copies of any documentation such Company has obtained in relation to such Company's client. If satisfactory evidence of identity is not provided within a reasonable time, it may be necessary for us to cease work. Where we believe that there are circumstances which may give rise to a money laundering offence under applicable legislation, we may consider it necessary to make a report to the appropriate authorities. We may not be able to discuss such reports with the applicable Company and we will not be liable to you for any loss or damage which the applicable Company may suffer or incur as a result of our making such a report, including, without limitation, as a result of any delay to any stage of a matter or as a result of completion being prohibited by such authorities.

[Signature page follows]

Confidential

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call me at (713) 540-4931. We look forward to working with you on this matter.

**Ankura Consulting Group, LLC**
By: John Shepherd ______________________
Name: John Shepherd
Title: Senior Managing Director
Email: john.shepherd@ankura.com
Address:
2 Houston Ctr.
909 Fannin St., Suite 2450
Houston, Texas 77010

With a copy to
485 Lexington Avenue, 10th Floor
New York, NY 10017
Attn.: General Counsel

Accepted and agreed:

**OYA Renewables Construction and Yield Holdings LLC**
By: ______________________________
Name: Eric Millard
Title: Authorized Person
Address:
E-mail:
Date:

**OYA Renewables Development LLC**

By: ______________________________
Name: Eric Millard
Title: Authorized Person
Address:
E-mail:
Date:

Confidential

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call me at (713) 540-4931. We look forward to working with you on this matter.

**Ankura Consulting Group, LLC**
By: ______________________________
Name: John Shepherd
Title: Senior Managing Director
Email: john.shepherd@ankura.com
Address:
2 Houston Ctr.
909 Fannin St., Suite 2450
Houston, Texas 77010

With a copy to
485 Lexington Avenue, 10th Floor
New York, NY 10017
Attn.: General Counsel

Accepted and agreed:

**OYA Renewables Construction and Yield Holdings LLC**
By: *Eric K. Millard*
Name: Eric Millard
Title: Authorized Person
Address: 2 Oberlin St, Mapewood, NJ 07040
E-mail: eric.k.millard@gmail.com
Date: 4/16/2024

**OYA Renewables Development LLC**

By: *Eric K. Millard*
Name: Eric Millard
Title: Authorized Person
Address: 2 Oberlin St, Maplewood, NJ 07040
E-mail: eric.k.millard@gmail.com
Date: 4/16/2024

Confidential

**OYA RENEWABLES EQUIPMENTCO LLC**

By: Eric K. Millard
Name: Eric Millard
Title: Authorized Person
Address: 2 Oberlin St, Maplewood, NJ 07040
E-mail: eric.k.millard@gmai.com
Date: 4/16/2024

Confidential

**Schedule I**

This Schedule I is a part of and incorporated into the Agreement, dated as of April 17, 2024, between Ankura and ORD and ORCYH pursuant to which Ankura has been engaged to Services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, ORD and ORCYH, jointly and severally, agrees that it shall indemnify and hold harmless Ankura and its affiliates and their respective directors, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "Indemnified Person"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "Liabilities"), and will reimburse each Indemnified Person for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Indemnified Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; provided that ORD and ORCYH will not be responsible for any Liabilities or Indemnified Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review, to have resulted primarily from an Indemnified Person's gross negligence or willful misconduct in connection with any of the Services. ORD and ORCYH shall also reimburse such Indemnified Person for all Indemnified Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this Schedule I). Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

ORD and ORCYH shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura. ORD and ORCYH will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, ORD and ORCYH shall contribute to the Liabilities and Indemnified Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to each of the Companies, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of each of the

Companies, on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Indemnified Expenses relate, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Company pursuant to the Agreement.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of each Company set forth in this Agreement, each Company will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the indemnification obligations of ORD and ORCYH set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura; provided, that the Companies shall have the option of satisfying this obligation by obtaining insurance covering the indemnification obligations of the Companies under this Agreement with at least $7,500,000 in coverage and which adds Ankura as an additional insured. Ankura shall promptly be provided copies of any such insurance upon it being bound.

These indemnification, contribution and other provisions of this Schedule I shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.

Confidential

August 6, 2024

OYA Renewables Development LLC
OYA Renewables Construction and Yield Holdings LLC
OYA Renewables EquipmentCo LLC

Re: Retention of John Shepherd as CRO

Dear Mr. Millard:

This letter agreement (this "Agreement"), entered into as of August 6, 2024, (the "Effective Date"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("Ankura") and OYA Renewables Development LLC ("ORD"), OYA Renewables Construction and Yield Holdings LLC ("ORCYH") and OYA Renewables EquipmentCo LLC ("ORE" and, together with ORD and ORCYH, collectively, the "Companies" or the "Client" and each, a "Company") pursuant to which Ankura has been engaged to act as the advisor to Client to provide interim management and restructuring advisory services as set forth below. As of the date hereof, this Agreement shall supersede any previous agreement between Ankura and the Client relating to services provided by Ankura to the Client.

We have been retained by the Client and will report to the Independent Managers of the Companies.

1. Scope of Engagement: On the terms and subject to the conditions of this Agreement, Ankura will provide to the Client the following interim management and restructuring advisory services (the "Services"), as requested by the Client and agreed to by Ankura:

A. Provide John Shepherd to serve as Chief Restructuring Officer of the Companies ("CRO") who shall serve as the Company representative in any bankruptcy proceedings and, to continue to serve as independent manager;

B. Provide Ankura professional resources, as needed, to support John Shepherd in the performance of his role as CRO ("Engagement Personnel");

C. Ankura shall provide the following restructuring and advisory services:

i) Assist the CRO and the Client in connection with the Client' evaluation and implementation of potential financial restructuring and alternative transaction processes;
ii) Assist the CRO and the Client in maintaining weekly cash flows and the Client's capital budget and oversee cash and liquidity management;
iii) Assist the CRO and the Client in support of the operations of the assets, in cooperation with the employees of affiliates of the Client;
iv) Assist the CRO and the Client in review and management of vendor and regulatory relationships;
v) Assist the Client's investment banker regarding the ongoing sale process;
vi) Assist the CRO and the Client in the development and implementation of any key employee retention issues, including employees of affiliates of the Client; and

vii) Perform such other professional services as may be requested by the Client and the Independent Manager and agreed to by Ankura in writing.

D. In the event the Client elects to pursue a court-assisted financial restructuring process, the Services will expand to include the following:

i) Advise and assist the Client and its advisors in the Client's identification, evaluation and negotiation of debtor-in-possession financing;
ii) Advise and assist the Client and its legal counsel in the negotiation of the Client's post-petition use of cash collateral;
iii) Advise and assist the Client and its bankruptcy legal counsel with development of business and financial information required for filing of first day motions and other required bankruptcy disclosures;
iv) Advise and assist the Client and its bankruptcy legal counsel with development of a filing strategy;
v) Advise and assist the Client and its bankruptcy legal counsel with a sales and/or liquidation process for the Client's assets, including the identifying, negotiating and securing a stalking horse bid for the Client's assets;
vi) Advise and assist the Client and its bankruptcy legal counsel with all bankruptcy reporting obligations; and
vii) Perform other professional services not otherwise listed which have been requested by the Client and are directly related to the Client's preparation for entrance into a bankruptcy restructuring proceeding.

The Services and compensation arrangements set forth herein do not encompass other advisory services not set forth in this Section 1. If the Client and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

Notwithstanding anything to the contrary in this Agreement, the Client agrees that the CRO shall be authorized, in such capacity, to make decisions with respect to all aspects of the Companies appropriate for a CRO and consistent with the Companies' organizational documents.

2. Fees and Expenses: For Ankura's Services hereunder, ORD and ORCYH agree to pay to Ankura the following non-refundable fees (the CRO Fee and the Advisory Fee, collectively the "Fees"):

A. CRO Fee: a monthly fee for the CRO in the amount of $100,000 (the "CRO Fee").

B. Independent Manager Fee: a monthly fee of $65,000; *provided* that such fee shall be waived for months in which Ankura is also providing the CRO.

C. Advisory Fees: our fees for the Services set forth above for the Engagement Personnel (the "Advisory Fees") will be based on the actual hours expended at our standard hourly rates that are in effect when the Services are rendered. Our rates are typically revised annually. Our current hourly rates are as follows:

Confidential

| 2024 US RATES | | | | |
|---|---|---|---|---|
| **Title** | **2024 - RATE RANGE** | | | |
| Senior Managing Director | $ | 1,205 | $ | 1,350 |
| Managing Director | $ | 1,000 | $ | 1,120 |
| Senior Director | $ | 820 | $ | 945 |
| Director | $ | 685 | $ | 790 |
| Senior Associate | $ | 560 | $ | 630 |
| Associate | $ | 460 | $ | 520 |
| Paraprofessional | $ | 360 | $ | 415 |

D. Expense Reimbursement: Ankura shall be entitled to reimbursement of actual, reasonable out-of-pocket and direct expenses (not to exceed $5,000 in any calendar month without the written consent of Eric Millard, an Independent Manager of the Companies) incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable out-of-pocket fees and expenses for outside legal counsel and other third-party advisors) incurred in connection with this Agreement, including the negotiation and performance of this Agreement and the matters contemplated hereby (collectively, "Expenses").

E. Testimony; Subpoena Requests. If Ankura is requested or required to appear as a witness in any action that is brought by, on behalf of, or against any of the Companies or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, ORD and ORCYH agree to (i) compensate Ankura for its associated time charges at our regular rates in effect at the time and (ii) reimburse Ankura for all documented, actual out-of-pocket expenses incurred by Ankura in connection with such appearance or preparing to appear as a witness, including without limitation, the fees and disbursements of legal counsel of Ankura's choosing. In addition, Ankura will be compensated and reimbursed for any time and expense (including without limitation, fees and expenses of legal counsel of Ankura's choosing) that Ankura may incur in considering or responding to discovery requests or other formal information requests for documents or information made in connection with any action or in connection with the Services.

3. Retainer

A. In connection with the foregoing, it is Ankura's policy to receive an advance retainer for the Fees and Expenses. Upon execution of this Agreement, ORD and ORCYH shall provide Ankura with such retainer in the amount of $200,000 (the "Retainer") and ORD and ORCYH agree to replenish the Retainer upon the request of Ankura. ORD and ORCYH understand and acknowledge that any Retainer becomes the property of Ankura when it is earned and neither ORD nor ORCYH no longer has a property interest in any Retainer upon Ankura's earning of the Retainer, any Retainer will be placed in Ankura's general account and will not be held in a client trust account, and ORD and ORCYH will not earn any interest on any Retainer; *provided, however*, that at the conclusion of the Services, if the amount of any Retainer held by Ankura is in excess of the amount of Ankura's

outstanding and estimated Fees and Expenses, any such excess Retainer amount will be returned to ORD and ORCYH.

B. If any of the Companies file a petition or any proceedings are commenced against such entities under Title 11 of the United States Code (the "Bankruptcy Code"), some Fees and Expenses (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Retainer will be applied to any such unpaid pre-petition Fees and Expenses. Ankura will hold any portion of the Retainer not otherwise properly applied for payment of any such unpaid pre-filing Fees and Expenses (whether or not billed) to be applied to Ankura's final invoice.

4. <u>Invoices and Payment</u>: The obligations of ORD and ORCYH under this Agreement shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of ORD and ORCYH. Prior to commencing any proceedings under any insolvency regime, ORD and ORCYH shall pay all invoiced amounts, whether for Fees or Expenses or otherwise, to Ankura by wire transfer of immediately available funds. In the event that ORD and ORCYH does not pay Ankura's invoices in accordance with their terms, Ankura has the discretion to (i) terminate or suspend the engagement and the performance of Services, and (ii) deduct any outstanding amounts owed from the Retainer. Under these circumstances, the ORD and ORCYH will also be responsible for any costs, including legal fees, associated with the collection of outstanding and overdue fees and expenses. ORD and ORCYH agree that it will pay the full amount of any invoices in accordance with the terms hereof regardless of any deduction that it is required by law to make Ankura will pay any local, state or federal income taxes due and payable by Ankura relating to the Services.

5. <u>Term of Agreement</u>: If any one of the Companies on the one hand and Ankura on the other hand desires to terminate its relationship with the other or the engagement, it may do so at any time for any reason by giving written notice to the other party. In such event, Ankura will be paid for amounts owed through the termination date. Any one of the Companies may terminate Ankura without the other Companies terminating Ankura, *provided*, that if both ORD and ORCYH terminate Ankura, Ankura will automatically be terminated by ORE.

6. <u>Nature of Services; Use of Advice</u>:

A. The Services, including the deliverables and reports, are provided solely for Client's use for the purposes set forth herein. You may not disclose or discuss the Services or any deliverable or report to anyone else other than GDEV OYA Lender I, LLC and CVI CEF Master Fund I LP and their respective affiliates and their respective directors, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors, in each case that have a need to know such information and agree to confidentiality terms at least as restrictive as those herein (collectively, the "Agent Representatives") or refer to the contents of a deliverable or report or the findings of our work except (i) as specifically stated herein, (ii) with our prior written consent on terms to be agreed in writing, or (iii) where required by law or regulation. The Services and all deliverables are not for a third party's use, benefit or reliance and Ankura disclaims any contractual or other responsibility or duty of care to any third party based upon the Services or

Confidential

deliverables. ORD and ORCYH will indemnify and hold Ankura harmless from any and all claims asserted by a third party as a result of such unauthorized release of any deliverables or reliance on the Services. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in Schedule I) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

B. At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Client.

C. The Services and any deliverables, including any oral advice or comments, should not be associated with, referred to or quoted in any manner in any financial statements or any offering memorandum, prospectus, registration statement, public filing, loan or other agreements.

7. Intellectual Property:

Ankura owns the intellectual property rights in the deliverables and reports and any materials created under this Agreement. Ankura agrees that upon payment in full for the Services, you will have a non-exclusive, non-transferable license to use the deliverables for your own internal use in accordance with the terms of this Agreement. Notwithstanding the foregoing, (i) any patent, copyright, trademark and other intellectual property rights of Ankura contained in any deliverable or report shall remain the sole and exclusive property of Ankura, and (ii) all methodologies, processes, techniques, ideas, concepts, trade secrets and know-how and other intellectual property embedded in the deliverable or reports that we may develop or supply in connection with our Services shall remain the sole and exclusive property of Ankura.

8. Court Approval:

In the event that a filing under the Bankruptcy Code is necessary or required, ORD and ORCYH will use best efforts to ensure that the court authorizes ORD and ORCYH continue to honor its obligations under this Agreement, including all indemnification obligations hereunder and payment by ORD and ORCYH of all Fees and Expenses in accordance with the terms hereunder (including Ankura's counsel's fees and expenses) and, if necessary, approves this Agreement, *nunc pro tunc* to the date the insolvency proceeding was commenced.

9. Confidentiality:

A. Generally. In connection with this engagement, either party (the "Receiving Party") may come into the possession, whether orally or in writing, of Confidential Information (as defined below) of the other party (the "Disclosing Party"). The Receiving Party hereby agrees that it will not disclose, publish or distribute such Confidential Information to any third party without the Disclosing Party's consent, which consent shall not be unreasonably withheld, other than (i) to the Receiving Party's affiliates and its and their employees, officers, directors, auditors, and advisors; (ii) if such disclosure is requested or required by a governmental agency having regulatory authority or other

authority over the Receiving Party; (iii) pursuant to court order, subpoena or legal process requiring disclosure, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice (if legally permissible) of any disclosure under this clause (iii) so that Disclosing Party can seek a protective order; (iv) to tax advisors regarding the tax treatment or tax structure of any transaction; provided that such advisors are informed of the confidential obligations hereunder; or (v) in the case of the Company, to the Agent Representatives that have a need to know such Confidential Information in connection with this engagement and agree to confidentiality terms at least as restrictive as those herein.

B. Definition of Confidential Information. "Confidential Information" means any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include information that: (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; or (iv) is independently developed without use of or reference to any Confidential Information.

10. Company Access and Information:

In order to fulfill the Services under this Agreement, it will be necessary for Ankura personnel to have access to each Company's facilities and certain books, records and reports of each Company. In addition, Ankura will need to have discussions with each Company's management and certain other personnel. Ankura will perform the Services in a manner that will permit the business operations of the Companies to proceed in an orderly fashion, subject to the requirements of this engagement. Each Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the "Information"). Each Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of each applicable Company. Each Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading, with respect to such Company that provided the information. To the best of each Company's knowledge, the Information to be furnished by or on behalf of each Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in

the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of each Company and its affiliates without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will state that we have no obligation to, and will not update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

11. Indemnification; Limitation of Liability: ORD and ORCYH shall provide indemnification, contribution and reimbursement as set forth in Schedule I hereto. The terms and provisions of Schedule I are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in Schedule I) is requested or required to appear as a witness in any Action (as defined in Schedule I) that is brought by or on behalf of or against any of the Companies or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, ORD and ORCYH shall, jointly and severally, reimburse Ankura and the Indemnified Person for all documented, actual out-of-pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the fees and disbursements of legal counsel. Neither the Companies nor any other party acting on their behalf shall hold Ankura liable for any matter in connection with the engagement or the Agreement, absent gross negligence, willful misconduct or bad faith, in each case as finally determined by a judgment of a court of competent jurisdiction. In no event shall Ankura be liable (i) under this Agreement or in connection with the Services or this engagement for damages in excess of the total amount of Fees collected; (ii) for loss or corruption of data from the Client's systems; or (iii) for any claim whatsoever for any loss of profit, goodwill, business opportunity, anticipated savings or benefits, special, consequential, exemplary, incidental, punitive or indirect damages of any kind.

12. Entire Agreement; Amendments: This Agreement represents the entire agreement between the parties in relation to the Services, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

13. Counterparts: This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

14. Severability: The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

15. Announcements: Ankura shall be entitled to identify the Companies and use the Companies' names and logo in connection with marketing and pitch materials upon conclusion of the Services. In addition, if

requested by Ankura, the Client agrees that in any press release related to the Services or outcome of the Services provided hereunder, the Client will include in such press release a mutually acceptable reference to Ankura's role as CRO and restructuring advisor to the Companies.

16. Governing Law; Jury Trial Waiver; Jurisdiction: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE. ANKURA AND THE COMPANIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN ANY FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE SOUTHERN DISTRICT OF NEW YORK, NEW YORK OR, IF SUCH COURTS DO NOT HAVE JURISDICTION, THEN THE COMMERCIAL DIVISION OF THE STATE COURTS SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING THE CLIENT BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND IF AN ENTITY OF THE COMPANIES IS A PARTY TO SUCH DISPUTE WITH RESPECT TO THIS AGREEMENT, ANKURA AND THE CLIENT IRREVOCABLY AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION THAT IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS. EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER. EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.

Confidential

17. Notices: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below. Notices shall be deemed provided on the date sent.

18. Miscellaneous:

(a) Conflicts:

i. Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify the applicable Company and take appropriate actions, as necessary. Each Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement that are directly adverse to any Company shall not be provided by personnel working on this engagement without prior written consent of the applicable Company.

ii. Each Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. Each Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to each Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to any applicable Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the applicable Company under this engagement. Except as may be required for retention in relation to bankruptcy proceedings, Ankura will not have any duty to disclose to the Companies or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

(b) Exculpation: Each Company agrees not to bring any claim in connection with this Agreement or the Services against (i) a direct or indirect holder of any equity interests or securities of Ankura, whether such holder is a limited or general partner, member, stockholder or otherwise; (ii) an affiliate of Ankura not providing Services under this Agreement; or (iii) a director, officer, employee, representative or agent of Ankura or its affiliates ((i), (ii) and (iii) collectively, the "Party

Confidential

Affiliates"). Each Company further agrees that no Party Affiliate shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or the Services contemplated thereby, and you waive and release all claims against such Party Affiliates related to any such liability or obligation.

(c) Authority; Due Authorization; Enforceability: Each Company represents and warrants that the Board has duly approved the retention of Ankura and approved the terms of this Agreement, including the appointment and authorization of the CRO and continued appointment of John Shepherd as independent manager. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such party and constitutes the legal, valid and binding agreement of each such party, enforceable in accordance with its terms.

(d) Independent Contractors: In connection with the Services, Ankura may utilize employees, agents or independent contractors or its own affiliates (each of which is a separate and independent legal entity) or its own agents or independent contractors. References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. Ankura shall act as an independent contractor under this Agreement, and not in any other capacity including as a fiduciary, and any obligations arising out of its engagement shall be owed solely to you. As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Ankura will remain solely responsible for the Services.

(e) Limitations of Engagement: Each Company acknowledges that Ankura is being retained solely to assist the Companies as described in this Agreement. Each Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. Client understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and each Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to each Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or otherwise, or any transaction contemplated thereby or incidental thereto. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) Limitations on Actions. Except for an action for nonpayment of Fees and Expenses, no action, regardless of form, relating to the Agreement or the Services provided thereunder, may be brought by either party more than one (1) year after the cause of action has accrued.

(g) Counsel Representation: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel. There shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.

(h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties. Notwithstanding the foregoing, Ankura may transfer or deal with its right to receive any unpaid invoices under this Agreement without prior written consent of each of the Companies; provided that if such assignment results in ORD and ORCYH having to pay a party other than Ankura, then Ankura shall provide ORD and ORCYH with such information.

(i) Headings: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) Survival: Those provisions that by their nature are intended to survive termination or expiration of this Agreement and any right or obligation of the parties in this Agreement which, by its express terms of nature and context is intended to survive termination or expiration of this Agreement, shall so survive any such termination or expiration. For the avoidance of doubt, upon any termination of this Agreement, Sections 2-12 and 14-18 shall survive such termination and shall remain in effect. Notwithstanding the foregoing, the obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) Force Majeure: Ankura shall not be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) Non-Solicitation: Each Company will not, during the term of the engagement or for twelve (12) months thereafter, solicit (directly or indirectly) any employee of Ankura or attempt to induce or cooperate with any other firm in an attempt to induce any employee to leave the employ of Ankura; provided that the foregoing shall not be violated by general advertising not targeted at Ankura employees.

(m) Insurance: The Companies, collectively, shall maintain directors, officers and corporate liability insurance policy (the "Policy"), with at least $7,500,000 in coverage to cover the CRO in addition

Confidential

to the existing officers and directors serving in such positions. The Client shall cause its insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the CRO. Upon any cancellation or nonrenewal of the Policy, the Client shall exercise its rights to extend the claim period to a six-year "discovery period" and shall pay the premium required thereunder.

(n) Money Laundering. Ankura may, in addition to making searches of appropriate databases, request from each Company, each Company's affiliates or each Company's advisors, certain information and documentation for the purposes of verifying each Company's identity in order to comply with our obligations under applicable money-laundering regulation, legislation and our internal policies. When each Company is acting on behalf of a third-party client, we may request from each Company, copies of any documentation each Company has obtained in relation to each Company's client. If satisfactory evidence of identity is not provided within a reasonable time, it may be necessary for us to cease work. Where we believe that there are circumstances which may give rise to a money laundering offence under applicable legislation, we may consider it necessary to make a report to the appropriate authorities. We may not be able to discuss such reports with the applicable Company and we will not be liable to you for any loss or damage which the applicable Company may suffer or incur as a result of our making such a report, including, without limitation, as a result of any delay to any stage of a matter or as a result of completion being prohibited by such authorities.

[Signature pages follow.]

Confidential

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call me at (713) 540-4931. We look forward to working with you on this matter.

**Ankura Consulting Group, LLC**

By: John Shepherd
Name: John Shepherd
Title: Senior Managing Director
Email: john.shepherd@ankura.com
Address:
2 Houston Center
909 Fannin St., Suite 2450
Houston, TX 77010
With a copy to
485 Lexington Avenue, 10th Floor
New York, NY 10017
Attn.: General Counsel

Accepted and agreed:

**CLIENT:**
OYA Renewables Development LLC
OYA Renewables Construction and Yield Holdings LLC
OYA Renewables EquipmentCo LLC

By: Eric K. Millard
Name: Eric Millard
Title: Independent Manager
Address: 2 Oberlin St., Maplewood, NJ 07040
E-mail: eric.k.millard@gmail.com
Date: 8/6/2024

Confidential

**Schedule I**

This Schedule I is a part of and incorporated into the Agreement, dated as of August 6, 2024, between Ankura and the Client pursuant to which Ankura has been engaged to Services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, the Client, jointly and severally, agrees that it shall indemnify and hold harmless Ankura and its affiliates and their respective directors, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "Indemnified Person"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "Liabilities"), and will reimburse each Indemnified Person for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Indemnified Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; provided that the Client will not be responsible for any Liabilities or Indemnified Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review, to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct in connection with any of the Services. The Client shall also reimburse such Indemnified Person for all Indemnified Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this Schedule I). Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

The Client shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura. The Client will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, the Client shall contribute to the Liabilities and Indemnified Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Client, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of the Client on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Indemnified

Expenses relate, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Client pursuant to the Agreement.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Client set forth in this Agreement, the Client will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the obligations of the Client set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura; provided, that the Company shall have the option of satisfying this obligation by obtaining insurance covering the indemnification obligations of the Company under this Agreement with at least $7,500,000 in coverage and which adds Ankura as an additional insured. Ankura shall promptly be provided copies of any such insurance upon it being bound.

These indemnification, contribution and other provisions of this Schedule I shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.

**<u>Exhibit C</u>**

**Shepherd Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered) |

**DECLARATION OF JOHN SHEPHERD**
**IN SUPPORT OF DEBTORS' APPLICATION**
**FOR AN ORDER (I) AUTHORIZING DEBTORS TO RETAIN**
**ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS**
**CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL,**
**AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE,**
**AND (II) GRANTING RELATED RELIEF**

I, John Shepherd, being duly sworn, hereby state as follows:

1. I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura"), an interim management and financial services advisory firm, with numerous offices throughout the country.

2. I am authorized to make this declaration (the "Declaration") on behalf of Ankura and in support of the in support of the *Debtors' Application for an Order (I) Authorizing the Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief* (the "Application").[2] Except as otherwise noted, I have personal

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed in the Application.

knowledge of the matters set forth herein or have been informed of the matters set forth herein by other professionals at Ankura.

**Ankura's Qualifications**

3. Since 2016, Ankura has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. Ankura's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position. Ankura's expertise relevant to the Chapter 11 Cases includes: (a) turnaround and restructuring consulting; (b) interim management, including serving in executive and management roles; (c) managing communications with lenders, board members, employees, investors, and creditor constituencies, (d) cash management and liquidity enhancement, (e) financial modeling and forecasting, (f) operational improvement, (g) strategic business plan development, (h) customer and vendor management; and (i) bankruptcy services, including contingency planning, preparing schedules and statements, preference analysis, claims resolution, and executory contract analysis.

4. In addition, Ankura and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings and liquidations, both out of court and in chapter 11 cases. Ankura and its professionals have provided restructuring or crisis management services in numerous bankruptcy cases, including: *In re Amyris, Inc. et al*, No. 23-11131 (TMH) (Bankr, D. Del. 2023); *In re FB Debt Financing Guarantor, LLC et al*, No. 23-10025 (KBO) (Bankr, D. Del. 2023); *In re Country Fresh Holding Co.*, No. 21-30574 (MI) (Bankr. S.D. Tex. Mar. 31, 2021); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. 2020); *In re Brooks Brothers Grp., Inc.*, No. 20–11785 (CSS) (Bankr. D. Del. 2020); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 19, 2020); *In re Elk Petroleum, Inc.*, No. 19- 11157 (LSS) (Bankr. D. Del. 2019); *In re MTE Holdings LLC*, No.

Case 24-12574-KBO Doc 735-4 Filed 11/02/24 Page 4 of 24

19-12269 (CTG) (Bankr. D. Del. 2019); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Dec. 18, 2019); *In re Emerge Energy Services LP*, No. 19-11563 (KBO) (Bankr. D. Del. Dec. 18, 2019); *In re Fallbrook Techs. Inc.*, No. 18-10384 (MFW) (Bankr. D. Del. Feb. 26, 2018); *In re Payless Holdings LLC*, No. 19- 40883-659 (Bankr. E.D. Mo. Feb. 18, 2019); *In re Model Reorg Acquisition, LLC*, No. 17-11794 (CSS) (Bankr. D. Del. 2017); *In re Last Call Guarantor, LLC*, No. 16-11844 (KG) (Bankr. D. Del. Sept. 2, 2016); *In re SynCardia Systems, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 1, 2016); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 11, 2016); *In re C. Wonder LLC*, No. 16-11127 (MBK) (Bankr. D.N.J. Jan. 28, 2015); *In re The SCOOTER Store Holdings, Inc.*, No. 13-10904 (PJW) (Bankr. D. Del. April 15, 2013); *In re Vivaro Corp.*, No. 12-13810 (MG) (Bankr. S.D.N.Y. Sept. 5, 2012); *In re Am. Commercial Lines LLC*, No. 03-90305 (Bankr. S.D. Ind. 2003).

5. I have over 30 years' worth of experience in energy private equity, corporate finance, strategy, corporate development, mergers and acquisitions and corporate restructuring. Currently, I am a Senior Managing Director in the Turnaround and Restructuring group at Ankura. I have held numerous senior positions and served on the board of directors for several energy companies. Throughout my career, I have garnered significant transactional, advisory and management experience spanning the full spectrum of the energy industry, including oil and gas upstream, energy infrastructure, oilfield services, power and renewable energy.

6. Prior to joining Ankura, I co-founded Integris Energy Partners, a firm focused on investing in impaired oil and gas upstream and midstream businesses. I also served as senior vice president of infrastructure at Select Energy Services, where I was responsible for water infrastructure strategy and implementation and business development. Prior to my time at Integris and Select, I was a managing partner at Strata Energy Investments, a firm focused on investing

Case 24-12574-KBO Doc 65-4 Filed 11/01/24 Page 5 of 24

private equity in energy infrastructure in North America. Prior to serving in these roles, I spent 10 years at GE Capital as a Managing Director, where I co-managed a team investing in energy infrastructure in North America, with over $4 billion in equity and preferred investments. For the first 11 years of my career, I worked as an investment banker in the global energy group at Morgan Stanley. I hold a Bachelor of Arts and a Master of Business Administration in Finance from the University of Texas at Austin.

7. Since April 17, 2024, Ankura and I have provided services to the Debtors in connection with their restructuring efforts. On August 6, 2024, the Debtors Board of Directors appointed me as CRO to facilitate ongoing operations and financial matters and, ultimately, to prepare the Debtors for these chapter 11 proceedings and proposed sale. In providing prepetition professional services to the Debtors, Ankura and I have become familiar with the Debtors and their businesses, including the Debtors' financial affairs, debt structure, operations, and related matters. Having worked closely with the Debtors' management and their other advisors, Ankura and I have developed relevant experience and expertise regarding the Debtors that will assist us in providing effective and efficient services in these Chapter 11 Cases. Accordingly, I believe that Ankura and I are both well-qualified and uniquely able to represent the Debtors in these Chapter 11 Cases in an efficient and timely manner.

**Services to be Provided**

8. The terms and conditions of the Engagement Letter were negotiated between the Debtors and Ankura and reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement. Subject to the Court's approval, the Debtors anticipate that Ankura will perform the following financial advisory services (collectively, the "Services"), among others,

pursuant to the terms and provisions of the Engagement Letter, as necessary and appropriate, and as mutually agreed upon by Ankura and the Debtors:[1]

a. Provide John Shepherd as Chief Restructuring Officer and other professionals as needed to support the scope of services;

b. Perform general due diligence on the Debtors in order to gain an understanding of the Debtors, capital structure, contractual commitments and current situation

c. Review and modify the Debtors existing cash management systems and cash flow forecasts, including updating or refining the cash flow forecasts as needed, consistent with the reporting requirements;

d. Assist Debtors in producing financial analyses and reporting for the lenders and other constituents;

e. Report to the Independent Manager of the Debtors and work closely with the Independent Manager in conducting Ankura's scope of services;

f. Review the Debtors existing business plans and financial forecasts and to the extent necessary, assist in updating or refining the plans and forecasts to take into account various scenarios to pressure test the plan;

g. Assist the Debtors in developing, evaluating and executing various restructuring strategies, including assisting with negotiation with creditors and other constituents, as requested;

h. Assist the Debtors in contingency planning and preparations, as may be requested by the Debtors;

i. Assist the Debtors in the administration of its Chapter 11 Cases, including DIP financing and chapter 11 reporting, vendor analysis and negotiations, witness testimony, and other transition service workstreams, as may be requested by the Debtors;

j. Assist and prepare the Debtors for asset sales pursuant to section 363 of the Bankruptcy Code or other sale process as requested by Debtors; and

k. Perform such other professional services as may be requested by the Debtors and agreed to by Ankura in writing.

[1] The summaries of the Engagement Letter contained in this Application are provided for purposes of convenience only. In the event of any inconsistency between the summaries contained herein and the terms and provisions of the Engagement Letter, the terms of the Engagement Letter shall control.

Case 26-02465-ELG Document 7-4 Filed 11/02/26 Page 7 of 24

9. I understand that such Services are necessary to the Debtors' efforts to conduct an orderly reorganization in these Chapter 11 Cases. If necessary, the individuals working on this matter will be assisted by or replaced by various professionals at various levels.

10. The Services provided by Ankura will complement, and not duplicate, the services to be rendered by any other professional retained in these Chapter 11 Cases.

**Professional Compensation**

11. My monthly fixed fee for the role of CRO is $100,000, as provided for in the Engagement Letter

12. As set forth more fully in the Engagement Letter, the Debtors and Ankura have agreed to compensate Ankura work efforts on a level of effort basis based upon a rate per hour:

| Professional Level | Rates per Hour |
|---|---|
| Senior Managing Director | $1,205 – $1,350 |
| Managing Director | $1,000 – $1,120 |
| Director/Senior Director | $685 – $945 |
| Associate/Senior Associate | $460 – $630 |
| Paraprofessionals | $360 – $415 |

13. In addition, Ankura will seek reimbursement for all of Ankura's reasonable out-of-pocket and direct expenses incurred in connection with the Services to be provided under the Engagement Letter (including for Ankura's reasonable out-of-pocket fees and expenses for outside legal counsel and other third-party advisors) incurred in connection with the Engagement Letter. All fees and expenses will be billed on a monthly basis, and invoices are payable upon receipt by the Debtors.

14. If the Court grants the relief requested herein, Ankura will be employed in these Chapter 11 Cases pursuant to section 363 of the Bankruptcy Code. Because Ankura is not being employed as a professional under section 327 of the Bankruptcy Code, Ankura shall not be

required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. However, to maintain transparency and to comply with the U.S. Trustee's protocol applicable to the retention of personnel under section 363 of the Bankruptcy Code (sometimes referred to as the "J. Alix Protocol"), Ankura will file reports of compensation earned and expenses incurred on a monthly basis (each a "Monthly Staffing Report," and collectively, the "Monthly Staffing Reports") with the Court and provide notice to the United States Trustee for the District of Delaware ("U.S. Trustee"), counsel to the DIP Lender (as defined in the First Day Declaration), and counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee", and collectively, the "Notice Parties"). Such reports will (a) summarize the services provided to the Debtors by discrete task, (b) summarize the compensation earned by each of the Ankura personnel, (c) identify the daily time expended by Ankura personnel, by discrete task, reported in tenth of an hour increments, and (d) itemize the expenses incurred. Notice for the Monthly Staffing Reports will provide for a time period of at least fourteen (14) days for objections by parties in interest.

15. Monthly Staffing Reports shall be due no later than twenty (20) days after the end of a Month with the first Monthly Staffing Report, covering the period from the Petition Date through October 31, 2024, due on or before November 20, 2024. This procedure shall continue for any subsequent Monthly Staffing Reports. In the event if a party in interest objects to a Monthly Staffing Report, Ankura's fees and expenses shall be subject to review by this Court.

16. The hourly rates that Ankura proposes to charge in these Chapter 11 Cases are Ankura's hourly rates currently in effect and are similar to the rates Ankura generally charges for special situations, restructuring, workout, bankruptcy, insolvency, and comparable matters

Case 24-12574-KBO Doc 65-4 Filed 11/01/24 Page 9 of 24

whether in court or otherwise, regardless of whether a fee application is required, and to rates that comparable advisors would charge to perform work in such matters.

17. I believe that the fee and expense structure is reasonable, market-based, and designed to compensate Ankura fairly for its work and to cover fixed and routine overhead expenses. The fee and expense structure appropriately reflects the nature of the services to be provided by Ankura and the fee structures typically utilized by leading financial advisory firms of similar stature to Ankura for comparable engagements, with respect to both in- and out-of-court restructurings. The fee and expense structure is consistent with Ankura's normal and customary billing practices for cases of this size and complexity and that require the level and scope of services outlined herein.

18. For the 90 days prior to the Petition Date, Ankura received payments and advances in the aggregate amount of $825,202.38 for professional services performed and to be performed, including services related to the commencement and administration of the sale process and these Chapter 11 Cases. In addition, Ankura has a credit balance in favor of the Debtors for professional services performed and to be performed, and expenses incurred and to be incurred, in connection with these Chapter 11 Cases in the amount of approximately $32,200 (the "Retainer"). Ankura intends to apply the Retainer, or add to the retainer, any outstanding amounts, or unused advances, relating to the period prior to the Petition Date. Ankura intends to retain the revised balance of the Retainer on account for services rendered and expenses incurred, subsequent to the Petition Date. All invoices for prepetition services have been paid in full or will be satisfied by the remaining Retainer. Accordingly, as of the Petition Date, Ankura does not hold any prepetition claim against the Debtors for fees or expenses.

**Indemnification**

19. The Engagement Letter contains standard indemnification language with respect to Ankura's services including, without limitation, an agreement by the Debtors to indemnify Ankura and its affiliates and their respective directors, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (each, an "Indemnified Person"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities and will reimburse each Indemnified Person for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party, in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Engagement Letter or any Indemnified Persons' actions or inactions in connection with any such Services. The Debtors are not responsible for any of the foregoing to the extent that they are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review, to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct in connection with any of the Services. In the event that any indemnification claim is brought by Ankura against the Debtors during or as a result of these bankruptcy cases, Ankura will seek approval of any such claim in this Court.

20. I believe that the indemnification provisions contained in the Engagement Letter, (as modified by the Proposed Order, the "Indemnification Provisions") are customary and reasonable for Ankura and comparable firms providing financial advisory services and an important component of the structure of Ankura's engagement.

21. The Debtors and Ankura negotiated the terms of the Engagement Letter and Indemnification Provisions at arms'-length and in good faith. The provisions of the Engagement Letter, as modified by the Proposed Order, viewed in conjunction with the other terms of Ankura's proposed retention, are reasonable, and in the best interest of the Debtors, their estates, and creditors.

22. Notwithstanding the foregoing, I understand that the Indemnification Provisions shall apply only to such Ankura employees not serving in executive officer positions and that the indemnification of any persons serving as executive officers shall be on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' directors and officers insurance policy. The Debtors request that with respect to any persons not serving in executive officer positions, this Court approve the Indemnification Provisions as set forth in the Engagement Letter, as modified by the Proposed Order.

**Ankura's Connections with Parties-in-Interest.**

23. Ankura utilizes certain procedures ("Firm Procedures") to determine the Firm's relationships, if any, to parties that may have a connection to any of the Debtors in the Chapter 11 Cases. In implementing the Firm Procedures, the following actions were taken to identify parties that may have connections to the Debtors, and Ankura's relationship with such parties:

a. Ankura requested and obtained from the Debtors extensive lists of interested parties and significant creditors (the "Potential Parties-in-Interest").[1] The list of Potential Parties-in-Interest that Ankura reviewed is annexed hereto as **Schedule 1**. The Potential Parties-in-Interest reviewed include, among others, the Debtors and non-Debtor affiliates, current and former officers, bankruptcy professionals, judges for the United States Bankruptcy Court for the District of Delaware, banks, lenders, contract

[1] As may be necessary, Ankura will supplement the Declaration if additional Potential Parties-in-Interest are provided to it and Ankura becomes aware of any relationship that may adversely affect Ankura's retention in the Chapter 11 Cases or would otherwise require disclosure.

counterparties, governmental/regulatory agencies, insurance carriers, landlords, parties to significant actual or known litigation with Debtors/adverse parties, top 30 creditors, U.S. Trustee personnel for the District of Delaware, utility providers, significant customers, and vendors.

b. Ankura then compared the names of each of the Potential Parties-in-Interest to the names in its master electronic database of the Ankura Entities' clients and vendors (the "Database").[1] For clients, the Database generally includes the name of each client of the Ankura Entities, the name of each party that has, or had, a substantial role with regard to the subject matter of the Ankura Entity's retention, and the names of the Ankura Entity professionals who are, or were, primarily responsible for matters for such clients. For vendors, the Database generally includes the name of the vendor.

c. An email was sent to all of the Ankura Entities' Senior Managing Directors, Managing Directors, and all Turnaround & Restructuring practice professionals requesting disclosure of information regarding: (i) any known personal connections between the respondent and/or the Ankura Entities on the one hand, and the Potential Parties-in-Interest, on the other hand,[2] (ii) any known connections or representation by the respondent and/or the Firm of any of those Potential Parties-in-Interest in matters relating to the Debtors; and (iii) any other conflict or reason why Ankura may be unable to represent the Debtors.

d. Known connections between former or recent clients and vendors of the Ankura Entities and the Potential Parties-in-Interest were compiled for purposes of preparing this Declaration. These connections are listed in **Schedule 2** annexed hereto.

---

[1] Ankura is affiliated with certain other Ankura-branded entities, including its affiliates, subsidiaries, and parent entities, which entities are managed by the same executive team (such entities the "Ankura Entities"). The Database maintained by the Ankura Entities includes information for all of the Ankura Entities. For companies and businesses acquired by any Ankura Entity, the Database captures engagements that were active at the time of such acquisition, as well as any post-acquisition engagements. For purposes of relationship disclosure, a three-year lookback period is used. The Ankura Entities include a trust company (Ankura Trust Company, LLC) and a broker-dealer (Ankura Capital Advisors, LLC). Neither of these entities hold or trade securities for their own account and, as with the other Ankura Entities, the clients of the trust company and broker-dealer entities are included in the Database.

[2] In reviewing its records and the relationships of its professionals, Ankura did not seek information as to whether any Ankura Entity professional or member of such professional's immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain Ankura Entity professionals have invested but as to which such professionals have no control over or knowledge of investment decisions, securities of the Debtors, or any other party-in-interest; or (b) has engaged in any ordinary course consumer transaction with any party-in-interest. If any such relationship does exist, I do not believe it would impact Ankura's disinterestedness or otherwise give rise to a finding that Ankura holds or represents an interest adverse to the Debtors' estates.

24. To provide further detail on the Database and the Firm Procedures, I note that Ankura is a portfolio company of private funds affiliated with Madison Dearborn Partners, LLC ("MDP" and such funds together with MDP, the "MDP Entities"). As such, the Firm Procedures include a review of MDP and its affiliated funds that have an ownership interest in Ankura, as well as MDP's other portfolio companies (the "Portfolio Companies") as of September 23, 2024, to determine if such entities appear on the list of Potential Parties-in-Interest.

25. The Portfolio Companies are under separate managerial control from the Ankura Entities and do not share any internal systems with any Ankura Entity. The Ankura Entities have no ability to access the Portfolio Companies' or MDP Entities' systems or confidential information,[1] nor do the Portfolio Companies or the MDP Entities have the ability to access the Ankura Entities' systems or confidential information. Certain MDP personnel serve as members of the Ankura Entities' board of directors (the "MDP Directors") and the MDP Directors serve on boards of directors for certain of the Portfolio Companies. However, the MDP Directors are subject to confidentiality obligations and fiduciary duties, which prohibit and prevent the sharing of confidential information between companies for which they have board of director responsibilities. Despite the separation between the Ankura Entities and the Portfolio Companies, the Portfolio Companies and MDP Entities are included in the Database and reviewed as part of the Firm Procedures and any connections to the Potential Parties-in-Interest are disclosed on **Schedule 2**.[2]

---

1 To the extent an Ankura Entity is engaged by another MDP portfolio company to perform services for such company, the Ankura Entities will have access to information from such company applicable to the work being performed. Such information will be subject to confidentiality agreements.

2 MDP may have other funds that do not have an ownership interest in the Ankura Entities. As these potential other funds are not connected to the Ankura Entities and the Ankura Entities have no access to non-public information related to such potential funds, these potential funds are not part of the Database and Firm Procedures. Similarly, MDP may use certain non-operating holding companies to hold the equity of the Portfolio Companies ("HoldCos"). Information regarding such HoldCos is not shared with the Ankura Entities and the Ankura Entities have no access to systems or confidential information related to such HoldCos. As such, these HoldCos are not

26. HPS Investment Partners, LLC ("HPS"), through certain investment funds, has a minority, non-controlling interest in Ankura. The Database therefore includes HPS and the above-referenced investment funds, and any connections to the Potential Parties-in-Interest are disclosed on **Schedule 2**. HPS has one board seat and one board observer seat on the Ankura Entities' board of directors. These board participants are subject to confidentiality obligations and fiduciary duties, and information walls exist to prevent the sharing of confidential information among HPS's investments. Further, the Ankura Entities have no access to HPS's or its investments' systems or confidential information. As such, while HPS is included in the Database and reviewed as part of the Firm Procedures, HPS's affiliates and the entities in which they invest are not.

27. As a result of the Firm Procedures, I have thus far ascertained that, except as may be set forth herein, upon information and belief, if retained, Ankura:

a. is not a creditor of the Debtors (including by reason of unpaid fees for prepetition services) or an equity security holder of the Debtors;

b. is not, and has not been, within two years before the Petition Date, a director, officer (other than by virtue of Ankura employees serving in the roles as Engagement Personnel (pre- and post-petition) as described in the Application), or an employee of the Debtors; and

c. does not have an interest materially adverse to the interests of the Debtors' estates, or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

28. Further, as part of its diverse practice, the Ankura Entities appear in numerous cases and proceedings, and participates in transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and

part of the Database or Firm Procedures. As noted above, however, all Portfolio Companies are part of the Database and Firm Procedures, regardless of ownership structure.

parties-in-interest in the Chapter 11 Cases. Further, the Ankura Entities performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which Ankura is to be employed, and none are in connection with the Chapter 11 Cases.

29. Neither I nor Ankura has entered into any agreements, express or implied, with any other party in interest, including the Debtors, any creditor, or any attorney for such party in interest in these Chapter 11 Cases, (a) for the purpose of sharing or fixing fees or other compensation to be paid to any such party in interest or its attorneys for services rendered in connection therewith, (b) for payment of such compensation from the assets of the estates in excess of the compensation allowed by this Court pursuant to the applicable provisions of the Bankruptcy Code, or (c) for payment of compensation in connection with these Chapter 11 Cases other than in accordance with the applicable provisions of the Bankruptcy Code.

30. Accordingly, except as otherwise set forth herein, insofar as I have been able to determine, neither I nor Ankura hold or represent any interest adverse to the Debtors or their estates, and Ankura is a “disinterested person” as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

31. If additional Potential Parties-in-Interest are provided to Ankura and any new material relevant facts or relationships are discovered or identified, Ankura will promptly file a supplemental declaration.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: November 12, 2024

*/s/ John Shepherd*
John Shepherd
Chief Restructuring Officer
OYA RENEWABLES DEVELOPMENT LLC, *et al.*

# <u>Schedule 1</u>

**Schedule 1**

**Potential Parties in Interest List**

**Schedule (a):Debtors**
OYA Renewables Development LLC
OYA Renewables EquipmentCo LLC
OYA Renewables Construction and Yield Holdings LLC
OYA Renewables Construction Holdings 2 LLC
OYA Renewables Construction Holdings 3 LLC
OYA-Rosewood Holdings LLC
OYA Renewables Yield-1 LLC
OYA-OMNI Development Company, LLC

**Schedule (b): Non-Debtor Affiliates**
OYA Renewables Inc.
OYA Renewables Corp.
OYA Solar NY, LP.
OYA-GPC 2021 Holdco LLC
State Route 122 LLC
Pulaski LLC
Wayside LLC
Robinson Road LLC
Rosewood Energy LLC

**Schedule (c): Banks**
TD Bank, N.A.
City National Bank

**Schedule (d): Significant Equity Holder**
OYA Renewables Corp.

**Schedule (e): Director**
Eric Millard

**Schedule (f): Bankruptcy Professionals**
Ankura Consulting Group, LLC
Sidley Austin, LLP
Young Conaway Stargatt & Taylor, LLP
Agentis Capital
Senahill Advisors LLC
Kroll Restructuring Administration LLC
Locke Lord LLP
Sheppard Mullin
Kirkland & Ellis LLP
Reed Smith LLP

**Schedule (g):Secured Lenders**
Carval
Greenbacker Development Opportunity Fund
Greenbacker Renewable Energy Company

**Schedule (h): Auditors**
RSM

**Schedule (i): Contract Counterparties**
Virginia Transformer Corp.
Anza RE, LLC
Quantum Logic, Inc.
ForeFront Power
Fourth Coast, Inc.

**Schedule (j): Independent Contractors**
Hailey Wilson
Bernadette Corpuz
Taymaz Jahaniaval
Roberto Roberti
Greg Rossetti
Aaron Merkle
Brett Kropf
Glenn Mackay
Glenn Frank
John McDonough
Christopher Willett

**Schedule (k): Landlords**
Anthony P. Crupi Trust
Marie G Pope
Henry J. Jr. & Kelly A. Finck
Luigi Basso
Susan Ashcraft
Hendricks, Jonny & Sandra B.
James H. Allison & Virginia Peck
Diane L. Patane
Robert D. Barnes
Ronald and Patricia Wittmeyer
Ronald J. Solem
Myron C. Brady

Dean D. Nicholson & Toni L. Nicholson
Patrick T. Dannebrock and Elizabeth A. Hetrick
Connie L. Schultz
E. Andrew Polley and Susanne M. Polley
Michael J. Mondrick
Daniel Byler
Arthur Malecki Jr.
Stephen Butchello
Nouryon Functional Chemicals LLC
David A. Frank & Cheryl Carlson
Craig Sabo & Gina Sabo
Ronald C. Brennan and Mary E. Brennan
Gibson Farm Properties LLC
Hacker, Eugene H. Jr. & Kristin H.
Shakley Donald R Trs & Shakley Tr
Barbara A. Yanko
James Bradford III
TATRO, WILLIAM J. & TATRO, DIANE M.
TRUST OF LEE DEBOER
RASMUSSEN, ERIC B. & RASMUSSEN, DONALD
CYPRESS FARMS LLC
Hanumantha Patlola, Usha Yellareddygari Sangreddygari Srinivas Tellagaddala & Venkata Satyanarayana Rao Dasari
Sheila K. Holman and Linette Perona
Conner, W. John & Diane Kaye
Douglas Alan Daniels & Julia Glenn Daniels
Carnes, Jason & Carnes Stephanie
Brendale Trust
Yam Trust
Randy Droll, Andrew Droll, Devon Droll and Joseph Droll
Rasmussen Family Limited Partnership
Walsh James T Trust
Phillips Family Farm Holdings LLC
Michael R. Baker & Dixie R. Baker
Mark P. Garrett and Katherine J. Garrett
Wayne K. Garrett
Deanne M Sweet and Neal E Sweet
Kenneth M Kanyo Jr
John Schoenfeld
Dee Ann M. Doerr as Trustee of the Dee Ann M. Doerr Living Trust
Craig A. Brehmer
Russell & Cynthia Varner Trust
Keith Myers
D.J. McQuestion & Sons Inc.
Scot Bursma Trust
UP Development Company
Jeffrey J. Whitman Trust
David A Brcik
Groeb Family Holdings LLC
Kreigh A. Freeland & Dawn L. Freeland
Marilyn J. Trinklein aka Marylinn J. Trinklein, Stafford G. Trinklein JR aka Stafford Trinklein JR., and Julie A. Trinklein.
Stafford G. Trinklein JR aka Stafford Trinklein JR., Julie A. Trinklein and Marilynn J. Trinklein aka Marylin J. Trinklein
Stafford G. Trinklein JR aka Stafford Trinklein JR
Stafford G. Trinklein JR. aka Stafford Trinklein JR
RCMA LLC
Beaver Farms LLC
JoBo Hunting Club LLC
Ellis Family Irrevocable Income Only Trust
Matthew Scully & Sally Scully
EGAN, MARK E. & NOE, EVELYN L.
PANDA LLC
JAMES A BARTLETT TRUST
David L. Reinhart
Rusty Bluck
Robert W. Bortel Revocable Living Trust
SURE FIRE INVESTMENTS LTD
Keller Real Estate Ltd
NYE, CHERYL S.
OGDEN AVE PROPERTIES LLC
BAUGHMAN, JEFFREY G. & BRECKENRIDGE LAND DEVELOPMENT INC
MILLER BRYAN T & TRICIA E
JOSEPH MARZULLO JR.
Rex Allen Brockschmidt & Dessie Faye Brockschmidt
DAVIDSON, JON A. & CAROL G.
POTATO CREEK PROPERTIES, LLC
Richard D. Rose & Timothy A. Rose

HANS F SCHOBER FARMS LLC
Howard Erlandsen & Debra Erlandsen
Bryan J. Crenshaw & Anita G. Crenshaw
Leininger, Brooke & Leininger, Michael
Troy A Woerner
Anne C. Phillips and Michael R. Crutchfield as Trustees of Francis T. Rogers Trust
CLUPPERT, DAVID M. & CLUPPERT, LAURIE G.
GRISCHOW, RHEINHARD W. & MARALYN F. LIVING TRUST
GAFFNEY, TRACI L.
Hoffmann Dairy Enterprises
Wojtalewicz, Dennis A. & Wojtalewicz, Jeanette A.
GARRET P. TRUDELL AND DANNA M. TRUDELL REVOCABLE TRUST, DATED 6/24/03
LAND FOR TOMORROW LLC
MUDDY ELK FARMS LLC
BARBARA J WADE AS TRUSTEE OF THE WADE LIVING TRUST
LARRY R. GRABER AND SEPARATELY, ROMAN T. GRABER AND CAROLYN F. GRABER, HOLDERS OF A LIFE ESTATE
PHILIP P. WADE AND KELLY WADE
DANIEL V. CRAIG
D & S LAND AND LIVESTOCK LLC
SNYDER FARMS INC
DAVID C. & JUDITH A. LEEGE JOINT REVOCABLE TRUST
KEMVA ACRES LLC
SJL ENTERPRISES LLC
TERRENCE L & KATHY GOERL LIVING TRUST
Rieck Family Properties, LLC
Rieck Family Properties II, LP
RICHARD T. CASEY & REBECCA C. CASEY
SHARON INVESTMENT & HOLDING COMPANY LLC, CASTLE ROCK LAND COMPANY LLC
Krapes Dillon
John D. Drumm & Kitty S. Drumm
Judy A Belew, Terry L Baxter, Gerry L Peters, & Rose M Speier
Richard Allen Brandenburg & Norma Alicia Brandenburg
Ardeshir Najafian & Alma L. Najafian
Thomas Ranch LLC
Estate of Gladys R. Robins
Derrick Nguyen, Calvin Nguyen, Tammie Le
Sukhwant Singh
Heather A. Swanson Revocable Trust
Whitney Dandurand and Daniel Dandurand
Noordhoff Deborah R Revocable Trust
Glenn W. Baldwin
Cedar Ridge Farms Revocable Trust
Knowles, Terry D & Connie D JT Ten Trust
Steven F. Bell & Cinda L. Bell
David & Grace Swartz Trust
Linn Gorecki Trust
Randy Sargent and Linda Sargent
Scott Harrand & Clara Harrand H&W
Thomas T. Lanway & Joyce M. Lanway
Rowe William P Jr Trust
William F. Roush Jr.
Bernard A. McKenna & Joan McKenna
Stephen Morenz, Susan Morenz, Brandon Morenz and Peggy L. Morenz
Mary M. Padget
Fallnest LLC
Jeffrey A. Reifensnyder
Crooked Horn Farm LLC
Robert G. Vollmer and Elaine M. Vollmer Revocable Living Trust
Berry David K Life Estate
John C. Rasmussen Trust
Prochnow Commercial Properties LLC

**Schedule (l): Insurers and Insurance Brokers**

Federal Insurance Company
Allianz Global Risk US Insurance Company
Everest National Insurance Company
Berkley Insurance Company - US
The Plexus Groupe LLC
Marsh

**Schedule (m): UCC Liens**

CVI CEF Master Fund I LP, as Collateral Agent

GDEV OYA Lender I, LLC, as Agent
City National Bank, as Agent for the Credit Parties

**Schedule (n): Litigation**
Omni Navitas Holdings, LLC
Ian Finlay
Scott Lechky

**Schedule (o): Ordinary Course Professionals**
RSM
Blake, Cassels & Graydon LLP

**Schedule (p): Sureties (Provider, Brokers and Obligees)**
Harco National Insurance Company
Brown & Brown Insurance Services, Inc.
Town of Richland
Town of Pamelia, Jefferson County, NY
Town of Orleans, Jefferson County, NY
Town of Cuba, NY
Town of Otto, NY

**Schedule (q): Tax Authority**
Delaware Secretary of State
Internal Revenue Service

**Schedule (r): Top 20 General Unsecured Creditors**
PRI Engineering Corp.-USD
Clear Point Energy, Inc
OMNI Navitas Renewables LLC
DNV Energy USA, Inc.
POLAR RACKING Inc - USD
LIHDC Professional Corp.
PurePower Engineering
Renewables Worldwide
STANCE Renewable Risk Partners Inc.
Bohler Engineering
CSC Company
Patterson Companies
David Laird Associates, Inc
NYS Department of Environmental Conservation
Allegany County Industrial Development Ag
Barclay Damon LLP
LaBella Associates D.P.C
Ausfeld & Waldruff Land Surveyors LLP
Catic Title Insurance Company
Town of Newfane
Richard (Dick) Scheutzow
Hodgson Russ LLP
National Grid
Sam Doubleday
TDK Engineering Associates, PC

**Schedule (s):U.S. Trustee Personnel and Bankruptcy Judges for the District of Delaware**
Chief Judge Laurie Selber Silverstein
Judge John T. Dorsey
Judge Craig T. Goldblatt
Judge Thomas M. Horan
Judge Karen B. Owens
Judge Brendan L. Shannon
Judge J. Kate Stickles
Judge Mary F. Walrath
Benjamin Hackman
Christine Green
Diane Giordano
Dion Wynn
Edith A. Serrano
Elizabeth Thomas
Fang Bu
Hannah M. McCollum
Holly Dice
James R. O'Malley
Jane Leamy
Jonathan Lipshie
Jonathan Nyaku
Joseph Cudia
Joseph McMahon
Lauren Attix
Linda Casey
Linda Richenderfer
Malcolm M. Bates
Michael Girello
Nyanquoi Jones
Richard Schepacarter
Rosa Sierra-Fox

Shakima L. Dortch
Timothy J. Fox, Jr.
Andrew Vara
Laura Haney
Robert Cavello
Demitra Yeager
Nickita Barksdale
Claire Brady
Marquietta Lopez
Amanda Hrycak
Danielle Gadson
Jill Walker
Rachel Bello
Cacia Batts
Lora Johnson
Paula Subda
Al Lugano
Catherine Farrell
Laurie Capp
Una O'Boyle
David C. Weiss
Hawa Konde, Auditor (Bankruptcy)
Dianne P. Dugan, Regional Staff -
Administrative Officer
Joanne E. Clausen, Regional - Staff Secretary

<u>**Schedule 2**</u>

**Schedule 2**

| Matched Entity | Relationship to Debtors | Relationship to Ankura |
|---|---|---|
| Barclay Damon LLP | Unsecured Creditor | Current Client, Former Client |
| Everest National Insurance Company | Insurance Provider | Former Client |
| Kirkland & Ellis LLP | Counsel to Lender | Current Client, Former Client, Service Provider |
| Locke Lord LLP | Counsel to Lender | Current Client, Former Client |
| Marsh | Insurance Broker | Former Client |
| National Grid | Unsecured Creditor | Current Client, Former Client |
| Reed Smith, LLP | Counsel to Lender | Current Client, Former Client |
| RSM | Auditor | Former Client |
| Sheppard Mullin | Counsel to Lender | Current Client, Former Client |
| Sidley Austin, LLP | Bankruptcy Professional | Current Client, Former Client |
| TD Bank, N.A. | Bank | Current Client, Former Client |
| Young Conaway Stargatt & Taylor | Bankruptcy Professional | Current Client, Former Client |

Case 24-12574-KBO Doc 105 Filed 12/20/24 Page 1 of 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered) |

**DEBTORS' REPLY IN SUPPORT OF THE DEBTORS' APPLICATION FOR AN ORDER (I) AUTHORIZING DEBTORS TO RETAIN ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE, AND (II) GRANTING RELATED RELIEF**

OYA Renewables Development, LLC and its debtor affiliates, as debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this reply (this "Reply") in support of the *Debtors' Application for an Order (I) Authorizing Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 73] (the "Ankura Retention Application") and in response to *The United States Trustee's Objection to the Debtors' Application for an Order (I) Authorizing Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief (D.I. 73)* [Docket No. 91] (the "Objection").

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

## PRELIMINARY STATEMENT

1. The Debtors and the economic stakeholders in these Chapter 11 Cases support the Debtors' retention of John Shepherd and Ankura Consulting Group, LLC ("Ankura") to ensure continuity in the Debtors' operations, to avoid needlessly interrupting these Chapter 11 Cases, and to avoid overwhelming an already thin budget with the costs of a replacement.

2. The Objection by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") argues that Mr. Shepherd and Ankura must meet retention criteria under section 327 of the Bankruptcy Code, rather than section 363 of the Bankruptcy Code—the section under which the Debtors seek to retain both.

3. Mr. Shepherd and Ankura are not replaceable in these Chapter 11 Cases. As discussed in the *Declaration of Eric Millard, Independent Manager, in Support of the Debtors' Application for an Order (I) Authorizing Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief* (the "Millard Declaration"), filed contemporaneously herewith, Mr. Shepherd and Ankura have played a vital role in managing the Debtors' day-to-day and strategic operations and have provided management stability for the better part of the last year. Mr. Shepherd served as an independent manager from mid-April to mid-October of 2024, and he served as Chief Restructuring Officer ("CRO") since early August 2024. Since August 2024, Ankura personnel have worked with Mr. Shepherd and the Debtors to manage the business, and they have gained critical experience and institutional knowledge related to the Debtors' business and ongoing sale efforts. After the CRO's work stabilizing the assets and seeking and negotiating with prospective bidders for over six months, the Debtors and their stakeholders are actively pursuing a Court-sanctioned sale and marketing process, making this a particularly precarious time to oust senior management.

4. The harmful outcome that would result from the U.S. Trustee's position is not mandated by the Bankruptcy Code because section 363(b) of the Bankruptcy Code is an appropriate and well-supported basis to seek retention of Mr. Shepherd and Ankura. Both case law and entered orders in various chapter 11 cases establish that courts throughout the country have approved retention of firms like Ankura to provide officers to debtors under sections 105 and 363 of the Bankruptcy Code. No party—including the U.S. Trustee—has even suggested that the Debtors lack a good business reason to retain Mr. Shepherd and Ankura or that the provision of their leadership during these Chapter 11 Cases is not in the best interests of the Debtors' estates. Further, the U.S. Trustee has not articulated how the interests of any of the Debtors' stakeholders are best served by abruptly removing the Debtors' CRO or Ankura.

5. As set forth more fully herein, the Debtors believe that the U.S. Trustee's Objection should be overruled. Accordingly, the Debtors respectfully request that the Court approve the retentions of Mr. Shepherd and Ankura.

## <u>FACTUAL BACKGROUND</u>

6. As set forth in greater detail in the First Day Declaration, the continuing cash drain on the Company, delays in completing certain solar projects, and hurdles to consummate sale transactions required the Company to begin exploring strategic alternatives to address its go-forward liquidity position. The Company also engaged advisors to assist in these efforts. *See* Millard Decl. ¶ 6.

7. In early 2023, the Debtors defaulted on certain payment obligations under various loan documents. On July 12, 2023, the Agent under the GDEV facility provided a notice of default to the Company of the occurrence of certain specified events of default and uncured breach under the Credit Agreement. Because of the event of default, on July 18, 2023, the Agent served notice to the Borrower of the Agent's exercise of the Lender's rights and remedies under the Credit

Case 26-02465-ELG Document 1 Filed 12/10/24 Page 4 of 21

Agreement, including, but not limited to, foreclosure and sale of collateral and assets of the loan parties. *See* Millard Decl. ¶ 7.

8. Notwithstanding the notice of default, the Prepetition GDEV Secured Parties and the Prepetition Carval Secured Parties agreed to forbear from enforcing their rights of the Company took certain actions, including appointing a new board of directors for the Debtors' non-Debtor parent. The Prepetition Secured Lenders further agreed to extend forbearances from time to time, with a final forbearance ending on February 15, 2024. *See* Millard Decl. ¶ 8.

9. By early 2024, the Debtors' liquidity position was more strained than ever, resulting in monetary defaults under the Prepetition GDEV Facility and the Prepetition Carval Facility. After the Debtors missed the March 31, 2024, interest payment, the Prepetition GDEV Secured Parties and the Prepetition Carval Secured Parties issued another notice of default. After the expiration of a period of forbearance, on April 17, 2024, the Prepetition GDEV Secured Parties and the Prepetition Carval Secured Parties exercised their rights to appoint, as independent managers, both John Shepherd and Eric Millard. Messrs. Shepherd and Millard did not know one another prior to their appointments. *See* Millard Decl. ¶ 9.

10. At the outset, Mr. Shepherd and Mr. Millard understood that even though the Debtors did not then have officers or employees, that as independent managers, they would have typical oversight responsibilities, such as making decisions with respect to the overall direction, overseeing a value-maximizing transaction or transactions, and preserving the Debtors' value for the benefit of creditors. *See* Millard Decl. ¶ 10. Further, at the time the independent managers were appointed, an immediate in-court restructuring was not being contemplated.

11. As detailed in the First Day Declaration, after Mr. Shepherd's and Mr. Millard's appointments as independent managers, the Debtors continued to pursue the sale of certain of their assets. *See* Millard Decl. ¶ 11.

12. Although Mr. Shepherd and Mr. Millard were told they would each be expected to spend approximately 15 hours per week in their roles as independent managers, it quickly became apparent that the scope of services were significantly broader than initially understood and that they would need to spend significantly more time in their efforts to rehabilitate value and work around the pursuit of a value-maximizing transaction for the Debtors. *See* Millard Decl. ¶ 12.

13. Mr. Shepherd, in particular, expended significant effort with respect to the Debtors and took on an active day-to-day management role over the Debtors, including daily work and interactions with all of the employees of the non-debtor parent companies (not just the executive team), paying the company's bills, negotiating directly with customers, vendors, and other stakeholders, and effectively fulfilling the role of a chief executive. It is estimated that Mr. Shepherd spent a minimum of 40 hours per week in his service to the Debtors. The Company would not have been able to function without Mr. Shepherd's efforts. *See* Millard Decl. ¶ 13.

14. It became clear that the workload was too substantial and that a chief restructuring officer (a "CRO") should be appointed with financial and operational support in order to most efficiently guide the Debtors through the sale process with multiple bidders and to further the Debtors' strategic alternatives for maximizing value through an out-of-court transaction or, if required, through an in-court restructuring. Mr. Shepherd recused himself from the evaluation of potential CRO and financial advisor candidates. *See* Millard Decl. ¶ 14.

15. At this point, Mr. Millard reviewed other comparable financial advisors' rates and stated expertise and with third parties on the basis for CRO qualifications. Mr. Millard considered

32455329.1

numerous factors, including price, reputation, qualifications, familiarity with the Debtors' business, and timing. *See* Millard Decl. ¶¶ 15–16.

16. Ultimately, in consultation with counsel, Mr. Millard independently made the decision that Mr. Shepherd was the best candidate to be appointed as CRO and that Ankura was the best option to be retained as the financial advisor, as they were the best options. Mr. Shepherd and his team had approximately four months of hands-on experience relating to the Debtors, potential buyers, the Debtors' counterparties, and the financial intricacies of the Debtors, and any other firm would have had to devote hundreds of hours to get up to speed in comparison to Mr. Shepherd and his team's knowledge. This cost would have been a substantial detriment to the precarious financial situation of the Debtors, and there was not capital available for the incremental costs. *See* Millard ¶ 17.

17. On August 3, 2024, Mr. Shepherd was formally appointed as CRO. Then, on August 6, 2024, the Debtors and Ankura formally entered into an engagement letter by which Ankura was engaged to act as the advisor to the Debtors to provide interim management and restructuring advisory services as set forth therein. *See* Millard Decl. ¶¶ 18–19.

18. After being appointed as CRO, Mr. Shepherd continued much of the activity in which he was engaged prior to his formal appointment, and Mr. Shepherd, Ankura, and the Debtors' other advisors continued to pursue certain out-of-court options for the Debtors. *See* Millard Decl. ¶ 20.

19. Through the course of the sale efforts, several of the lead bidders had indicated their desire to close a sale in chapter 11. By mid-October, it became clearer that to close transactions, the Debtors would need to explore an in-court option and prepare for filing for bankruptcy. On

Case 24-12574-KBO Document 65-4 Filed 01/02/26 Page 7 of 21

October 17, 2024, Mr. Shepherd resigned his position as independent manager and remained only as CRO. *See* Millard Decl. ¶ 21.

## LEGAL ARGUMENT

### I. The Court May Authorize the Debtors' Retention of Mr. Shepherd and Ankura Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code.

20. Pursuant to section 363(b) of the Bankruptcy Code, after notice and a hearing, a debtor has broad discretion to "use, sell, or lease, other than in the ordinary course of business, property of the estate," so long as such use is supported by a good business reason." 11 U.S.C. § 363(b)(1); *see, e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."). Courts interpreting section 363(b) of the Bankruptcy Code have held that transactions should be approved pursuant to such provision where, as here, they are supported by management's sound business judgment. *See, e.g.*, *Meyers v. Martin (In re Martin*), 91 F.2d 389, 395 (3d Cir. 1986) (citations omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also In re Elpida Memory, Inc.*, Case No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that judicial approval under section 363 of the Bankruptcy Code requires a showing that the proposed action is fair and equitable, in good faith, and supported by a good business reason).

32455329.1

21. Under the business judgment rule, a court will not interfere with the judgment of a board unless there is a showing of "gross and palpable overreaching." *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002) ("under the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' and a court 'will not substitute its own notions of what is or is not sound business judgment'") (citation omitted); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor articulates a reasonable basis for its business decision (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumption of the business judgment rule on the merits is a near-Herculean task"). The relief requested herein is appropriate and warranted under each of the above standards.

22. As the U.S. Trustee acknowledges, restructuring and a debtor's decision to engage restructuring professionals "is, by definition, outside the ordinary course of business," and "courts have approved the retention of restructuring professionals under [section] 363 [of the Bankruptcy Code]." Objection ¶ 8.

23. Indeed, courts have relied upon section 363(b) as the basis upon which to employ and compensate professionals to serve as officers or other management-level personnel employed by debtors. *See, e.g.*, *In re Takeoff Technologies, Inc.*, Case No. 24-11106 (CTG) (Bankr. D. Del. Jul. 3, 2024); *In re Proterra Inc.*, Case No. 23-11120 (BLS) (Bankr. D. Del. Sept. 6, 2023); *In re AeroCision Parent, LLC*, Case No. 23-11032 (KBO) (Bankr. D. Del. Aug. 29, 2023); *In re Spansion Inc.*, Case No. 09-10690 (KJC) (Bankr. D. Del. Apr. 13, 2009); *In re Verasun Energy Corp.*, Case No. 08-12687 (PJW) (Bankr. D. Del. Dec. 17, 2008); *In re WorldSpace, Inc.*, Case No. 08-12412 (KJC) (Bankr. D. Del. Nov. 10, 2008); *In re Hines Horticulture, Inc.*, Case No. 08-

11922 (KJC) (Bankr. D. Del. Oct. 2, 2008); *see also In re Copenhaver, Inc.*, 506 B.R. 757, 764–65 (Bankr. C.D. Ill. 2014) (holding that the retention of a current director as consultant and chief restructuring officer under section 363(b) would be appropriate given the "unique and compelling circumstances" of the case, subject to modification of the court's oversight of the officers' fees).

24. Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." The Debtors, in exercising their sound business judgment and acting through their independent manager Mr. Millard, appointed Mr. Shepherd as CRO and retained Ankura as financial advisor.

25. ***First***, as described in the Millard Declaration, the Debtors determined that the retention of a CRO and financial advisor was necessary and reasonable because the Debtors required assistance and the expertise to guide them through the sale process with multiple bidders and to further the Debtors' strategic alternatives for either maximizing value through an out of court transaction, or through an in-court restructuring if needed. *See* Millard Decl. ¶ 12.

26. ***Second***, Mr. Shepherd and Ankura in their capacities as CRO and financial advisor, respectively, provide services that benefit the Debtors' estates and creditors.

27. ***Third***, through an independent evaluation process and an arms'-length negotiation, as described the Millard Declaration, the Debtors determined that Mr. Shepherd—who was unknown to Mr. Millard prior to their appointments as independent managers—and Ankura were the appropriate professionals to hire based on the Debtors' exploration of strategic alternatives, pursuit of an out-of-court solution, and, ultimately, their entry into bankruptcy. *See* Millard Decl. ¶¶ 9, 12–17.

28. Accordingly, the Debtors represent that they, in their sound business judgment, have decided that it is in the best interests of the Debtors' estates to retain Mr. Shepherd as CRO and Ankura as financial advisor.

**II. The U.S. Trustee's Arguments That Mr. Shepherd and Ankura Cannot Be Retained Under Section 327 of the Bankruptcy Code Misconstrue Officer-Based Engagements Under Section 363 of the Bankruptcy Code.**

29. The U.S. Trustee shoehorns an argument that Mr. Shepherd and Ankura must meet the disclosure and retention standards of and, effectively, be retained under section 327 of the Bankruptcy Code despite the Debtors' express application to retain both under section 363 of the Bankruptcy Code. *See* Objection ¶¶ 9–11, 14. Retention under section 327 of the Bankruptcy Code is inapplicable in this instance.

30. Section 327 of the Bankruptcy Code provides that a trustee or debtor in possession "with the court's approval may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). A "professional person is one who plays an intimate or central role in the administration of the debtor's bankruptcy proceeding." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp., et al. (In re Johns-Manville Corp.)*, 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986) (stating that a professional within the meaning of section 327 is one intimately involved in the administration of the reorganization process, for example, one who played a part in negotiating a plan, who is involved with disposing of or acquiring assets, or who interacts with creditors).

31. Individuals who are hired to oversee day-to-day operations and manage companies rather than specifically for bankruptcy-related purposes are not "professional persons" within the meaning of section 327 of the Bankruptcy Code. *See In re Phoenix Steel Corp.*, 110 B.R. 141, 142

32455329.1

(Bankr. D. Del. 1989) (finding that workout managers hired as officers to evaluate a company's financial condition and oversee day-to-day operations were not "professional persons" within the meaning of section 327(a) of the Bankruptcy Code); *see also In re SageCrest II, LLC*, Case Nos. 3:10V978, 3:10CV979, 2011 WL 134893, at *7 (D. Conn. Jan. 14, 2011) ("[o]fficers responsible for the day-to-day business of the debtor . . . stand in contrast to professionals hired for the sole purpose of reorganizing the debtor organization"); *In re Dairy Dozen-Milnor, LLP*, 441 B.R. 918, 920 (Bankr. D.N.D. 2010) (stating that a "professional person" under section 327(a) is one who "takes a central role in the administration of the debtor's bankruptcy estate and bankruptcy proceedings as opposed to one who provides services to the debtor that are necessary regardless of whether a bankruptcy petition was filed"); *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) (concluding that maritime engineers hired by the debtor were not "professional persons" because they did not play a central role in the administration of the bankruptcy case and the need for their employment did not arise from the bankruptcy itself).

32. As a first order, the Debtors are not seeking to retain Mr. Shepherd or Ankura pursuant to section 327 of the Bankruptcy Code. The Debtors are seeking to retain Mr. Shepherd and Ankura under section 363 of the Bankruptcy Code, and, despite the U.S. Trustee's argument to enforce an inapplicable standard and assertion that the Debtors "cannot evade the requirements of § 327," Objection ¶ 10, it is the Court that has discretion to permit retention of a professional under section 363 of the Bankruptcy Code—"'not a backdoor but, rather, an equally appropriate door' on which the Court can consider retention of" Mr. Shepherd and Ankura. *In re Nine West Holdings, Inc.*, 588 B.R. 678, 691 (Bankr. S.D.N.Y. 2018). By approving numerous retention applications based on section 363 of the Bankruptcy Code rather than section 327 (as cited above),

Case 26-01465-E14-KB Document 55-4 Filed 12/02/24/26 Page 12 of 21

courts in this District have made clear that section 327 of the Bankruptcy Code is not the exclusive means by which a debtor may retain and pay professionals.

33. Even if compliance with section 327 of the Bankruptcy Code were required, Mr. Shepherd and Ankura are not "professional persons" within the meaning of section 327 of the Bankruptcy Code. In *Nine West*, the Office of the United States Trustee for the Southern District of New York (the "SDNY UST") objected to the Debtors' proposed retention of a CRO who had served as interim CEO, financial advisor, and, most notably, a board member of certain of the Debtors. *Id.* at 693–694. As part of its objection, the SDNY UST argued that the proposed CRO and professionals were professional persons within the context of section 327 of the Bankruptcy Code, as they "'specialize[d] in financial and operational restructuring,'" were "'intimately involved in the restructuring of the Debtors' businesses and [were] central to the reorganization,'" and "among other things, [] prepared each of the Debtors' schedules and SOFAs; [] assisted in claims work and in reviewing various contracts for the Debtors to determine which contracts to assume or reject; . . . assist[ed] with the debtor-in-possession financing; and were intimately involved in the postpetition sale of a substantial portion of the Debtors' business where they evaluated bids, qualified certain bids, and participated in the auction." *Id.* at 694 (quotations and citations omitted). Acknowledging that the proposed retained parties did, in fact, offer these incredibly valuable services to the debtors, the Court also emphasized that these professionals had been retained in the years preceding bankruptcy to "manage the day-to-day operations of the company's business and not for the express purpose of administering the then-nonexistent bankruptcy estates." *Id.* at 694. Similarly, in the present case, Mr. Shepherd was hired as an independent manager months prior to the Debtors' entry into bankruptcy. Immediately upon his retention, he engaged in "board-level" responsibilities, including making decisions with respect to

32455329.1

the overall direction of the business, overseeing a value-maximizing transaction or transactions, and preserving the Debtors' value for the benefit of their creditors. *See* Millard Decl. ¶ 8. As the demands beyond typical board-level responsibilities became unsustainable in his role as an independent manager, Mr. Millard—and Mr. Millard alone—made the decision to appoint Mr. Shepherd to CRO. Then, Mr. Millard—again, alone—retained Ankura to assist as financial advisor. In the following months, Mr. Shepherd and Ankura took active roles within the Debtors' management and tirelessly sought an out-of-court solution to the Debtors' liquidity crisis, and it was only after those out-of-court options became unattainable that bankruptcy became the likeliest outcome, at which point Mr. Shepherd resigned as independent manager. *See* Millard Decl. ¶¶ 10–12, 19. Since entry into bankruptcy, Mr. Shepherd and Ankura and have continued to provide the types of services provided to the Debtors prior to bankruptcy, *see* Millard Decl. ¶¶ 18, and, as such, "[t]heir roles—both prepetition and postpetition—are focused on running the business. . . . [and] the services that they have provided to the Debtors' bankruptcy-specific professionals are largely work that the officers and managers of any bankrupt entity would have to do in the ordinary course." *In re Nine West Holdings, Inc.*, 588 B.R. 678, 695 (Bankr. S.D.N.Y. 2018). To deem them and require their retention as "professional persons" within the meaning of section 327 of the Bankruptcy Code "would be an absurd result" and, "if this were the case, virtually every senior executive of every chapter 11 debtor would have to be retained under section 327(a). This simply cannot be." *In re Nine West Holdings, Inc.*, 588 B.R. 678, 695 (Bankr. S.D.N.Y. 2018).

34. If the U.S. Trustee's position were adopted, good governance practices would be imperiled as companies would be limited in their ability to retain advisory firms to manage their business as circumstances dictate. If followed, advisory firms that have supplied vital services to companies preceding bankruptcy would be forced out immediately upon filing for bankruptcy,

disrupting company management at a time when such services are most needed. The Bankruptcy Code—which is designed to rehabilitate debtors—does not require this result. The Debtors' ability to use estate assets pursuant to section 363 of the Bankruptcy Code ensures that the Bankruptcy Code's goal of rehabilitating debtors is not hampered by a narrow reading of advisory services firms pursuant to section 327 of the Bankruptcy Code. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). This reading safeguards a company's ability to exercise prudent governance and hire management advisory consultants on an as-needed basis without the risk of losing such company's services upon commencement of a bankruptcy case, thus harmonizing sections 327 and 363 for purposes of implementing the Bankruptcy Code's purposes. Particularly here, with now eight months of institutional history deep in the weeds of the Debtors' business and rehabilitation workstreams, replacing the CRO/Ankura with unknown and unknowledgeable new people would cost dollars these cases cannot afford.

## III. That the Debtors' Proposed Retention of Mr. Shepherd and Ankura Complies With the Jay Alix Protocol in All Material Respects Further Demonstrates Retention Under Section 363(b) Is Appropriate.

35. Even though the "Jay Alix Protocol" is not law, the Debtors' proposed retention of Mr. Shepherd and Ankura complies with the Jay Alix Protocol in all material respects. The Jay Alix Protocol arose out of *In re Safety-Kleen Corp.*[2] and *In re Harnischfeger Industries Inc.*[3], by which bankruptcy courts approved the United States Trustee Program's settlement of its objections to applications to retain a CRO and the CRO's firm as a restructuring advisor. By the Jay Alix Protocol, the "U.S. Trustee assents to—indeed, directs—the retention of distressed management

[2] Case No. 00-2303 (Bankr. D. Del. 2000).
[3] Case No. 99-2171 (Bankr. D. Del. 1999).

32455329.1

consultants by a debtor pursuant to section 363 of the [Bankruptcy] Code so long as the firm complies with certain requirements contained in the [Jay Alix] Protocol." *In re Nine West Holdings, Inc.*, 588 B.R. 678, 688 (Bankr. S.D.N.Y. 2018) (citation omitted).

36. The central goal of the Jay Alix Protocol is to prevent conflicts of interest and collusive behavior where advisors to a debtor may be wearing "two hats." *See In re Saint Vincent's Catholic Med. Centers of N.Y.*, Case No. 05 B 14945 (ASH), 2007 WL 2492787, at *3, n.3 (Bankr. S.D.N.Y. Aug. 29, 2007) (noting that the Jay Alix Protocol "recognizes that there is an inherent conflict between an advisor's duty to a debtor and its own business interests where the advisory firm serves as both a financial advisor retained under section 327 of the Bankruptcy Code and as a crisis manager and where the advisory firm's staff serve as officers of the debtor corporation").

37. In other words, the Jay Alix Protocol "was designed to prevent a party from using its position in one capacity to benefit itself in another capacity." *In re Nine West Holdings, Inc.*, 588 B.R. 678, 688 (Bankr. S.D.N.Y. 2018). Here, Mr. Shepherd and Ankura did not use their respective positions to benefit Ankura in multiple capacities. As indicated in the Millard Declaration, it was Mr. Millard—independent of Mr. Shepherd—who decided to appoint Mr. Shepherd as CRO and to retain Ankura as financial advisor. *See* Millard Decl. ¶ 15.

38. Although the "J. Alix Protocol has provided a reliable framework for the postpetition employment of a financial advisor, when one of whose members has served as Chief Restructuring Officer or other executive position to a debtor before the filing of a petition," Objection ¶ 9, the Jay Alix Protocol is not itself law, courts are not bound by it, and the Debtors' legal right to retain Mr. Shepherd and Ankura does not depend on it. *See In re Nine West Holdings, Inc.*, 588 B.R. 678, 687–88 (Bankr. S.D.N.Y. 2018). Courts were approving the retention of restructuring advisors as a matter of law under section 363(b) well before the U.S. Trustee first

32455329.1

Case 24-12534-JKS Doc 1055-4 Filed 12/02/24 Page 16 of 21

employed the Jay Alix Protocol. *See, e.g.*, *In re Bill's Dollar Stores, Inc.*, Case No. 01-0435 (PJW) (Bankr. D. Del. Mar. 14, 2001) [Docket No. 141] (authorizing the continued retention of an advisory firm to provide the debtors with interim management through their Interim CEO and CRO pursuant to section 363(b) of the Bankruptcy Code).

39. Nevertheless, the core requirements of the protocol consist of the following:

a. the firm sought to be retained must serve in only one capacity (i.e., as either a financial advisor, crisis manager, claims agent, or investor);

b. the firm's retention application must be filed under section 363 of the Bankruptcy Code and the application must disclose the firm's relationships with interested parties and make other disclosures showing the firm is otherwise disinterested;

c. the firm must file monthly staffing reports, which must be subject to Court review; and

d. retention of persons furnished by the firm must be approved by and act under the direction of an independent board of directors.[4]

40. The Ankura Retention Application, the Shepherd Declaration, and the proposed order attached to the Ankura Retention Application address a number of these points, which the U.S. Trustee has not challenged.

41. ***First***, the Ankura Retention Application provides that Ankura will only serve as financial advisor and not in any other capacity.

42. ***Second***, the Ankura Retention Application was filed under section 363 of the Bankruptcy Code, and the Ankura Retention Application and Shepherd Declaration disclose the firm's relationships with interested parties, showing that Ankura is disinterested.

[4] *See In re Nine West Holdings, Inc.*, 588 B.R. 678, 688 (Bankr. S.D.N.Y. 2018).

43. ***Third***, the Ankura Retention Application provides that Ankura will file monthly reports of compensation earned and expenses incurred on a monthly basis (the "Monthly Staffing Reports").

44. ***Fourth***, as detailed in the Millard Declaration, Ankura was retained by and acts under the direction of Mr. Millard, who is unaffiliated with Ankura. *See* Millard Decl. ¶ 15.

45. In its Objection, the U.S. Trustee acknowledges that the Jay Alix Protocol permits a CRO to serve a debtor prepetition as an officer. Objection ¶ 11. However, the U.S. Trustee attempts to distinguish prepetition service as an *officer* with prepetition service as a *director*, and claim that the Jay Alix Protocol flatly does not permit a prepetition director to be a CRO. *See* Objection ¶ 11.

46. The U.S. Trustee misconstrues the Jay Alix Protocol with respect to prepetition service as an officer or director. The Jay Alix Protocol expressly provides that "service as a pre-petition officer will not *per se* cause disqualification." Jay Alix Protocol § I(E)(3). Further, although the Jay Alix Protocol includes a footnote that a financial advisor "shall not seek to be retained in any capacity in a bankruptcy proceeding for an entity where any principal, employee or independent contractor of [the financial advisor] serves or has previously served as a director of the entity or an affiliate thereof within two years prior to the petition date," Jay Alix Protocol, n.3, the circumstances that the footnote addresses are not present here. In *Safety-Kleen* and *Harnischfeger*, the financial advisor had principals on the debtor boards selecting the professionals to be employed in their imminent chapter 11 cases. Here, although Mr. Shepherd was an independent manager, he was not involved in the decision—one made entirely by Mr. Millard—to retain Ankura. *See* Millard Decl. ¶¶ 12,15. Further, when Ankura was retained, it was not at all

Case 24-12574-KBO Doc 1055 Filed 11/26/24 Page 18 of 21

a foregone conclusion that the Debtors would need to enter bankruptcy. *See* Millard Decl. ¶¶ 18–19.

47. Notably, recently in *In re Takeoff Technologies, Inc.*, Case No. 24-11106 (CTG) (Bankr. D. Del. 2024), the U.S. Trustee did not even lodge an objection to the debtors' motion to retain a CRO, deputy CRO, and financial advisor when the proposed deputy CRO had previously served as both chief executive officer and director of the debtors at the time the cases were filed and resigned only just prior to filing the retention application. *See In re Takeoff Technologies, Inc.*, Case No. 24-11106 (CTG) (Bankr. D. Del. Jun. 14 2024) [Docket No. 83]. Despite this prior role, the Court approved the retention of the CRO, the deputy CRO, and the financial advisor. *See In re Takeoff Technologies, Inc.*, Case No. 24-11106 (CTG) (Bankr. D. Del. Jul. 3, 2024) [Docket No. 169].

## IV. Retention of Mr. Shepherd and Ankura Is of Critical Importance in These Chapter 11 Cases.[5]

48. It is vital to the success of the Debtors' Chapter 11 Cases and their ongoing sale efforts to retain Mr. Shepherd and Ankura, and the U.S. Trustee does not argue to the contrary.

49. Bankruptcy courts have substantial freedom when considering requests pursuant to section 363(b) of the Bankruptcy Code. *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992) ("First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir. 1983)).

50. Additionally, this Court's inherent equitable powers under section 105(a) of the Bankruptcy Code allow this Court to "issue any order, process, or judgment that is necessary to

32455329.1

Case 26-02465-ELG KBO Document 1055-4 Filed 12/02/24 Page 19 of 21

appropriately carry out the provisions of this title." 11 U.S.C. § 105(a). This broad authority is consistent with "the fundamental purpose of reorganization and [] the Act's grant of equity powers to bankruptcy courts," which "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors." *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987). This Court can and should "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985).

51. The Debtors have numerous business reasons of the highest importance that justify retaining Mr. Shepherd and Ankura. In addition to the specific knowledge that Mr. Shepherd and Ankura have acquired about the Debtors' business, Mr. Shepherd and Ankura have extensive experience providing restructuring services to distressed companies. Mr. Shepherd and his team had approximately four months of hands-on experience relating to the Debtors, potential buyers, the Debtors' counter-parties, and the financial intricacies of the Debtors, and any other firm would have had to devote hundreds of hours to get up to speed in comparison to Mr. Shepherd and his team's knowledge. *See* Millard Decl. ¶ 15.

52. If the Debtors were forced to disengage with Mr. Shepherd and Ankura, the Debtors would be deprived of the assistance of highly qualified professionals and be forced to engage new professionals who lack familiarity with the Debtors' business and strategy and work to get these professionals up to speed while rapidly approaching the proposed sale process, pending milestones under the DIP Facility, and deteriorating liquidity. *See* Millard Decl. ¶ 15.

53. Accordingly, the Debtors respectfully submit that the services provided by Mr. Shepherd and Ankura are critical to the Chapter 11 Cases, and the forced departure of

32455329.1

Mr. Shepherd and Ankura would be detrimental to the success of these Chapter 11 Cases and the Debtors' parties in interest.

**<u>CONCLUSION</u>**

54. For the foregoing reasons, the Debtors submit that good business justification exists to approve the Debtors' retention of Mr. Shepherd and Ankura, and respectfully request that the Court overrule the U.S. Trustee's Objection and grant the Ankura Retention Application.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request the Court overrule the U.S. Trustee's Objection and enter an order granting the relief requested in the Ankura Retention Application.

Dated: December 2, 2024
Wilmington, Delaware

*/s/ Kenneth J. Enos*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
emorton@ycst.com
kenos@ycst.com
rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (admitted *pro hac vice*)
Maegan Quejada (admitted *pro hac vice*)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

Nathan C. Elner (admitted *pro hac vice*)
Chelsea M. McManus (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
Email: nelner@sidley.com
cmcmanus@sidley.com

Ian C. Ferrell (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (KBO)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 73** |

**ORDER DENYING THE DEBTORS' RETENTION OF ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE**

Upon consideration of the application (the "Application")[2] of the Debtors as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code for entry of an order authorizing the Debtors to retain and employ Ankura Consulting Group, LLC effective as of the Petition Date to provide the Debtors with a Chief Restructuring Officer and other additional personnel, all as more fully set forth in the Application; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Application.

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and this Court having held a hearing to consider the relief requested in the Application; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Application is denied.

2. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**Dated: December 20th, 2024**
**Wilmington, Delaware**

Ka B. Ow

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**

32544996.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| OYA Renewables Development LLC,. *et al.*,[1] | : | Case No. 24-12574 (KBO) |
| | : | |
| | : | Jointly Administered |
| | : | |
| Debtors. | : | **Hearing Date: Dec. 3, 2024 at 11:00 a.m.** |
| | : | **Objections Due: Nov. 26, 2024 by 4:00 p.m.** |

**THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' APPLICATION FOR AN ORDER (I) AUTHORIZING DEBTORS TO RETAIN ANKURA CONSULTING GROUP, LLC TO PROVIDE JOHN SHEPHERD AS CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AS NECESSARY, EFFECTIVE AS OF THE PETITION DATE, AND (II) GRANTING RELATED RELIEF (D.I. 73)**

In support of his Objection to the *Debtors' Application for an Order (I) Authorizing Debtors to Retain Ankura Consulting Group, LLC to Provide John Shepherd as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date, and (II) Granting Related Relief* (D.I. 73) (the "Application"),[2] Andrew R. Vara, the United States Trustee for Region 3, by and through his counsel, respectfully states:

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYARosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield- 1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd,Chief Restructuring Officer.

[2] Unless otherwise defined herein, capitalized terms shall have the same meaning and context as those capitalized terms included in the Application, the Shepherd Declaration and/or any other relevant, referenced or cited document or pleading.

## PRELIMINARY STATEMENT

The Application to retain Ankura Consulting Group, LLC ("Ankura") and utilize John Shepherd ("Mr. Shepherd") as Chief Restructuring Officer ("CRO") deviates from the J. Alix Protocol,[3] and presents an incurable defect in the form of previous board of directors' service at the Debtors, all while Ankura was selected to provide Mr. Shepherd as CRO and provide additional services to these Debtors. Accordingly, Ankura is not disinterested and cannot be retained under Section 327(a) or Section 363(b). Ankura and the Debtors were fully aware of these restrictions on board of director service, but nonetheless structured the engagement in a manner that violated these fundamental principles of proper employment for CROs and their firms.

## JURISDICTION AND PROCEDURAL HISTORY

1. The Court has jurisdiction to hear the Application and this Objection.

2. Pursuant to Section 586 of title 28, U.S. Code, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this District. 11 U.S.C. § 586. Under Section 586 and Section 307 of the Bankruptcy Code, Congress charged the U.S. Trustee with broad responsibilities in Chapter 11 cases and the standing to rise and be heard on any issue in any case or proceeding. 11 U.S.C. § 307; *see also United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## RELEVANT FACTS

3. These cases were initiated by voluntary petitions filed on November 6, 2024

---

[3] *See infra.* at ¶¶ 8 & 9.

(the "Petition Date") by the above-captioned Debtors. Along with the filing of the petitions, the Debtors also filed the *Declaration of John Shepherd in Support of Chapter 11 Petitions and First Day Pleadings* (D.I. 2) (the "Shepherd First Day Declaration").

4. In the Shepherd First Day Declaration, Mr. Shepherd states that:

- He is the CRO of "OYA Renewables Development LLC" ("ORD") and the affiliated debtors and debtors in possession (collectively, the "Debtors") and non-debtor subsidiaries of ORD (collectively, the "Company"). Shepherd First Day Decl. ¶ 1.
- He is a Senior Managing Director in the Turnaround and Restructuring group at Ankura, and has served on the board of directors for several energy companies, as well as holding numerous senior positions. *Id.* ¶ 2.
- In his capacity as CRO, Mr. Shepherd is generally familiar with the facts and circumstances of the Debtors business, financial condition, day-to-day operations, and circumstances leading to the commencement of these cases. *Id.* ¶ 4.
- Mr. Shepherd, along with Eric Millard ("Mr. Millard"), on or about April 17, 2024, were appointed by the Prepetition GDEV Secured Parties and the Prepetition Carval Secured Parties "***as independent managers on the Debtors' board of directors***." *Id.* ¶ 45 (emphasis added).

5. The Company was founded in 2009 to design and build rooftop and ground-mount solar arrays. Shepherd First Day Decl. ¶ 7. These cases were filed to consummate a Sale Transaction to Radial Power LLC ("Radial") to maximize the value of the Debtors' estates for the benefit of all stakeholders. *Id.* ¶¶ 10 & 54.

6. On November 12, 2024, the Debtors filed the Application seeking to retain Ankura and designate Mr. Shepherd as CRO. The Application includes a further Declaration from Mr. Shepherd (the "Shepherd Declaration") as an exhibit in support of the Application. D.I. 73-4. The Shepherd Declaration states that on August 6, 2024, "the Debtors Board of Directors appointed [Mr. Shepherd] as CRO to facilitate ongoing operations and financial matters, and ultimately to prepare the Debtors these chapter 11 proceedings and proposed sale." *Id.* at ¶ 7.

The Application does not discuss Mr. Shepherd's previous service as an "independent manager" disclosed in the Shepherd First Day Declaration. Nor does it provide any detail regarding when the resignation from such position occurred. Shepherd First Day Decl. ¶ 45 ("I eventually resigned as an independent manager and am now only serving as the Chief Restructuring Officer of the Debtors."). In paragraph 30 of the Shepherd Declaration annexed to the Application, Ankura highlights and asserts that Ankura is "disinterested" as that term is defined by Bankruptcy Code section 101(14). Appl. [D.I. 73-4] ¶ 30.

7. Other relevant features of the Application and proposed form of order include:

- Mr. Shepherd states that Ankura "is not, and has not been, within two years before the Petition Date, a director, officer (other than by virtue of Ankura employees serving in the roles as Engagement Personnel (pre- and post-petition) as described in the Application), or an employee of the Debtors;" Appl. [D.I. 73-4] ¶ 27. The Application omits discussion of Mr. Shepherd's time as an independent manager of the Debtors.

- Annexed to the Application at D.I. 73-3 are a series of engagement letters, including the letter dated April 17, 2024 styled "Re: Retention of a Board Member"; which identifies in the "Scope of Engagement" "A. Provide John Shepherd to serve as an independent manager of each Company ('Board Member')." Appl. [D.I. 73-3] at p. 2 of 32.

- The proposed form of order at Paragraph 3 contains indemnification relief beyond the scope of accepted practice for CRO engagements. Appl. [D.I. 73-2] ¶ 3. There is no limitation with respect to Ankura as a firm, or its affiliates in the terms of the order.

## LAW AND ANALYSIS

### A. The CRO and Ankura Lack Disinterestedness as Director Service is Not Permitted

8. Through the Application, the Debtors purportedly seek relief under the crisis management protocol that has existed in this District for many years.[4] The Protocol arose out of

[4] A copy of the protocol, commonly known as the "J. Alix Protocol", is attached as Exhibit "A" hereto.

*In re Safety-Kleen Corp.* and *In re Harnischfeger Industries Inc.*,[5] where bankruptcy courts approved the United States Trustee Program's ("USTP") settlement of its objections to applications to retain a CRO and the CRO's firm as a restructuring advisor. The settlement acknowledged the hybrid nature of a CRO's engagement. CROs are not wholly traditional, salaried, corporate officers capable of being hired by debtors in possession without court authority. And a debtor in possession's decision to engage a restructuring professional is, by definition, outside the ordinary course of business.[6] Further, the duties of a CRO extend beyond those traditionally performed by traditional officers of a company. In settling, the USTP recognized the dual nature of CRO engagements, the litigation risk arising from a CRO's legally uncertain status under a Bankruptcy Code that never contemplated their existence, and the debtors' legitimate need for CRO services at the time of a crisis. For over 20 years, the United States Trustee and the restructuring community have relied on the J. Alix Protocol to harmonize the relevant Code provisions to ensure that estate professionals (including CRO firms) remain conflict-free and, with the exception of the chief restructuring officer role, disinterested while recognizing the hybrid nature of the retention, which is part operations management and part professional financial service.

9. The J. Alix Protocol has provided a reliable framework for the continued

---

[5] Case No. 00-2303 (Bankr. D. Del. 2000) and Case No. 99-2171 (Bankr. D. Del. 1999).

[6] Restructuring in bankruptcy can never be considered "ordinary course" for any business, and courts have approved the retention of restructuring professionals under § 363 (b). *See, e.g., In re Liberty Asset Mgmt. Corp.*, No. 16-13575 (Bankr. C.D. Cal. June 9, 2016), Docket No. 94; *In re Interfaith Med. Ctr.*, No. 12-48226 (Bankr. E.D.N.Y. Jan. 25, 2013), Docket No. 177; *In re Qualteq Inc.*, No. 11-12572 (KJC) (Bankr. D. Del. Sept. 2, 2011), Docket No. 135; *In re Hartford Computer Hardware Inc.*, No. 11-49744 (PSH) (Bankr. N.D. Ill. April 12, 2012), Docket No. 270; *In re Colad Grp. Inc.*, 324 B.R. 208, 215 (Bankr. W.D.N.Y. 2005).

postpetition employment of a financial advisor, when one of whose members has served as a Chief Restructuring Officer or other executive position to a debtor before the filing of a petition. The Protocol carries with it the requirement that a CRO fully meets the disclosure and retention standards under section 327 of the Bankruptcy Code, except for having served as an *officer* prepetition. Statutory interpretation is a "holistic" endeavor[7] that should avoid (1) rendering other statutory provisions unnecessary and (2) interpreting them inconsistently with the policy of another provision.[8] Consistent with these canons, the J. Alix Protocol gives the fullest effect to all of the pertinent Code provisions, including §§ 327(a) and 363(b).

10. Because Mr. Shepherd served as an officer of the Debtor prepetition, he and Ankura have elected to seek their retention pursuant to § 363 and the terms of the J. Alix Protocol. As noted above, they cannot evade the requirements of § 327. The Debtors and the CRO acknowledge this requirement in paragraph 30 of the Shepherd Declaration where they highlight and assert that Ankura is "disinterested" as that term is defined by Bankruptcy Code section 101(14). Where one member of a firm is disqualified, then the entire firm is disqualified. In *In re Essential Therapeutics*, 295 B.R. 203 (Bankr. D. Del. 2003), this Court held that a law firm could not be retained as attorney for the debtor because a member of the firm was an officer-insider of the Debtor. This Court further held that the disqualification of the member of the firm on grounds that he had served as an officer of the debtors (and, thus, was not disinterested) mandated disqualification of his entire firm. *Id*. at 210-11. Specifically, this Court stated: "We conclude that having one member's independence and disinterestedness

---

[7] *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988).

[8] *Ratzlaf v. United States*, 510 U.S. 135, 140 (1994); *Timbers of Inwood*, 484 U.S. at 371.

impugned because he was an officer must equally affect the firm's independence and disinterestedness such that the firm must be disqualified under Section 327(a) of the Code." *Id.* at 211.

11. The J. Alix Protocol accommodates prepetition service by the CRO as an officer, as that factual circumstance necessitates the Protocol in the first place. Other facts that would present disinterestedness problems are to be evaluated as if the retention was sought under Section 327. There is no accommodation under the J. Alix Protocol for service as a ***director*** of the Debtors, and therefore the Ankura and Shepherd Application must be denied.

12. It is beyond dispute that any professional seeking retention by the Bankruptcy Court must make full disclosure of any connections that may affect disinterestedness and that the obligation to do so is a continuing one pursuant to the provisions of section 328(c) of the Bankruptcy Code. This principle is at the heart of the J. Alix Protocol. In *In re Leslie Fay Companies*, 175 B.R. 525 (Bankr. S.D.N.Y. 1994), where the Debtor's counsel had failed to disclose to the court its ongoing representation of the Audit Committee and its members, in reducing compensation, the Court held:

> All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. [citations omitted]. So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification." [citations omitted] 175 B.R. at 533.

13. The proposed engagement of Ankura and the CRO does not address the fundamental bar to Ankura's/Shepherd's post-petition employment that Shepherd was a pre-petition board member; the fact that Shepherd was a board member is mentioned in passing.

Shepherd First Day Decl. ¶ 45. Notwithstanding that disclosure, and the annexed engagement letter at D.I. 73-3, the Application is devoid of any representations regarding whether Mr. Shepherd was involved in selecting Ankura to provide additional services and/or directed his appointment as CRO.

14. It is often said that "the conduct of bankruptcy proceedings not only should be right but must seem right." *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966). Neither Ankura nor Mr. Shepherd are disinterested under section 327(a) of the Bankruptcy Code or the J. Alix Protocol. Consequently, neither may be retained by these estates due to these infirmities.

**B. Additional Areas of Concern and Objection[9]**

15. Beyond the structural problem prohibiting Ankura's/Shepherd's employment, even if Shepherd had not served as a pre-petition board member and, by extension, disqualified both Ankura and himself from employment, the proposed form of order does not contain several standard provisions which appear in the J. Alix Protocol Order accompanying the Application, including, but not limited to, provisions which: (i) prohibit indemnification beyond that to which other executive officers under the bylaws and applicable nonbankruptcy law may be entitled (and prohibit indemnification of Ankura or its affiliates) and (ii) subject all compensation to review by the Court in the event an objection is filed.

16. The U.S. Trustee reserves and any all rights, remedies and obligations to, *inter*

[9] The U.S. Trustee provided informal comments regarding these items, which may be addressed by a revised form of order, but which would not address the threshold issue of eligibility.

*alia*, complement, supplement, augment, alter, substitute and/or modify this Objection, file a Motion or seek any other relied deemed appropriate and necessary and conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent.

WHEREFORE, the U.S. Trustee respectfully requests that this Court deny the Application and grant such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**

By: <u>*/s/ Timothy J. Fox*</u>
Timothy J. Fox, Jr., (DE Bar No. 6737)
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Tel)
(302) 573-6497 (Fax)

Dated: November 26, 2024

# Exhibit A

**<u>Protocol for Engagement of Jay Alix & Associates and Affiliates</u>**

I. <u>Retention Guidelines</u>

A. Jay Alix & Associates ("JA&A") is a firm that provides turnaround and crisis management services, financial advisory services, management consulting services, information systems services and claims management services. In some cases the firm provides these services as advisors to management, in other cases one or more of its staff serve as corporate officers and other of its staff fill positions as full time or part time temporary employees ("crisis manager"), and in still other cases the firm may serve as a claims administrator as an agent of the Bankruptcy Court. JA&A and its affiliates[1] will not act in more than one of the following capacities in any single bankruptcy case: (i) crisis manager retained under Sec. 363, (ii) financial advisor retained under Sec. 327, (iii) claims agent/claims administrator appointed pursuant to 28 U.S.C. § 156(c) and any applicable local rules or (iv) investor/acquirer; and upon confirmation of a Plan may only continue to serve in a similar capacity. Further, once JA&A or one of its affiliates is retained under one of the foregoing categories it may not switch to a different retention capacity in the same case. However, with respect to subsequent investments by Questor this prohibition is subject to the time limitations set forth in IV.B below.

B. Engagements involving the furnishing of interim executive officers[ss] whether prepetition or postpetition (hereinafter "crisis management" engagements) shall be provided through JA&A Services LLC ("JAS").

C. JAS shall seek retention under section 363 of the Bankruptcy Code. The application of JAS shall disclose the individuals identified for executive officer positions as well as the names and proposed functions of any additional staff to be furnished by JAS. In the event the Debtor or JAS seeks to assume additional or different executive officer positions, or to modify materially the functions of the persons engaged, a motion to modify the retention shall be filed. It is often not possible for JAS to know the extent to which full time or part time temporary employees will be required when beginning an engagement. In part this is because the

[1] Affiliates of JA&A presently are System Advisory Group (an organization that provides information services), JA&A Services LLC (an entity that provides temporary employees), Questor Management Company LLC, an organization that manages Questor Partners Fund, Questor Partners Fund II, and various Side-by-Side entities, which are limited partnerships that invest in underperforming and troubled companies, and ACT Two (an entity that owns and operates a private airplane). Future affiliates of JA&A, if any, will be subject to the limitations set forth herein.

[2] "Executive officers" shall include but is not necessarily limited to Chief Executive Officer, President, Chief Operating Officer, Treasurer, Chief Financial Officer, Chief Restructuring Officer, Chief Information Officer, and any other officers having similar roles, power or authority, as well as any other officers provided for in the company's bylaws.

extent of the tasks that need to be accomplished is not fully known and in part it is because JAS is not yet knowledgeable about the capability and depth of the client's existing staff. Accordingly, JAS shall file with the Court with copies to the UST and all official committees a report of staffing on the engagement for the previous month. Such report shall include the names and functions filled of individuals assigned. All staffing shall be subject to review by the Court in the event an objection is filed.

D. Persons furnished by JAS for executive officer positions shall be retained in such positions upon the express approval thereof by an independent Board of Directors whose members are performing their duties and obligations as required under applicable law ("Board"), and will act under the direction, control and guidance of the Board and shall serve at the Board's pleasure (*i.e.* may be removed by majority vote of the Board).

E. The application to retain JAS shall make all appropriate disclosures of any and all facts that may have a bearing on whether JAS, its affiliates, and/or the individuals working on the engagement have any conflict of interest or material adverse interest, including but not necessarily limited to the following:

1. Connection, relationship or affiliation with secured creditors, postpetition lenders, significant unsecured lenders, equity holders, current or former officers and directors, prospective buyers, or investors.

2. Involvement as a creditor, service provider or professional of any entity with which JA&A or any affiliate has an alliance agreement, marketing agreement, joint venture, referral arrangement or similar agreement.

3. Any prepetition role as officer, director, employee or consultant,[3] but service as a pre-petition officer will not *per se* cause disqualification.

4. Any prepetition involvement in voting on the decision to engage JA&A or JAS in the bankruptcy case, and/or any prepetition role

[3] In no case shall any principal, employee or independent contractor of JA&A, JAS and affiliates serve as a director of any entity while JA&A, JAS or any affiliate is rendering services in a bankruptcy proceeding, and JA&A, JAS and their affiliates shall not seek to be retained in any capacity in a bankruptcy proceeding for an entity where any principal, employee or independent contractor of JA&A, JAS and affiliates serves or has previously served as a director of the entity or an affiliate thereof within two years prior to the petition date. During such two year period, neither JA&A, JAS or affiliates shall have provided any professional services to the entity nor shall any individuals associated with JA&A, JAS and affiliates have served as an Executive Officer.

carrying the authority to decide unilaterally to engage JA&A or JAS.

5. Information regarding the size, membership and structure of the Board so as to enable the UST and other interested parties to determine that the Board is independent.

6. Whether the executive officers and other staff for the engagement are expected to be engaged on a full time or part time basis, and if part-time whether any simultaneous or prospective engagement exists that may be pertinent to the question of conflict or adverse interest.

7. The existence of any unpaid balances for prepetition services.

8. The existence of any asserted or threatened claims against JA&A, JAS or any person furnished by JA&A/JAS arising from any act or omission in the course of a prepetition engagement.

F. Disclosures shall be supplemented on a timely basis as needed throughout the engagement.

G. Where JA&A does not act as a crisis manager its retention will be sought as a financial advisor under section 327 of the Code or as a Court appointed claims representative.

II. Compensation

A. Compensation in crisis management engagements shall be paid to JAS.

B. The application to retain JAS shall disclose the compensation terms including hourly rates and the terms under which any success fee or back-end fee may be requested.

C. JAS shall file with the Court, and provide notice to the UST and all official committees, reports of compensation earned and expenses incurred on at least a quarterly basis. Such reports shall summarize the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred. The notice shall provide a time period for objections. All compensation shall be subject to review by the Court in the event an objection is filed (*i.e.*, a "negative notice" procedure).

D. Success fees or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and shall not be pre-approved under section 328(a). No success fee or back-end fee shall

be sought upon conversion of the case, dismissal of the case for cause or appointment of a trustee.

III. Indemnification

A. Debtor is permitted to indemnify those persons serving as executive officers on the same terms as provided to the debtor’s other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the debtor’s D&O policy.

B. There shall be no other indemnification of JA&A, JAS or affiliates.

IV. Subsequent Engagements

A. Pursuant to the "one hat" policy as stated above, after accepting an engagement in one capacity, JA&A and affiliates shall not accept another engagement for the same or affiliated debtors in another capacity.

B. For a period of three years after the conclusion of the engagement, Questor shall not make any investments in the debtor or reorganized debtor where JA&A, JAS or another affiliate has been engaged.

DET_C\442365.4