UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re: | . | Case No. 26-00465 |
| | . | Chapter 11 |
| SYNERGY CHC CORP., et al. | . | |
| | . | Washington, D.C. |
| Debtors. | . | September 11, 2026 |

. . . . . . . . . . . . . . .

DEBTOR'S FIRST DAY MOTIONS (CONTINUED)
(1) APPLICATION TO EMPLOY CHIEF RESTRUCTURING OFFICER
(2) MOTION TO USE CASH COLLATERAL
(3) MOTION TO UTILIZE FDIC-INSURED DEPOSITORY ACCOUNTS
(4) MOTION TO APPROVE COMPROMISE WITH JACK ROSS
BEFORE HONORABLE ELIZABETH L. GUNN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | The Belmont Firm<br>By: MAURICE VERSTANDIG, ESQ.<br>(TELEPHONICALLY)<br>1050 Connecticut NW<br>Suite 500<br>Washington, DC 20036 |
| | The Dakota Bankruptcy Firm<br>By: CHRISTIANNA CATHCART, ESQ.<br>(TELEPHONICALLY)<br>1630 1st Avenue North<br>Suite B<br>Fargo, North Dakota 58102 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: KRISTEN EUSTIS, ESQ.<br>(TELEPHONICALLY)<br>1725 Duke Street<br>Alexandria, VA 22314 |
| For ACP Agency LLC/ACME Credit Partners LLC: | Caplin & Drysdale<br>By: JEFFREY A. LIESEMER, ESQ.<br>KEVIN DAVIS, ESQ.<br>ALEC. G. SCHWARTZ, ESQ.<br>LUCAS SELF, ESQ.<br>1200 New Hampshire Avenue NW<br>8th Floor<br>Washington, DC 20036 |

| | |
|---|---|
| For Sanders Morris: | Sheppard<br>By: THEODORE A. COHEN, ESQ.<br>350 South Grand Avenue<br>40th Floor<br>Los Angeles, California 90071 |
| For Jack Ross in his individual capacity: | Nelson Mullins<br>By: DYLAN TRACHE, ESQ.<br>(TELEPHONICALLY)<br>901 15th Street NW<br>Suite 1200<br>Washington, DC 20005 |
| Also Present: | Lauren Berett (TELEPHONICALLY)<br>Chief Restructuring Officer - Synergy CHC, Inc. |
| | Jack Ross (TELEPHONICALLY)<br>Chairman/CEO Synergy CHC, Inc. |
| | Jaime Fickett (TELEPHONICALLY)<br>CFO Synergy CHC, Inc. |
| | Trent McDonald (TELEPHONICALLY) |

Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

(Proceedings commenced at 3:09 p.m.)

THE CLERK: This honorable court is again in session. Please be seated and come to order.

Next on today's calendar, I have case number 26-465, the jointly administered cases under Synergy CHC Corp. Matters before the Court are the continuation of the debtor's first day motions.

Will the parties please come forward and state your name for appearances?

UNIDENTIFIED SPEAKER: (Indiscernible).

THE COURT: Okay. Well, somebody put that camera on. I guess we'll start with debtor's counsel. Mr. VerStandig.

MR. VERSTANDIG: Good afternoon, Your Honor. Maurice VerStandig on behalf of Synergy CHC Corp, and the five affiliate debtors.

I'm joined on Zoom by my co-counsel, Christiana Cathcart, by our chief restructuring officer, Lauren Berret, and by Jack Ross, Jaime Fickett, and Trent MacDonald, who are also representatives of the various debtors.

THE COURT: All right. Good afternoon.

Ms. Eustis, good afternoon.

MS. EUSTIS: Good afternoon, Your Honor. Kristen Eustis, on behalf of the United States Trustee.

THE COURT: All right.

Mr. Trache?

MR. TRACHE: Good afternoon, Your Honor. Dylan Trache on behalf of Jack Ross in his individual capacity.

THE COURT: All right.

Mr. Cohen, good afternoon.

MR. COHEN: Good afternoon, Your Honor. Ted Cohen of Sheppard on behalf of Sanders Morris.

THE COURT: All right. Any other party on the Zoom making an appearance?

All right. In the courtroom.

MR. LIESEMER: Good afternoon, Your Honor. Jeffrey Liesemer, Caplin & Drysdale on behalf of ACP Agency LLC and ACME Credit Partners, LLC, the senior secured lender in this case. And with me at counsel table are my colleagues Kevin Davis, Alex Schwartz, and Lucas Self. I believe Mr. Self has a pro hac vice motion pending before you.

THE COURT: I think I may have entered the order yesterday. I might have got -- yeah. It entered the docket yesterday. So you're all set.

MR. LIESEMER: Thank you, Your Honor.

THE COURT: All right. Sure. Good afternoon.

All right. Mr. VerStandig, we have the remaining part of the agenda carried over from yesterday.

MR. VERSTANDIG: Yes, Your Honor. I believe we're still on agenda items 4 and 6, which are cash collateral and the 9019 motion, respectively. And I believe when we broke

yesterday, we were preparing to have Ms. Berret take the stand and testify in support of both motions in a consolidated fashion.

THE COURT: All right. Any preliminary matters before we launch into that portion of the hearing?

MR. VERSTANDIG: Not a preliminary matter, but one item to add to the complex case housekeeping. I would suggest that we not have to list Zoom instructions under each item on the agenda, but perhaps just once on the agenda going forward.

THE COURT: Sure. As long --

MR. VerStandig: As long as we've done it.

THE COURT: As long as it's there.

MR. VerStandig: Thank you, Your Honor.

THE COURT: Okay. All right.

MS. EUSTIS: Your Honor, Kristen --

THE COURT: Go ahead.

MS. EUSTIS:-- Eustis. I'm the United States Trustee. As we begin today, I did, at least, want to again note the United States Trustee's objection with moving forward with evidence, and in general with the 9019 motion given the lack of notice of that motion on creditors and parties-in-interest in this case.

THE COURT: Well, I think what Mr. VerStandig indicated is evidence goes to both. So I'm going to have to take it one way or the other. So I might as well take the

evidence, and then we'll hear argument on the various motions and whether or not they're ripe -- or they're ripe or appropriate for me to hear in more fulsome manner today. But is that right, Mr. VerStandig?

MR. VERSTANDIG: Your Honor, I believe it's ripe that they are appropriate to be heard in a fulsome manner today. But yes, the Court can certainly make that decision after evidence is adduced. And without putting words in Ms. Eustis' mouth, I don't think there's any suggestion that we're not moving forward, at least on cash collateral. And I think the Court's going to find the 9019 evidence to be compelling.

THE COURT: All right. Well, I'll just take -- look, we're going to reserve the argument. I'm going to take the evidence and we'll go on argument from there. I note the United States Trustee's objection about notice on all the matters. So --

MS. EUSTIS: Very well, Your Honor. Thank you.

THE COURT: All right.

We're taking Ms. Berret -- is it [Ber-it] or [Ba-ret]? Have I been saying it wrong for years?

MS. BERRET: It's [Ber-ret], but I answer to both. So --

THE COURT: I've been saying it wrong for years. All right. Ms. Berret. All right. Let's -- Ms. Lee, could you swear in Ms. Berret, please?

THE CLERK: Yes, Judge. Would you please raise your right hand?

(Witness sworn.)

THE CLERK: Thank you. And you could state your name again for the record.

THE WITNESS: Sure. It's Lauren P. Berret.

DIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Ms. Berret, where are you employed as of present?

A. I'm employed by Eisner Advisory Group, LLC. I'm based out of Philadelphia, Pennsylvania.

Q. Okay. How far did you go in school?

A. Through the juris doctorate at law school.

Q. Do you have any other degrees that are advanced to a bachelor's degree?

A. A certificate in accounting, although I don't know if you would consider that advanced.

Q. Do you hold any professional licenses?

A. I do, yes.

Q. What licenses are those?

A. I'm a certified public accountant in Pennsylvania.

Q. Do you have any other professional licenses?

A. Yes. I am a licensed attorney in the Commonwealth of Pennsylvania and the District of Columbia.

Q. Okay. And for clarity, are you a member of the bar of

this Court or the lesser court one block away?
A. The lesser court, one block away.
THE COURT: I'm not going to tell them you called them --
A. And I do sort of --
THE COURT: I'm not going to tell them you called them lesser, but understood that it's the D.C. court, the D.C. Superior Court actually.
THE WITNESS: Correct.
MR. VERSTANDIG: I think those are uniquely my views, and my feelings about D.C. Superior are perhaps too well known. All right.
THE WITNESS: And just at the outset, I do also want to clarify, although I am a licensed attorney, I do not practice, and I do not represent the Debtors in any legal capacity in this matter, so.
Q. So I appreciate your clarifying that, and I'm yet to introduce you as my co-counsel. If I do so, I don't mean to. Ms. Berret, briefly, because we don't want to belabor what already seems to be too long of a hearing, can you walk us through your work history post-graduation from college?
A. Sure. So I started my career as a consumer bankruptcy attorney. I actually had my own firm for a number of years, filing 7s and 13s. I have been part of several regional and larger national-sized accounting and consulting firms. I have

been with EisneAmper. To clarify, that's our brand name. But I fall under our LLC, which is our advisory group. I've been here since April of 2022.
Q. And what are the two firms you're at prior to Eisner?
A. I was at CBIZ prior to this based out of New York, and Baker Tilly again here based in Philadelphia.
Q. Are you familiar with an entity known as Synergy CHC Corp.?
A. I am, yes.
Q. And if I say Synergy or the Debtor, can we agree that's what I'm referring to contextually today?
A. Yes.
Q. When did you first become aware of the entity's existence?
A. As we've disclosed in, kind of, my retention, complete coincidence. We had done work for the entity a number of years ago, '22, '23, so I'm aware of the brand and the company itself.
Q. Did there come a time when you were approached about potentially serving as a chief restructuring officer for the entity?
A. Yes.
Q. When was that?
A. August of 2026, so last month.
Q. And who is it that initially approached you?
A. You did.

Q. Okay. Thereafter, did there come a time when you met with personnel at the company?
A. Yes.
Q. Okay. Who did you meet with?
A. I met with the individuals on the phone here, Mr. Ross, Mr. McDonald, and, there she is, Ms. Fickett.
Q. Okay. And did there come a time when you became the chief restructuring officer of the entity and its affiliates?
A. Yes.
Q. When was that?
A. I was appointed by a board resolution for Synergy CHC Corp. on August 26th, 2026, and by board resolution for the remaining entities, I believe it was, September -- September 4th, 2026.
Q. And have you been chief restructuring officer at all times since, to the best of your knowledge?
A. Yes.

MR. VERSTANDIG: Your Honor, for exhibits, would you like me to share a screen or call them out by exhibit reference?

THE COURT: Go ahead and share a screen. That's fine.

MR. VERSTANDIG: Thank you. I'll start with the easy one. Your Honor, I'm displaying what is marked as Exhibit B, which is certified records from the Nevada Secretary of State, as to the UCC search for the Debtor. You can tell they're

certified by the exorbitant fees my firm agreed to pay to retrieve them. I believe they are self-authenticating, because they are certified, and we would move them into evidence as Exhibit B.

THE COURT: All right. Hold on. I'm going to use the virtual ones. Just give me one second. And it's not you, it's the -- give me one second.

MR. VERSTANDIG: Also, I mean, I'm loathe to suggest anything is not controversial in this case, but we are moving to be solely to establish that ACME is the party in secured position --

THE COURT: All right.

MR. VERSTANDIG: -- and that they are the first party.

THE COURT: I just had printed copies which weren't segregated by exhibit. So this is a twelve-page exhibit, reflecting UCC search from Nevada. Does anybody object to the admission of Exhibit B?

All right. So admitted.

(Nevada UCC search was hereby received into evidence as Debtor's Exhibit B, as of this date.)

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: Oh, did I miss somebody?

MR. VERSTANDIG: I'm sorry, what, Your Honor?

MR. COHEN: No objection.

THE COURT: No, okay.

MR. COHEN: No objection.

THE COURT: Okay. I thought I heard something.

No, go ahead.

MR. VERSTANDIG: And hopefully with shared screen, we're now looking at something else in the courtroom.

THE COURT: Is that Exhibit A?

MR. VERSTANDIG: Yes, it is. It's a budget. I just wanted to make sure the share screen actually moved over.

THE COURT: Yes.

MR. VERSTANDIG: Okay. And then I will do one more technology check and then stop being annoying. I'm going to pull up my notes and please tell me not everyone can see them.

THE COURT: No, you're using the native PDF window, so it continues to show us the native PDF app window.

MR. VERSTANDIG: Thank you. All right.

BY MR. VERSTANDIG:

Q. Ms. Berret, do you recognize what's been marked as Exhibit A and what's on your computer screen at the moment?

A. Yes.

Q. And what is this?

A. Sure. It's the interim cash collateral -- collateral budget. In this case, for the period of the petition date September 4th, 2026, through the thirteen-week period ending December 3rd, 2026.

Q. And is this for one of the Debtors, or is it a

consolidated budget for all six Debtors?
A. It's a consolidated budget.
Q. Who prepared this document?
A. I did.
Q. And is it a true and accurate copy of the document you prepared?
A. Yes.
MR. VERSTANDIG: Your Honor, we'd move Exhibit A, being the proposed cash collateral budget.
MR. COHEN: No objection, Your Honor.
THE COURT: All right. A is admitted.
(Proposed budget was hereby received into evidence as Debtor's Exhibit A, as of this date.)
Q. All right. Ms. Berret, understanding that it's a sophisticated crowd, and you're not going to need to explain things that are obvious, I'm still going to ask you to go through this line by line, and simply indicate what each line item is, and how you arrived at the numbers. If you'd prefer, I can prompt you line by line, or you can start reading top to bottom.
A. No, I -- I'm happy to walk through this. I just -- for full transparency, I do have the exhibit open on a larger screen, since my eyes are good, but they're not that good. And I -- I hope that's okay with all the parties here.
THE COURT: Any party object to Ms. Berret referencing

on her screen, a slightly larger version, not through the Zoom window?

MR. COHEN: No, Your Honor.

THE COURT: All right. Go ahead, Ms. Berret. Thank you for disclosing.

THE WITNESS: Sure, sure. Absolutely.

Q. And I -- I just want to, you know, at the outset, you know, reiterate what -- what my role here was. And you know, I -- I came in, you know, to understand the immediate liquidity of the Debtors, to assess our available resources, and to determine what kind of expenses, and what cash number was needed to monetize and preserve the remaining assets. And that's what the -- the thirteen-week cash flow has been prepared for. And I do want to let everyone know, yeah, you know, I heard the comments yesterday, and -- and I hope that I can address those today.

So to -- to start off, we -- we'll kind of start at the top. So obviously we know the company is no longer operating at its historical levels. As you'll see as I walk through here, we have one employee. We have limited operating expenses. My principal focus first is on collecting the remaining accounts receivable. We have about -- I'm just going to do some round numbers here -- about 200,000 at Synergy CHC Corp., the United States entity, although I -- I recognize Syn @Reorg, as part of that -- that assignment scale.

I'm doing an estimated collection here of about fifteen percent on what's outstanding between that and the Canadian entity of about $300,000. I recognize that's conservative. I -- there are things that I'm considering here, assumptions that I'm making at the outset, based on the information available to me, that some of those accounts may not be collectible, that certain vendors may apply credits or other discounts. And I'm certainly hoping that these numbers are higher than that. But again, just at the outset, it's a conservative number.

Our inventory liquidation, again, is also a conservative number here.

Q. Let me guide you a little bit here, Ms. Berret.

A. Oh, sure. Sure.

Q. We're here on an interim basis. No one is suggesting that we're going to get a final order today. So for the few items where there is nothing that crops up in the first three weeks, you can skip them. If you could go on and talk about what other cash flows is, because I see $100,000 there in the second week, and I'm very curious about that.

A. Sure. Those are anticipated proceeds from a settlement with Mr. Ross.

Q. Okay. Payroll and payroll taxes seems sort of obvious, but is there anything there that's not titularly as indicated?

A. No, I would just want to indicate that that's for our one

employee, with institutional knowledge and access to the Debtor's systems and books and records.

Q. And just for clarity, those are post-petition wages, not pre-petition wages, correct?

A. Correct.

Q. Okay. And --

THE COURT: Wait, are you --

Q. And again, could --

THE COURT: Wait, hold on. You're saying that the one employee makes $33,000 a month?

THE WITNESS: She's very good at what she does.

THE COURT: Okay. I just wanted to make sure I heard that right.

MR. VERSTANDIG: Your Honor, the one employee is the chief financial officer of a publicly traded entity. It tracks out to a little under $400,000 a year.

THE COURT: That's fine. I just wanted to make sure I understood that that was what was being said. Look, I'm the newest to this case. So I'm the densest in the room. I'm going to ask the stupid questions. Go ahead.

THE WITNESS: No stupid questions.

Q. Ms. Berret, the next line is contractor services. Can you draw a distinction between the employee and the contractor or contractors?

A. Sure. We have the independent contractor who's been

providing services as well. And that is Trent McDonald, who's on the phone as well.

Q. Okay. And without jumping to conclusions, I don't see anything else on here that looks like we're paying individuals other than professionals. Does that mean you're not paying Mr. Ross?

A. We are not.

Q. Okay. Telecommunications, anything not self-explanatory there?

A. The cell phone that had -- for the company phone number.

Q. It seems like a lot of money for IT systems and software. What are we buying for fifteen grand?

A. Sure. So enterprise resource planning systems, and it's a quarterly payment.

Q. Okay. Insurance. Why so much, and what are we insuring, and why are there -- why does it fall into, sort of, two back-to-back periods?

A. Sure. We have our -- our general -- general liability insurance, which is that first payment of 5,400. That's a monthly payment, consistent with the current terms of that arrangement.

Q. Okay. And I know it's a little bit outside, but just to sort of --

A. Sure.

Q. -- contextually complete, what's the 1,291 that would be

in the ensuing week?

A. That's the continuing health insurance for our employee.

Q. Okay. Storage, $145. What are we storing?

A. We have a storage unit that contains books and records.

Q. And for clarity, do we know what country the storage units in?

A. I believe it's Canada, off the top of my head. If I'm wrong, please correct me.

Q. I'm going to go with North America and defer to you. All right. Can you walk the Court through inventory handling and fulfillment?

A. Sure. These are estimated expenses for our third-party logistics companies.

Q. So let's talk about that a little bit, because I'm not sure that one is as titularly evident as the others.

A. Sure.

Q. On my way home this morning, I stopped at the Costco in Scarborough, Maine, and I saw a product on the shelves. How does that interplay with third-party companies? What is a third-party logistics company and what's going on there?

A. Sure. And -- and at the outset, you know, as disclosed in the schedules, we have about two million in -- in inventory, book value for Synergy CHC Corp. That is sitting safely at a third-party logistics provider. And obviously the -- the companies are protecting that inventory. It's available for

handling and fulfillment. And we want to continue, obviously, to pay those -- those third-party logistics companies, so that we can preserve control of -- of that process and continue to liquidate the inventory in a smart manner.

Q. Okay. For the total columns, may I assume that you used Microsoft Excel and these are computer generated numbers?

A. Correct.

Q. It's the ordinary course professionals and --

A. Yes.

Q. -- we don't have employment applications for anyone other than your firm and my firm. What's going on there?

A. Again, these are -- these are estimated costs that could be necessary for accountants, auditors, securities counsel, again, you know, I -- I want to make sure that I'm being conservative with these numbers, and that we're building in those necessary expenses.

Q. Mostly, so the various U.S. Trustee representatives on Zoom don't think less of any of us, do you understand any professional needs to be employed by application first, correct?

A. Yes.

Q. Is there anything else -- oh, I'm sorry. What is -- I know it's the fourth week -- but what is the release of restricted cash?

A. There are currently funds being held in the Debtor's main

operating accounts, the Bank of California, that are restricted by the current secured lender.

Q. That being ACME?

A. Correct.

Q. Okay. Is there anything else on this budget that you don't think is sort of obviously self-explanatory in nature?

A. I -- I think the only one -- one other item I would want to point out is in week four in the other cash inflows. There's about 56,000. That is also cash in a collateral account at the Bank of California that we expect to be released.

Q. Okay. Oh, and I guess I will call out one other oddity. There is a very small number for U.S. Trustee fees, even though it's not until October. Why is that number so small?

A. That's for Q3, 2026. So we certainly understand there would be additional fees for Q4, that may -- would fall outside of the thirteen-week forecast here.

Q. Okay.

MR. VERSTANDIG: Hopefully no one can see my computer screen anymore.

THE COURT: Nope. I just have the Brady Bunch boxes.

MR. VERSTANDIG: All right.

Q. Ms. Berret, are you familiar with a quote-unquote, "merchant cash advance entity", that's had some involvement with the Debtors?

A. Yes.
Q. Okay. Can you tell the Court what that is?
A. The company itself or the merchant cash advance agreement?
Q. Well, who is the company and how do they play into all this? What's the agreement and --
A. Sure.
Q. -- also, how much money was paid?
A. Sure. It's Cedar Advance, LLC. We believe potential payments -- well, let me back up. I believe payments in the last year alone were nearly 1.9 million. And -- and generally, the merchant cash advance agreement purports to be a sale of receivables. The company sells -- again, purportedly sells receivables for funds -- for net proceeds.
Q. Are you currently serving as an expert witness in MCA litigation in unrelated cases?
A. I am, yes.
Q. Does that give you some familiarity with the nature of claims that can be brought against MCA entities?
A. Yes.
Q. Without opining as a legal point, because as we established early on, you're not here as counsel --
A. Right.
Q. -- is it your belief that the Debtor holds litigation rights that can be pursued against Cedar?
A. Yes.

Q. Okay. And do you have a generalized understanding of what a conservative estimate of the value of those litigation rates would be?
A. Sure. I'm looking at about three-and-a-half to five million.
Q. Okay. And again, without giving a legal opinion, is it your understanding based on the lay of the land, that those are or are not currently subject to ACME's lien, meaning the litigation rights?
A. It's my understanding those are not currently subject to anything.
Q. So does the Debtor need to spend the money on that budget to survive and maximize value? Or do we just want to do it because it seems like a good thing to do?
A. No, we absolutely don't want to do -- we don't want to do the latter. I -- I mean, the goal here and, you know, as -- as discussed, that there are -- there are benefits to a Chapter 11. There are two brands here with customer recognition. I think we all know, kind of, the factors that have led to the filing of this case. But as Mr. VerStandig noted, and as I can tell you right here, because I have my Focus Factor, the brand is still very visible. There's customer recognition, and there's a value to preserving that brand, and -- and monetizing our current assets.
So what the budget -- what we're proposing to do, and

again, you know, I recognize that the current iteration of this budget reflects my best estimate as of the petition date, based on the information that's available to me. Those assumptions are not static and they could change. Again, I -- I'm hoping that I'm -- I'm light on my collections for accounts receivable and inventory liquidation. But what we're trying to do here is preserve the brands and the intellectual property and create enough runway so that we can monetize and dispose of those smartly.

Q. What's being suggested from the papers is that ACP or ACME be given a replacement lien, to the extent of any diminution on what amounts to Chapter 5 claims. Do you believe that will adequately protect their interests?

A. Yes.

MR. VERSTANDIG: Your Honor, I'm going to go back to screen share if the Court will bear with me for one moment.

Q. Ms. Berret, do you recognize this document?

A. I do, yes.

Q. And what is this document?

A. This is the settlement agreement between the Debtors and Mr. Ross.

Q. And if I go to the last page, or I guess the last two pages, is that your -- I guess it's not literally your signature -- is that your Docusign signature?

A. It is, yes.

Q. Okay. Is this a true and accurate copy of that document?
A. It is, yes.
MR. VERSTANDIG: Your Honor, we'd move Exhibit C, which is the proposed settlement agreement.
THE COURT: All right. Exhibit C is admitted.
(Proposed settlement agreement was hereby received into evidence as Debtor's Exhibit C, as of this date.)
THE COURT: Oh, did you want to be heard?
MR. COHEN: No objection, Your Honor.
THE COURT: Okay. Sorry.
Q. Okay. I'm going to stop sharing, so we can go back to the Brady Bunch. But if you want to see any part of it --
A. Sure.
Q. -- let me know. And I would ask that if there needs to be reference to it, you just make clear that you're looking at it and we can pull it up. Ms. Berret, what, if any, due diligence did you undertake before entering into this proposed agreement?
A. Sure. So I conducted a thorough review of quite a bit of information that was available to me, to independently evaluate certain transactions from the perspective of the Debtors and their estate, and this includes transactions to-and-from Mr. Ross and his related entities. And I'm happy to walk through kind of some of the information that I had available.
Q. So I'd like to start by walking through what documents you reviewed --

A. Sure.
Q. -- and then we'll get into some more details. So what did you look at?
A. Sure. So I -- I did a thorough analysis of bank statements for the Debtor's accounts and transaction detail, and that included check images. I reviewed credit card statements and transaction detail. I'd accessed and reviewed payroll records, related board approvals and resolutions. I also had the credit agreements and relevant amendments. The Debtor's SEC filings. I also reviewed some communications surrounding the lender relationship. We had the audited financial statements. I had a number of discussions with Mr. Ross and -- and the Debtor's management regarding those transactions.
Q. Were there any documents you asked for that were withheld or not made available?
A. No.
Q. Were there documents you asked for that were given to you?
A. Yes.
Q. Okay. Were there any questions you asked of Mr. Ross, Ms. Fickert, or Mr. McDonald that were not answered?
A. No.
Q. Are there any questions that were not answered to your satisfaction? They were evasive, elusive, whatever it might be.

A. No.
Q. Okay. Do you have concerns that documents have been withheld from you?
A. No.
Q. Okay. Did you negotiate the provisions of this agreement?
A. I did, yes.
Q. In so doing, did you ask for, insist -- whatever the nomenclature might be -- for the inclusion of some provision governing withheld documents?
A. Yes.
Q. Okay. Can you tell the Court about that?
A. Sure. Again -- again, you know, I recognize that I was appointed sometime shortly before the filing. So I want to make it clear that, you know, I -- I did a broad review of the Debtor's books and records and the information available to me, but I wanted to make very clear in the arrangement that it was -- if there was anything material that was withheld, that the Debtors had the ability to -- looking for the correct terminology, apologize -- to --
Q. Is "rescind" the legal word you're in search of at the moment?
A. But -- sorry?
Q. Is "rescind" the legal word you're --
A. Yeah, there you go.
Q. All right. And finish your sentence. I don't mean to cut

you off; I'm sorry.
A. No, no, no. All good, all good.
Q. Okay.
A. That was -- that was -- that's important to me, as -- as the CRO.
Q. All right. So let's take a couple of steps back. Are you proposing in this agreement to release any officer, director, former director, employee, or agent --
A. No.
Q. -- other than Mr. Ross?
A. No.
Q. Okay. So you're not suggesting a release of the Debtor's former board members?
A. No.
Q. You're not suggesting a release of the Debtor's other officers?
A. No.
Q. Okay. Without giving a legal opinion, and again, you're not here as an attorney, and I respect and appreciate that. What types of claims do you believe the Debtor could bring against Mr. Ross, if they are not released?
A. Sure. I looked at, kind of, two buckets of claims. Claims related to Mr. Ross's compensation. And -- and I'll kind of broadly refer to that, but I also mean, any payments to related entities as well. So that's bucket one. And -- and

kind of the second bucket here is, you know, fiduciary duties and Mr. Ross's duties to the company.
Q. Again, not giving a legal opinion, what do you believe the probability of success would be in pursuing claims along those lines against Mr. Ross?
A. Oh, it would be low.
Q. Why?
A. Sure. Well, I'm going to separate that in -- into my two buckets here. Certainly compensation claims, Mr. Ross is the CEO of a publicly held company, with the board of directors who approved his compensation and bonuses. So he -- he certainly has, again, defenses. And we have those board resolutions, supporting the compensation.
Q. And what about breaches of fiduciary duty?
A. Sure. So I -- I considered the nature of the rest of transactions. You know, we'll start -- let me go back to -- to related parties -- recognized that there's, you know, a management fee that's paid to a related party. Again, that -- that's part of the compensation. There are also rent payments to a related party. Again, those are -- the board approved, as well. So we'll kind of put those in that bucket.

For the fiduciary duties, you know, I reviewed kind of the nature of transactions, potential causes of action. I also reviewed and assessed potential defenses, the probabilities of success, the cost and complexity of litigation, other

collection considerations. And really, I'm not looking at this in -- in kind of a vacuum.

And I think that's important that, you know, Mr. Ross had been at the helm of this company for quite some time. He's built two very successful brands. And he's done everything he could. You know -- you know, unfortunately we know that -- that Costco discontinued stocking. But I -- I don't believe that there is anything that Mr. Ross did that I am aware of that was a breach of fiduciary duty.

Q. And only because you brought it up. Let's walk back to something that --

A. Sure, I'll walk.

Q. -- pertains to the -- in this report. Has Mr. Ross historically had family members on the payroll?

A. Yes.

Q. Okay. So let's start with the DC question. Are any of them minors?

A. No.

Q. Okay. Do you know if those people did or did not perform a bona fide job for their wages?

A. They did, yes.

Q. Okay. All right. So I know you touched on this a bit and I don't want to be redundant, but did you do any assessment as to whether or not there would be any difficulty collecting if there was a judgment realized against Mr. Ross?

A. Can you rephrase that? Sorry.
Q. Yeah. Any concerns about an absence of D&O insurance?
A. Yes.
Q. Okay. Can you extrapolate upon that, please?
A. So certainly. There -- there's two concerns, but the -- the primary one is there is no D&O insurance in this case, to provide a source of recovery.
Q. And to the best of your understanding, I don't mean to sound nefarious, is Mr. Ross a domestic person or a foreign national?
A. He's a foreign national.
Q. Did you give any consideration to whether there would be any complexity to litigation against Mr. Ross?
A. Yes.
Q. Okay. Talk a little bit about that, if you would, please.
A. Sure. Obviously, Mr. Ross is represented by independent counsel. There are, you know, potential defenses that he has. There are also significant costs of litigation associated with that, not just the estate in general, but because there is no D&O insurance. Excuse me. Those funds are not available to fund defenses.
Q. So let's talk about cost litigation for a second. Who would pay for Mr. Ross's defense, to the best of your understanding?
A. To the best of my understanding, the company would be

required to indemnify him.
Q. Why is that? Is that because it's the right thing to do or because there's some obligation?
A. There's some obligation.
Q. Okay. Do you believe that entering into this agreement is in the best interest of creditors?
A. I do, yes.
Q. Why?
A. Sure. It provides a finality to -- for Mr. Ross, so that we have his continued cooperation and access to his knowledge in -- in this matter. It also gives us immediate cash that's available to -- to fund these Chapter 11s that is not currently subject to a lien by a secured creditor.
Q. Did you do any analysis of what ranges of recovery might be if litigation were pursued?
A. I did, yes.
Q. Okay. Can you tell the Court about that please?
A. Sure. Well, of course I -- I considered all the, kind of, gross value of the transactions. I looked at the probability of success on those, the potential defenses. Again, the possible costs and the tangible benefits to the estate. So my range was about 50,000 to 500,000.
Q. And is that before or after accounting for attorney's fees that we run up?
A. Before.

Q. Okay. Do you have any sense, based on your experience, what legal fees might be to get through that litigation?
A. Well, you guys keep charging more and more, so 200,000, 250,000. I -- I would suspect that we'd lose fifty percent to defense costs and litigation.
Q. This is probably obvious, but the range you just gave is if the estate were successful. Correct?
A. Yes.
Q. And do you believe there is a possibility the estate would not be successful and would thusly recover conflict?
A. Yes. Absolutely.
Q. Ms. Berret, do you have any personal financial stake in the outcome of any litigation or in the settlement agreement?
A. No.
MR. VERSTANDIG: Your Honor, subject to redirect, nothing further for the witness at this time.
THE COURT: All right. To make things easier, I'm going to start with people on Zoom. Does Anyone on Zoom wish to ask questions -- cross-examine Ms. Berret?
Mr. Cohen?

MR. COHEN: Yes, I do, Your Honor. May I proceed?
THE COURT: Yes. Go ahead. Sorry.
MR. COHEN: Oh. Thank you. Thank you.
CROSS-EXAMINATION

BY MR. COHEN:
Q. Good afternoon, Ms. Berret. I'm Ted Cohen. My client is Sanders Morris. So some questions for you. It sounds like you have a lot of experience in the bankruptcy space representing all different kinds of parties. Is that a fair characterization?
A. Yes.
Q. Okay, great. I want to ask you some questions about the bankruptcy schedules that were attached to the petition.
A. Okay.
Q. And if you need me to show them to you, I will do that, but let's see if we can do it without that.
A. Sure.
Q. Did you examine all the information in the schedules and now have a reasonable belief that the information in there is true and correct?
A. I did, and yes.
Q. Okay. Great. And you signed them to that effect, correct?
A. Yes.
Q. Okay. In the twenty largest creditors, other than ACME's deficiency claim, whatever it might be, my client, Sanders Morris, has the largest unsecured claim, correct?
A. Correct.
Q. And it exceeds $10 million?

A. Correct.
Q. Right. Okay. And it's scheduled as undisputed, liquidated, and not contingent. Correct?
A. Yes.
Q. And that it's not subject to offset? Is that correct?
A. Not cor -- believe so. Yes.
Q. Okay. Great. Now as you testified before, with respect to the different elements for approving a settlement motion, one of them requires that the interest of creditors be considered. Right?
A. Yes.
Q. Okay. Now, you didn't seek the input of my client on the terms of this agreement, correct?
A. Correct. I did not.
Q. Oh, and similarly, you did not reach out to any other creditors, is that correct?
A. Correct.
Q. Okay. Let's talk about the settlement agreement again. And if Mr. VerStandig will indulge me, I would appreciate it if he could put the settlement agreement back up on the screen. Thank you.
Okay. Now under Section 2, Mr. Ross gets a complete broad release of everything possible up to the time of the effectiveness of the settlement. Correct?
A. Yes.

Q. Okay. Now, as you testify, while it is subject to rescission if there's information that surfaces later that you don't know about now that you have the right to seek rescission, but you're not obligated to do so. It it's in your discretion. Correct?
A. Correct.
Q. Okay. Now, under the release of Mr. Ross by the estate, let's say that a third party brought a claim against the Debtors based on Mr. Ross's alleged wrongful conduct. By him getting the release, that would preclude the estate from being able to seek indemnity or reimbursement from him. Correct?
MR. VERSTANDIG: Objection. Calls for a conclusion of law. I mean, I think that's legal argument more than a factual question, and the document speaks for itself.
THE COURT: I'll allow her to answer to her understanding. But again, it does call for some legal analysis. But to the extent she has an understanding there, I'll allow that question to stand.
A. Yes, that would be my understanding.
Q. Okay. And during your investigation, did you determine whether there might be any claims by third parties that could be brought against the estates based on Mr. Ross's wrongful conduct?
A. I did, in a general context.
Q. And did you reach a conclusion based on that?

A. Sorry, I apologize. I'm just -- I don't want to say I did.

Q. Okay. But certainly the release doesn't include a carve-out for any such claims. Correct?

A. Doesn't include a carve-out?

Q. Right. There is no carve-out for that?

A. No.

Q. Right. Okay. Okay. So we've talked about the estate's release of Mr. Ross. Can you please tell me where in the settlement agreement there's a release that Mr. Ross is providing to the estates?

A. Off the top of my head, I'm not sure.

Q. Okay. Yeah, I've reviewed it. I certainly didn't see one in there.

A. Okay.

Q. So okay. So based on the fact that there is no release that Mr. Ross is providing to the estate, you testified earlier that what this settlement does is it brings certainty to what happens to Mr. Ross, but it really doesn't do that in the case of any claims that he might have against the estate. Right?

A. Correct.

Q. Okay. And so let's -- have you determined whether he himself might have any claims against the estate? Did you ask him that question in negotiating this?

A. I don't recall.

Q. Okay. And did you, in your negotiations, did you attempt to elicit a release from him?

A. I don't recall.

Q. Whether you did or not? Okay. So then I take it if you did, you don't recall what his response to that was?

A. Correct.

Q. Okay. Now, let's say that he had such claims. If he were successful on them, that would be to the detriment of other creditors. Correct?

A. Well, that would be my understanding, yes.

Q. Okay. So do you, in light of that, do you believe that this settlement agreement is actually in the best interests of creditors without having obtained a release from Mr. Ross?

A. I mean, certainly, based on my business judgment. I -- I still think there's a value, but that's certainly something I need to consider.

Q. Okay. Thank you. If I understand correctly, you were retained on August 26th, correct?

A. Correct.

Q. And the settlement agreement, at least, is signed on September 4th, which is the date of the petition.

A. Correct.

Q. Okay. Great. And so you indicated that you conducted this investigation as to these potential claims. And just so I understand, is it correct that in those nine days between the

time that your retention began and you signed the settlement agreement, you spoke with Mr. Ross and the other management, you requested a whole bunch of information and documents, conducted an investigation, received answers, reviewed the documents, negotiated the settlement, and did all the other preparation for the bankruptcy in that nine-day period? Is that correct?

A. Yes.

Q. Okay. Give me one second here. On what date did you first request the documents and information?

A. Immediately. I believe it was at the same time that I was retained.

Q. Okay. And who did you make requests of?

A. It was to the Debtor's -- excuse me -- the Debtor's management, who's on -- on the call with us today.

Q. Got it. And I think you mentioned that you reviewed bank statements. Were those provided by the Debtor's management?

A. Yes.

Q. Okay. And are you satisfied that you received all the bank statements that were relevant?

A. Yes.

Q. Okay. So I think you testified that you thought that that a potential recovery against Mr. Ross, if litigation were pursued, would be between 350,000 to $500,000. What was that --

A. Oh, I -- sorry.
Q. Oh, did I get that wrong, or?
A. No, I said that that was a gross value.
Q. Gross value. Okay.
A. Potential.
Q. So did you reach a conclusion as to how much in payments Mr. Ross received in the year preceding the bankruptcy?
A. I did, yes.
Q. And what was that amount?
A. I would need to refer to my -- to my records on that. Off the top of my head, I'm not sure.
Q. I mean, do you know was it in the millions?
A. Yes.
Q. Okay.

MR. VERSTANDIG: Sorry. And this isn't an objection, but this is a remote question. I believe Ms. Berret has her records at her fingertips, and counsel on the Court, this goes to both of you. If you'd like her to check those records, we have no objection to her doing so. She's just not going to look at something without disclosing it.

MR. COHEN: Well, yeah, I mean, sure. I have no problem with her doing that, and to save time in a break or something, I think that would be fine.

THE COURT: All right. So right now we're still going to go on with questions, is that what I'm hearing?

MR. COHEN: Yes.

THE COURT: Okay. Let's just continue --

MR. COHEN: Yes.

THE COURT: -- with questions. Thank you.

MR. COHEN: Yeah. Right. Right.

Q. Okay. Now I believe the statement of financial affairs show that there were payments to two affiliates of Mr. Ross, one for rent and the other for, like, I guess compensation. Do you have that in mind?

A. Yes.

Q. Okay. But there were no payments at all listed to Mr. Ross, individually. Is it the case that you did not discover any payments that were made to him individually?

A. There were -- hold on -- I believe -- and I don't want to -- I don't want to misspeak. I believe that those were included under management fees under the related entity. And there are certain reimbursements for insurance that I believe were included in that as well.

Q. Okay. During your testimony on direct, you indicated that there were two buckets of potential claims. One was compensation related and the other was fiduciary duties -- potential breaches of those.

A. Correct.

Q. Just so I understand, so the compensation-related ones relate to payments that were actually made to him or his

related entities. Is that --

A. Correct.

Q. Correct? Okay. The fiduciary duties really, if I understand correctly, doesn't have anything to do with that. That's just based on maybe decisions he made as a director or officer that someone might say was basically a breach. Is that also a fair statement?

A. Correct.

Q. Okay. So let's talk about the compensation-related ones again. My first question is, did all the payments that went to or for the benefit --

THE COURT: Oh shoot. Hold on. Yeah. Hold on. Oh, hold on, hold on. Mr. Cohen, can you hear me? Just stop because our Zoom timed out here, so we're actually not getting anything you're saying. Give us one or two minutes --

AUTOMATED VOICE: Welcome to Zoom.

THE COURT: -- before we're back in.

AUTOMATED VOICE: Please press pound then enter your meeting ID followed by the pound.

THE COURT: Okay. Everybody in the Zoom. Everybody in Zoom. Hold on. We can't hear you because our Zoom timed out. I'm talking to you, I hope through my computer, so just give us two more minutes to log in. We'll let you know when we're back in. Okay? Did everybody hear that? Somebody give me a thumbs up because I actually can't hear you.

AUTOMATED VOICE: Please enter the meeting password --

MR. COHEN: Actually just hold on.

AUTOMATED VOICE: -- followed by the pound sign.

THE COURT: It's been a really long day. I started at 8 a.m. The Zoom just decides when it's done with me. It's like we've had enough fun with you.

MR. COHEN: Yeah, it's like an hour is max.

AUTOMATED VOICE: You are in the meeting now.

MR. COHEN: Like, that's a lot of Zoom.

THE COURT: This is too much for me.

MR. COHEN: Yeah. trying to help you out here. Mental health function.

MR. VERSTANDIG: That's right.

THE CLERK: Judge, I think we're back online.

THE COURT: All right. Can everybody hear us again? Oh, they can see me. Can you hear me?

MR. VERSTANDIG: Yes.

MR. COHEN: Yes, Your Honor.

THE COURT: Hold on a second. All right. So we lost you on, "Okay. So let's talk about compensation-related ones again. My first question is, did all the payments that went to or for the benefit," and then Zoom told me I had worked enough today, and I should go home. So if you don't mind reversing and doing a dramatic recreation of whatever you all were doing while we were in Zoom limbo, it would be helpful to the Court

to start over at that point.

MR. VERSTANDIG: Your Honor, while we're here.

THE COURT: Hold on a second.

MR. VERSTANDIG: If we're not going to refer to the agreement here in the gallery --

THE COURT: Oh, right.

MR. VERSTANDIG: -- we've just got that --

THE COURT: Are you are you done referring to the agreement, Mr. Cohen, because while I --

MR. COHEN: Oh, yeah, he --

THE COURT: -- while I can see you when you screen share, the system only does the screen share. So if we can unshare the screen --

MR. COHEN: Sure.

THE COURT: -- so they can see you and Ms. Berret, that'd be helpful.

MR. VERSTANDIG: Thank you, Your Honor.

MR. COHEN: Yeah. Yes, I --

THE COURT: There we go.

MR. COHEN: -- I'm done with question about those.

THE COURT: Okay. Fantastic. All right. Everybody can see everybody again. I apologize. Zoom was telling me to go home and have my weekend start, but nonetheless, we'll get going.

All right, so you knew where we left off, if you don't

mind restarting that, Mr. Cohen.

MR. COHEN: Sure. And I had asked a question, and Mr. VerStandig had objected to it. Let me try rephrasing it.

THE COURT: Okay.

BY MR. COHEN:

Q. So in my mind, compensation claims would be salary, bonus, that type of thing. There might be some other claim that -- payment -- that is made to him that doesn't fall into that. So if you saw, say, on a bank statement, a payment to him that was not for compensation. I don't know if there was or not. That's really what I'm asking. Were there any -- or for example, if there were payments made to third parties that appeared to be for his benefit. That's really what I'm asking. Or were all the payments that you determined went to or for his benefit -- were they all from, based on his entitlement to compensation as an employee, director, officer of the company?

A. Apologize and just take a moment there. Can I take a moment to --

THE COURT: Take your time, Ms. Berret. When you're ready, just answer.

MR. COHEN: Yeah.

A. I want to make sure I don't -- I don't misspeak. We have the compensation claims that were approved by the board, the bonus that was approved by the board, there were certain payments made for insurance reimbursement that were part of his

employment package, the -- the vehicle reimbursement. So I want to make sure I'm not missing something there off the top of my head.
Q. Sure, sure. Sorry. Were you completed -- have you completed your answer?
A. Yes.
Q. Okay. So is it fair to say that any payment that you came across as going to or for the benefit of Mr. Ross was related to his compensation and what he is entitled to be paid as a director or officer or employee of the company? Is that accurate?
A. I apologize, just thinking something through. So I -- I do want to be, you know, very transparent and very clear. There were also, you know, payments made. I want to make sure that I'm, again, reviewing -- having reviewed everything, that there were certainly -- there were payments made to, you know, a credit card -- a corporate credit card -- that certainly Mr. Ross had access to and use of that the company paid. So I don't want to, you know.
Q. Well --
THE COURT: Say the truth.
A. Sure. I don't want to -- I don't want to say that there weren't other payments made to somebody that potentially benefited him, so I'm just trying to be transparent with -- with everybody.

Q. Let me follow up on something you just said. On the credit card statements and payments to his credit card, did you go to the level of looking at what the credit card charges were?

A. I did, yes.

Q. And nothing there, in your judgment, stood out as being potentially questionable?

A. There were items that I certainly had questions about, and that I spoke to Mr. Ross about.

Q. Okay. And I guess, is it fair to say that you took all that into account in reaching your decision that the value was somewhere between 350 and $500,000?

A. I did, yes.

Q. Okay. Now what legal claims did you consider that might give a basis to bring some kind of action against Mr. Ross?

MR. VERSTANDIG: I'm going to instruct the witness not to answer to the extent she discussed legal claims with counsel for the entity. There is a weird privilege component here, but I'm not instructing her not to answer the question overall. That she can and should do.

THE COURT: Noted.

A. Sorry, for which -- did I consider the legal claims?

Q. Well, I guess, yeah. Did you consider specific legal claims?

A. Yes.

Q. Okay. And subject to what Mr. VerStandig just Instructed you, are you able to answer what claims you considered?
A. I'm not comfortable answering that. Just -- Mr. VerStandig, I -- I don't know if that would be considered.
Q. Well, let me try something a little different. And then if we need to go further on this specific line, we can deal with that. Did you consider in your investigation, the timing of the payments made to Mr. Ross as compared to when the services for those payments were provided?
A. Yes.
Q. Okay. And so are you familiar with preferences under the Bankruptcy Code?
A. I am, Yes.
Q. Okay. I guess I'm asking, did your analysis include a preference analysis?
A. Yes.
Q. Okay. All right. Just a few more questions here. In negotiating the settlement agreement, did you try to reach an agreement with Mr. Ross that would not require providing him the release that was provided? For example, exploring whether he would give a loan to the estates instead of entering into a settlement agreement.
A. I did not.
Q. Okay. Let's talk about the collectability prong of approving a settlement agreement. You indicated that the -- if

I understand correctly -- the basis for determining that there were questions about collectability were the fact that there was no directors' and officers' insurance. Is that correct?
A. That's certainly a component of that analysis. Yes.
Q. Was there anything else that went into the analysis?
A. For the analysis of collectability?
Q. Of collectability, right.
A. We certainly considered that, you know, Mr. Ross is not a U.S. citizen, as Mr. VerStandig pointed out before. So there are some -- some logistics there.
Q. And just so I know, is he a Canadian citizen or a different country?
A. That, I don't know.
Q. Oh. So how do you know he's not a U.S. citizen?
A. It's based on information that I've received from counsel.
Q. Okay. But it just indicated that he's not a U.S. citizen?
A. Correct.
Q. Okay. Now, did you look into Mr. Ross's financial situation? His personal financial situation?
A. I did not.
Q. Okay. So you don't know what his net worth is?
A. No.
Q. Is that correct?
A. Correct.
Q. Okay. And just on the litigation costs, if litigation

were pursued. Are you assuming that the litigation would be handled on a contingency basis or where counsel is paid hourly irrespective of the outcome of litigation?

A. I considered hourly.

Q. Okay. And in your experience, does the type of litigation that you would bring in within a bankruptcy setting, would that be handled by counsel on an hourly basis or on a contingency basis?

A. That, I'm not sure of. I apologize.

Q. Okay I have no further questions at this time.

THE COURT: Okay.

MR. COHEN: Thank you.

THE COURT: All right. Thank you. Any other person on Zoom have questions for Ms. Berret before I come to the courtroom?

Ms. Eustis?

MS. EUSTIS: Thank you, Your Honor.

THE COURT: Go ahead.

MS. EUSTIS: Thank you. And hopefully I can close some loops quickly here.

Good afternoon, Ms. Berret. And I apologize for mispronouncing your name yesterday.

THE WITNESS: It's all good.

CROSS-EXAMINATION

BY MS. EUSTIS:

Q. All right. So quickly, I just had a question on the budget and that should --
A. Sure.
Q. -- should tie up any questions we had on that. Mr. VerStandig alluded to the fact that he stopped at a local Costco in Maine and saw some product on the shelves. Perhaps he purchased it, perhaps he didn't. But I didn't see anywhere on the budget where those sales from stores -- if the product is still on shelves at Costco --
A. Right.
Q. -- Walmart, wherever, Amazon direct sales -- where do those sales appear in the collection of those sales on the budget?
A. I would need to look at specific agreements, but it would be my understanding that most of that inventory was paid for in advance, but I will -- that's my, again, I could be -- I would just want to clarify that.
Q. Okay. So there are different agreements with different --
A. Purchasing agreements and -- yes.
Q. Okay. But if you did -- if the Debtor did direct sales, it was my understanding that there was a direct sale component. Wouldn't those sales come directly to the Debtor?
A. I don't believe at this point that we have any additional direct sales.
Q. Okay. Okay. But at one point in time, there were?

A. At least for one of the brands, I believe.
Q. Okay. Well, I guess that was the one question I had on the budget. All right.
MS. EUSTIS: Mr. Cohen, thank you for being thorough because you got through a number of my questions.
Q. Mr. Cohen had asked you about certain credit card transactions that could be -- or that you saw and determined were for the benefit of Mr. Ross. Can you give some examples and the amounts of those transactions that would have been made, on the corporate credit card or otherwise, for the benefit of Mr. Ross?
A. I can try. I don't have these in front of me, so I can give you kind of high level. There are certainly things that I saw that could be justified as a business expense. You know, I don't have full back-up now, so things like, you know, a golf game, right? Or a business dinner, tickets to a show -- things of that nature that kind of could go either way. But I just wanted to note that, you know, I saw those, and I spoke to -- to Mr. Ross about those.
Q. Were there anything that were indisputably personal expenses of Mr. Ross that were being paid for by the Debtor that you encountered in your review?
A. I don't want to say definitively one way or the other without reviewing.
Q. Okay. So as you sit here today, you don't recall?

A. (indiscernible)
Q. All right, so you were hired -- or appointed -- by CHC on August 26th. Who were the members of the board at that time that approved your appointment?
A. Oh, goodness. I -- name the members of the board off the top of my head? Can I -- can I refer to the schedules?
Q. Were there multiple members of the board at that time that approved your appointment or --
A. There were. Yes. There were.
Q. And then subsequently those other members of the board resigned?
A. Correct.
Q. All right. And since filing for bankruptcy, have you been taking any direction from anyone at the Debtors? From Mr. Ross?
A. No.
Q. Okay. And you said the date at the time that you were appointed and hired, you had made the request for, it sounds like, voluminous documentation from these Debtors. How long did it take you to get those documents from the debtors?
A. For how long it took them to provide them to me?
Q. Yes, that is my --
A. Almost immediately. There was no delay in -- in any request.
Q. Okay. And I know one of these entities is a Mexican

entity. Was there any language barriers in terms of getting the documentation translated from another language or anything of that nature?
A. My Spanish is not great. But no, we were able to -- to -- we -- for example, we had bank statements with them able to -- to understand.
Q. Okay. And did you do this review on your own, or did you have support from your team at Eisner working with you on this?
A. I did have one associate who helped export certain statements into Excel for analysis.
Q. Okay. And in those nine days, how many hours did you and your associate work in total on this?
A. Oh, goodness. Forty, fifty hours?
Q. Each or collectively?
A. Collectively.
Q. Okay. And you said Mr. Ross was represented by counsel in the negotiation of the settlement agreement?
A. Yes.
Q. And was that with Mr. Trache was his counsel --
A. Yes.
Q. -- in connection with that? All right. Okay.
THE COURT: Wait. Hold on. Was that yes? Sorry. There was just some overlap.
A. Yes.
THE COURT: Okay. Thanks.

Q. And Nelson Mullins had previously represented the Debtor entities. Is that correct?
A. Yes.
Q. And do you know when that representation ceased?
A. I don't.
Q. How did you determine what other entities were affiliated with Mr. Ross in connection with your review? Was that just through an interview with Mr. Ross?
A. I was provided a list of related parties.
Q. Okay. And you provided that by Mr. Ross himself?
A. By the company management.
Q. Were there any transfers in your review? I understand that certain of his relatives may have worked for the entities. Were there any transfers outside of compensation for those family members and relatives?
A. I think -- I believe there were some expense reimbursements.
Q. Do you recall the amount of those expense reimbursements to his relatives?
A. Not off the top of my head, but they are in the schedules.
MS. EUSTIS: Okay. I think that that's all for the United States Trustee. Thank you. Thank you, Ms. Berret.
MR. VERSTANDIG: Your Honor, before we shift to the courtroom and recognizing that courtesy of the time of day. I look like the Phantom of the Opera. Could we take a three-

minute break? And it is not so I can confer with the witness. I will not do so.

THE COURT: We'll take a five-minute nature break. Everybody try and be quick, since we're running on borrowed time.

MR. COHEN: Thank you.

THE CLERK: Thank you, Judge. All rise. This Court will stand in brief recess.

(Recess 4:20 P.M./Reconvene 4:29 P.M.)

THE CLERK: This Court is now in session. Please be seated and come to order.

THE COURT: All right. It looks like we have everybody back.

Mr. Liesemer?

MR. LIESEMER: Thank you, Your Honor.

THE COURT: Yeah, you can, if you want to, you can either come here or you can do it from there. If you do it from there, just make sure --

MR. LIESEMER: With Your Honor's permission, I'd like to do it here so I can see the witness.

THE COURT: Okay. Well it's also in the podium.

MR. LIESEMER: Oh, it's a screen in the podium?

THE COURT: There is a screen in the podium.

MR. LIESEMER: All right.

THE COURT: Whichever way you'd like. Just, I was going to say, if you're going to do it from there, just do what you just did to the microphone.

MR. LIESEMER: Yeah. Since I have all my papers there --

THE COURT: You also -- feel free to stay seated.

It'll be easier for you. If you want.

MR. LIESEMER: All right.

THE COURT: It won't bother me in the slightest.

MR. LIESEMER: All right. Thank you, Your Honor.

THE COURT: Sure.

CROSS-EXAMINATION

BY MR. LIESEMER:

Q. Good afternoon, Ms. Berret.

A. Good afternoon.

Q. It's nice to see you again on this happy Friday.

A. Yes.

Q. Do you recall putting in a declaration in support of the CRO retention agreement -- retention application?

A. Yes.

Q. And in Paragraph 6 of that declaration, you say that the Debtors engaged your firm, pursuant to an engagement letter dated August 26th, 2026. Does that sound familiar?

A. Yes.

Q. Who on the Debtors' side signed that engagement letter?

A. Mr. Ross?

Q. As CRO, whom do you report to?

A. It's -- I -- I report to me. I'm -- I'm the CRO of the company.

Q. You don't report to the board?

A. The -- there is no board. The -- the board resigned.

Q. The board resigned except Mr. Ross. Correct?

MR. VERSTANDIG: I'm going to lightly object here because this is the subject of the motion that was heard yesterday that is, I don't want to say under advisement, but somewhere in fluctuation as to whether or not she is removable by the board or only removable by order of this Court.

THE COURT: I understand, or sorry, I'm not --

A. What I -- I guess I should clarified that there's the pre-petition --

MR. VERSTANDIG: Hold on, Ms. Berret. Hold on. I objected, and I get a ruling first.

THE WITNESS: Sorry.

THE COURT: Okay. Understood. The question was who's the current board, and I realize that the objection goes to probably the next two questions, but to the pending question it's overruled.

MR. VERSTANDIG: Okay.

THE COURT: So I think the question was who's the current board.

Q. As CEO, did Mr. Ross have signature authority over the company's bank accounts?

THE COURT: Have or had? Sorry. Could you --

Q. Before the petition date --

THE COURT: Thank you.

Q. -- did Mr. Ross have signature authority over the

company's bank accounts?
A. I don't know.
Q. Who negotiated the settlement agreement?
A. For -- for the Debtor?
Q. Right. The settlement agreement between the Debtors and Mr. Ross.
A. I did.
Q. You negotiated the agreement?
A. Yes.
Q. During the negotiations, did you ask Mr. Ross to pay more than $100,000 in exchange for release?
MR. VERSTANDIG: Hold on. There's going to be a limited objection here. I don't object to the question being answered for purposes of establishing an arm's length negotiation. I object to any answer given being accepted pursuant to Rule 408 to establish liability or value thereof.
THE COURT: So noted. You can answer the question, Ms. Berret.
A. All right. Could you just repeat the question?
Q. When you were negotiating the settlement agreement with Mr. Ross, did you ask him to pay more than $100,000 in exchange for the release?
A. Yes.
Q. When you were negotiating the settlement agreement, did you consider offering to sell the claims against him to a third

party for more than $100,000?

MR. VERSTANDIG: There's going to be an odd objection here. She can answer to the extent that her consideration is not based on the attorney-client privilege. Counsel, I'll point out, and I think this is familiar in this Court, we're in one of the last four champerty jurisdictions, so there are some weird privilege considerations.

THE COURT: Understood. Objection is noted. You can answer the question, Ms. Berret.

A. I did not.

Q. All right. Let's turn to the cash collateral budget. And perhaps if Debtors' counsel can put that on the screen so everybody can see it.

THE COURT: Just so you're aware, you won't be able to see Ms. Berret while it's on the screen.

MR. VERSTANDIG: Sorry, Your Honor, do you want me to take it down?

THE COURT: No, no, I was just reminding Mr. Liesemer that he wouldn't be able to see Ms. Berret while it's on the screen.

Q. So the budget forecast shows incoming receipts ending on week 7, but you have expenses continuing for another six weeks, correct?

A. Correct.

Q. And when I add the total operating expenses, I'm looking

at the far right column, to the total nonoperating disbursements, I come up with total disbursements of $602,613. And in the far right hand column, total receipts, the number is 538,868. Am I reading those numbers correctly?
A. Yes.
Q. So under this budget, the Debtors are expecting to spend $602,613 of cash collateral just for the opportunity to bring in $538,868. Is that correct?
A. No.
MR. VERSTANDIG: The form of the question, specifically the words just for the opportunity, asked and answered as to the benefits of cash collateral and the specific benefits realized through a liquidation.
THE COURT: Sustained as to the characterization. Overruled as to the other questions. So Ms. Berret, you can answer the question.
A. Sure. So I want to clarify as I noted earlier, these are conservative estimates for the accounts receivable and inventory liquidation, especially when it comes to the inventory liquidation. We have not made calls yet on what we could expect someone to make an offer for. But, you know, recognize that as long as that inventory is sitting at a third-party logistics company, there certainly are, you know, costs to that that would allow us to preserve control of disposing of that in a manner that creates a maximum value for the estate.

And I do want to kind of note here that as for the budget itself, I -- I'm not measuring value per se. I'm measuring liquidity. That projected deficit does not kind of mean that there's more coming in, more coming out. I don't want to look at cash as the only asset available to the debtors here. That -- what our goal is with the budget and with cash collateral is to preserve the assets, to preserve the brand value, and to be able to realize proceeds from the inventory that is available outside of a, you know, Chapter 7 liquidation, which would ultimately result in less for the creditors.

Q. Your forecast did disbursements do not include the professional fees of a creditors committee. Is that right?

A. There is not a separate line item for that. No.

Q. And your forecasted disbursements do not include the fees of a claims and noticing agent. Is that correct?

A. Correct. There's not a line item for that.

Q. And your budget forecast doesn't include any number for potential recoveries on Chapter 5 actions. Is that right?

A. Not in this budget.

THE COURT: I want to ask a similar question since it follows here. There was discussion at the beginning of a sale of trade name, IP, et cetera that's also, if I'm reading the budget correctly, also not reflected in this budget?

THE WITNESS: Correct.

THE COURT: Okay. Thank you.
Q. Now, toward the bottom, there's a line item called Release of Restricted Cash, and there's an entry of $83,295. Are you seeing that?
A. Correct.
Q. Ms. Berret?
A. Yes. Yes.
Q. That money is not guaranteed to be released or to come in. Is that correct?
A. I'm sorry. Can you -- can you repeat that?
Q. So for the line item that's Release of Restricted Cash --
A. Right.
Q. -- $83,295, there is no guarantee that that restricted cash will be released, correct?
A. Correct. Well, I want to clarify what, kind of, that restricted cash is. I believe I discussed earlier that's the cash that's currently held in the current operating account that I understand is -- is restricted, based on the lien of the secured creditor.
Q. And we learned a little earlier in the line item that says Other Cash Inflows, and there is a number 56,868 --
A. Correct.
Q. -- that is also restricted cash, correct?
A. No. It's -- it's in a cash collateral account -- or excuse me -- a collateral account that is due to be released at

the end of the month. I believe there was a forty-five-day window for that.

Q. All right. So let's set aside the $83,295 in restricted cash.

A. Sure.

Q. So looking at the bottom portion of the budget --

A. Correct.

Q. -- you're forecasting a starting cash balance of $49,545. Do you see that?

A. Correct.

Q. And you're also forecasting a deficit of $63,745 by the end of thirteen weeks. Is that correct?

A. I agree, yes.

Q. So if the restricted cash of $83,295 is never released, the Debtors will be out of money by week thirteen, if not earlier. Is that right?

MR. VERSTANDIG: I'm sorry. Is the premise of this question if the creditor willfully disobeys a collateral order?

THE COURT: Well, that's not the question that was placed, Mr. VerStandig. You're welcome to make that argument later, but it's a math question. If A doesn't, then B doesn't --

MR. VERSTANDIG: Of course.

THE COURT: -- does C happen? It's bankruptcy math.

MR. VERSTANDIG: Your Honor, I, just, for the record,

I want to object on the grounds that the question is predicated not only on an assumption and a hypothetical, but an illegality at that.

THE COURT: So noted. But I'm still going to allow the A plus B equals C to go forward.

A. And I -- I can answer that. Again, it's an assumption. And these were the, you know, my best estimates as of the petition date, based on the information available to me. You know, I -- I've testified that I believe the operating receipts are conservative. Based on the numbers I have, I actually do believe more was collected in this first week than we anticipated. And certainly, nonoperating disbursements are conservative as well. So yes, in this budget, based on that assumptions. But if the assumption changed -- changes, then I would adjust other assumptions accordingly.

Q. Now let's talk about the variances that are described at the end of the cash collateral motion. Do you know what I'm referring to?

A. Yes.

Q. So at Page 7 of the cash collateral motion, it says that the Debtors are committing to a thirteen-week budget, quote, "not to be exceeded in the aggregate by ten percent in any two-week period."

A. Correct.

Q. The cash collateral motion is not proposing to provide my

client, ACME, with immediate notice when a variance occurs. Right?

A. Based on my understanding of the motion, no.

Q. All right. And the motion is not proposing to give ACME Credit the right to consent to or veto any variance. Is that right?

MR. VERSTANDIG: Your Honor, I object. The motion speaks for itself. And at this point, it's asking for legal characterization.

THE COURT: Sustained.

Q. Now there is an exception to the variance described in the cash collateral motion. The motion says the variance can exceed ten percent to the extent that increased revenues invite the incursion of correlatively increased expenses in any given measuring period. Is that correct?

A. Yes.

Q. Okay. I couldn't find an objective standard for those words. Are you aware of any objective standard for those words?

MR. VERSTANDIG: Your Honor, same objection. I think he's arguing at this point.

THE COURT: Sustained.

MR. LIESEMER: Your Honor, if I may have a moment --

THE COURT: Yeah, take your time.

MR. LIESEMER: -- to confer with my colleague?

THE COURT: Sure.

MR. VERSTANDIG: May I stop screen sharing just so I can see everyone again?

THE COURT: Yes, go ahead. Thank you.

MR. VERSTANDIG: Thank you. There's a lot of very nice faces, and I miss them. See, Mr. Trache even just winked at me.

MR. LIESEMER: Thank you, Your Honor. Those are all my questions.

THE COURT: All right. I think we've covered everybody for cross. Did I miss anyone?

Mr. VerStandig, any redirect of Ms. Berret based upon the various cross-examinations?

MR. VERSTANDIG: Yes, Your Honor, very briefly.

REDIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Ms. Berret, we talked about schedules. Were full schedules filed for all of the Debtors?

A. Yes.

Q. Okay. Do those schedules list all the parties to whom the Debtors believe money is owed?

A. Yes.

Q. Okay. To the best of your knowledge, do any of the Debtors schedule Mr. Ross as being owed a claim or moneys?

A. No.

Q. Okay. The rent that was paid to Mr. Ross or an entity affiliated with Mr. Ross, was that rent for the actual use of equipment or premises?
A. Yes.
Q. Okay. So something was received in exchange?
A. Correct.
Q. Okay. In your experience, would claims of 300 to $500,000 be enough to justify the engagement of quality contingency counsel? Someone going to take that for one-third?
A. There's always somebody.
Q. Do you think it would be somebody good? Let's put it that way. Okay. Ms. Berret, this is a very specific question. It may seem ticky-tack, but I think it's important cleanup. In reviewing credit card statements, did you find a number of Tim Hortons expenses?
A. Yes.
Q. Okay. And for those of us who do not live very close to the Canadian border, is Tim Hortons basically the Canadian version of Dunkin and Waffle House crammed together?
THE COURT: Timbits are better. Just got to say --
MR. VERSTANDIG: Okay.
THE COURT: -- got to have a timbit.
Q. Ms. Berret, may I assume? It's reasonable to surmise that Tim Hortons expenses are probably not client expenses?
A. Probably not.

Q. Generally speaking, do you have a sense of how much money is spent at Tim Hortons? Are we talking single digits, double digits?
A. The -- sorry. Say that -- the individual expenses?
Q. Yeah. So you had been asked in cross about credit card expenses?
A. Yes.
Q. I just think it's important to be very clear and transparent about this.
A. Okay.
Q. There are Tim Hortons expenses with some frequency, correct?
A. Yes.
Q. Okay. Do they tend to be 0 to $5, 0 to $10? I don't know if you could spend $100 on Tim Hortons, but can you give the Court an idea of how much the Tim Hortons expenses are?
A. Sure. 3 to $5.
Q. Per visit, I assume.
A. Correct.
Q. And may I assume there's -- I hope there's not more than one visit a day?
A. Huh-uh.
Q. Okay. Did you also find expenses at what we would call a luxury boutique?
A. Yes.

Q. Okay. And that would be for more money, correct?

A. Correct.

Q. Okay. Can you give some sense of what that is, how much that was, and how that factors into your analysis, getting to the potential recoveries?

A. Sure. There were some expenses at a designer boutique, and obviously in, you know, amounts significantly larger than Tim Hortons, you know.

Q. 30,000, 50,000, half a million? What are we looking at?

A. For individual expenses?

Q. In the aggregate for the luxury boutiques.

A. Let's say 100,000.

Q. Okay. And I don't mean this to sound like an obnoxious question. It's going to. But because we dealt with the foreign national, your understanding is that Mr. Ross resides in Canada, correct?

A. Yes.

Q. Are these U.S. dollars or Canadian dollars?

A. Those are U.S. dollars.

Q. Okay. Do you expect to recover on any Chapter 5 claims in the first thirteen weeks of this case?

A. No.

Q. Do you expect -- and I'm not asking you to commit to this, but do you expect we're likely to sell on a successful -- I'm sorry -- likely to close on a successful sale of intellectual

property rights in the first thirteen weeks of this case?

A. Unlikely.

Q. Thank you.

MR. VERSTANDIG: Your Honor, nothing further. I think Mr. Trache has a representation he'll make on the record, though.

THE COURT: Okay. Thank you, Ms. Berret. You can go on mute. Thank you for your testimony.

Do you have any other witnesses, Mr. VerStandig?

MR. VERSTANDIG: Your Honor, I do not. But just so that we are not sandbagging as others look to put on their evidence, I would ask that Mr. Trache make a representation and I'll confirm its veracity on the record.

THE COURT: All right. That's where I was going next.

All right. Mr. Trache?

MR. TRACHE: Your Honor, there was some discussion about claims that Mr. Ross may have against the bankruptcy estate. And while it's not a provision of the settlement agreement, Mr. Ross is willing to waive any claim against the estate if the settlement agreement is approved.

MR. VERSTANDIG: And to state the obvious, we're agreeable to that, and we would fold that to an order. I've not been able to discuss it with our CRO since she's on the stand and there's ethical rules, but I would be a little flabbergasted and trust she'll blink three times if she's not

agreeable to that.

THE COURT: Okay. All right. I'm taking the representation and that statement.

All right. Mr. Liesemer, any evidence from your client?

MR. LIESEMER: Yes, Your Honor. And my colleague, Mr. Davis, will --

THE COURT: All right.

MR. LIESEMER: -- be eliciting the evidence.

THE COURT: All right.

MR. DAVIS: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. DAVIS: Kevin Davis, Caplin & Drysdale. For the record, we do have Mr. Peter Eschmann, who is the managing partner and chief compliance officer of ACME Credit Partners on the line.

THE COURT: I see him.

MR. DAVIS: He did submit a declaration in these cases. In the main case, it is document 20. Given the hour, we would submit to have Mr. Eschmann's declaration entered into evidence in lieu of his direct testimony. Obviously, he would remain subject to cross.

THE COURT: All right. Anything you are going to ask him in addition to his direct or his -- sorry, his declaration or just relying --

MR. DAVIS: No. His declaration can suffice.

THE COURT: It's the full direct. All right. So Mr. Eschmann's declaration of paragraph 20 has been offered as his direct testimony in this matter. Does any party wish to cross-examine Mr. Eschmann based upon his declaration.

MR. VERSTANDIG: Your Honor, I realize the error, and I realize we're trying to move quickly. Court's indulgence. Could I have 90 seconds before I definitively respond to that?

THE COURT: Sure.

MR. VERSTANDIG: Thank you.

THE COURT: While he's looking, does any other party wish to cross-examine Mr. Eschmann on the declaration? Okay. Seeing none, we'll wait for Mr. VerStandig to let me know what he wants to do.

(Pause)

MR. VERSTANDIG: Your Honor, I'm not going to cross him for the time being. We'll reserve our right to call him as a rebuttal witness.

THE COURT: All right. So Mr. Eschmann's declaration is accepted with respect to items number 4 and number 6 on the agenda and will be taken as evidence.

MR. DAVIS: Thank you, Your Honor.

THE COURT: Thank you.

Anyone other testimony or exhibits from the Secured Creditor? Anything further from y'all?

MR. DAVIS: Nothing further, Your Honor.

THE COURT: All right. And I think no one online -- did anyone online have any evidence they wanted to enter into the record today?

MR. VERSTANDIG: Your Honor, Debtor will have a rebuttal case.

THE COURT: Okay.

MR. DAVIS: I'm sorry. Rebuttal of what?

MR. VERSTANDIG: Rebuttal of the declaration. We're going to call Mr. McDonald as a rebuttal witness.

MR. DAVIS: Okay.

THE COURT: All right. Any other opposition evidence before we go to rebuttal?

All right. Hearing none, Mr. VerStandig, you had a rebuttal witness?

MR. VERSTANDIG: Your Honor, Debtor calls Trent -- or the Debtors call Trent McDonald.

THE CLERK: Would you please raise your right hand?

(Witness sworn.)

THE CLERK: Thank you. Would you state your name again for the record?

THE WITNESS: Trent McDonald.

DIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Mr. McDonald, what do you do for a living?

A. I am -- I do advisory work. I've been the CFO of several different companies, both publicly listed private companies. I've been an entrepreneur in my career, and I have a CPA designation.
Q. Are you familiar with the Debtors in these cases?
A. I am.
Q. And in what capacity are you familiar with the Debtors?
A. I'm currently Engaged as a senior adviser to the company and have been since approximately April of this year.
Q. Have you had occasion to review the declaration of Mr. Eschmann that was just offered into evidence by ACME?
A. I have.
Q. Are you independently familiar with the books and records of the Debtor based on your consulting work?
A. I am.
Q. Based upon your knowledge of the Debtor's books and records and operations and your review of Mr. Eschmann's declaration, do you believe there are assertions in the declaration that are either misleading or inaccurate in nature?
A. I do.
Q. And what are those assertions?
A. Well, there's a -- there's a -- there are a couple that go through the declaration, so I'll address them sort of singularly as I go here.
Q. Like, I'm happy to put the declaration on the screen or

suggest that you can have it in front of you. I don't mean to hide the ball on access to the document we're talking about.

THE COURT: I think I'd rather -- the other parties to be able to see Mr. McDonald. So I'm going to authorize him to refer to either hard copy or a coterminous electronic copy. But that way he's able to be seen. I think we all have a copy here. But for my purposes, because, again, there were 1,000 pages in the last three days, and I haven't memorized them, if you could refer to paragraph or page numbers so that I'm following along, that would just save me a lot of scrolling and dumb looks on my face.

THE WITNESS: Sure.

THE COURT: Thanks. All right.

Q. Sir, you can answer now.

A. Yeah. Okay. So let's -- let's refer to paragraphs 7 and 8, okay? So in paragraph 7 and 8, he talks about Boombod, okay? Boombod -- just for the sake of understanding amongst the parties here, Boombod is a company that was owned -- which Peter points out was owned by Mr. Jack Ross on a one hundred percent basis. It's long since been defunct. But there was a note receivable that was due to Synergy as a result of transactions that took place several years ago. And there were -- there was an expectation at one point that of course that would be paid.

And so in -- in his -- in his declaration, he explains that the

amount was due on a certain date under the loan agreement, and it was not paid, which it was not. And that, at that point, he was -- Jack Ross was supposed to provide a pledge agreement. And he says that it was not provided. And -- and then -- and as a result of that, he was in default. Now -- the company was in default.

And that is a mischaracterization of what actually transpired. What actually transpired was that a -- a -- what happened was that there was an actual pledge agreement -- draft pledge agreement provided. There was disagreement between the parties as to the terms within that agreement. As a result -- as it -- as it turns out, at the time of -- the loan agreement was executed back in 2025, there weren't any actual terms agreed to in relation to the pledge agreement, just that one would be forthcoming.

And so when the payment did not come through, they did in fact supply a draft pledge agreement with terms. It did -- it did not get agreed upon. And you'll see there's lots of evidence. There's email strings back and forth all through February and March between these parties, negotiating a settlement that would put this to bed, and it resulted in a warrant -- a lender warrant agreement in which ACME received three million warrants at nominal value that were exercisable in the event of a qualified default, which, in this case, is a default that comes about as a result of a nonpayment of interest or principal that

would have otherwise been scheduled to have been made. And so that was executed on March 24th, I believe. It was okayed on March 25th. And that was simultaneous to the amending agreement. So all of that was settled. So I -- I don't know -- you know, I can't speak to motive as to why it's in there as if it -- it hadn't been settled, but it was. And just so you know, the thirty-day VWAP, which I calculated the -- for those who don't know, that's the volume weighted average price of the shares as it trades on the Nasdaq over the course of the thirty days directly preceding the -- the -- the execution of that agreement was approximately $1.40, which means that the value of those warrants at the time of execution of the agreement was approximately $4.2 million. And therefore, it approximates the value of the underlying note that was not received. And so it was fair value. It was negotiated amongst parties that were both represented by -- by good counsel. So not sure why this was an issue. And certainly, there -- while there's an insinuation of nefariousness there, clearly there was not. The next thing I would point out was that he made issue -- and this was a fairly big one. And Lauren also made mention of some of this through her direct testimony. But the -- it goes without saying that there's been an issue brought up about compensation. And again, the -- I -- I believe it was paragraph 21, where Peter talks to the fact that he feels that

Mr. Ross was in default as a result of receiving $3.87 million worth of payments to what he called insiders.

There was no detail supplied as to what those amounts were, to whom they went, and what he classified as an insider. But -- but he did talk about that amount. And I know that in the questioning to Lauren, it was referred to this way again as a -- what you'd call a trailing twelve-month. So the twelve months directly leading into the filing of this -- this particular filing that we're all discussing here today.

The reality, however, is very different. The reality is that the loan does not talk about trailing twelve months. And that is that -- that is neither here nor there.

What the loan says is that Mr. Ross is entitled to $1 million worth of compensation per fiscal year, which, in this case, is calendar year. So what is that -- what is that question here is whether or not he received more than $1 million in direct compensation, not to all insiders or affiliated parties, but just direct compensation.

And -- and the -- and the proof and evidence is that if you look at all the invoices that were paid to -- to Mr. Ross in relation to compensation, he was under the $1 million mark both in --

MR. DAVIS: Your Honor, I'm going to --

A. -- calendar year --

MR. DAVIS: -- I'm going to object at this point. Mr.

McDonald keeps making note of a number of documents, including invoices that I do not believe are in the record. So those would be -- he's testifying to hearsay. And I think he's bringing in for the truth of the matter.

And secondly, under best evidence rule, if he wants to show these documents that apparently prove his point, then counsel is more than welcome to put them into the record.

MR. VERSTANDIG: Your Honor, I'll respond as follows. We're here on first days. He is rebutting the affidavit that was submitted by the Secured Creditor. And perhaps I was too generous, and perhaps I was too kind, because the affidavit does the same thing.

He is testifying as to his understanding of the documents, his understanding of the records and how it informs his impression as to the misstatements that were made. I believe that is kosher. I believe that is permissible. And they're certainly welcome to show him those documents on cross and to adduce further information accordingly.

MR. DAVIS: Your Honor, I'm not aware of the rules of evidence not applying simply because we're here on short notice or because it is rebuttal.

THE COURT: It has been a long day of the rules of evidence being thrown around in here. I mean, so I --

MR. DAVIS: I agree, Your Honor. But objections that are made or objections that are made and objections that are

sat on are objections that are sat on.

THE COURT: I know. And I'm not saying that. I --

MR. DAVIS: We're not trying to elongate this proceeding. We're actually trying to cut it short.

THE COURT: No. I --

MR. DAVIS: If they want to show that there is some document that disproves this --

THE COURT: Well, I'm not going to take -- I understand the objection. And to the extent that the objection is that he's testifying as to a document, I would say it would be sustained. To the extent that he's testifying to his understanding upon review of said documents, I can take that testimony today.

He's identifying it, maybe pointing you in the way of what you should look at. But I can take his understanding as a result of his looking at it as testimony today -- maybe not. Maybe it's not the best evidence, but it's his understanding of that. And I can take that as the testimony. So I guess it's partially sustained, but I will take the testimony solely for his analysis based upon his review of the books and records.

MR. DAVIS: So if I understand, Your Honor, it's not being brought in for the truth of the matter, but simply for Mr. McDonald's understanding?

THE COURT: Yeah. Mr. McDonald's -- I mean, it's Mr. McDonald on behalf of the company's review of the

documentation. I'm not taking it for the truth of the matter as to what the underlying documents may or may not say, but his analysis thereof --

MR. DAVIS: Thank you, Your Honor.

THE COURT: -- in his role for the company.

All right. Mr. McDonald -- am I screwing up your last name? No, Mr. McDonald, I got it right. Again, it just says Trent, and I'm going to -- I'm going to call you Trent at some point, so I apologize for that.

THE WITNESS: It's okay. It's okay.

THE COURT: The best and worst part about becoming a judge during COVID, I got really, really, really reliant on Zoom names. And I'm working to be better about not being reliant on Zoom names.

Okay. So Mr. McDonald, you were speaking somewhat about the payment of comp on a fiscal basis. So maybe you could pick up there.

THE WITNESS: Yeah. So again, the fiscal basis versus trailing twelve months. So I'll say, to the best of my knowledge, based on my review of the books and records, it was $1 million -- less than $1 million in both fiscal year 2025 and fiscal year 2026. So based on that, it is my firm belief that he was not in default of those covenants.

The second thing that I would say is that when referring to when Peter -- when Mr. -- when -- when they're --

when he's -- when Peter -- I -- I just say, Peter, I guess. I'm so used to it, but when Peter puts into his affidavit that it's $3.87 million, again, there was no detail associated with that. And he referred to it simply as insiders and said that he was off covenant on the compensation clause of the loan. That's what he says in the affidavit.

The reality, again, is the compensation was on a fiscal year basis. But beyond that, the insiders -- I can only speak to the two that are most pertinent here. And that is in -- and that is rent. Rent was paid. It -- it -- again, in the -- in the actual loan agreement -- and Peter does in fact refer and -- and quotes the loan agreement itself.

And in that loan agreement, it says very specifically that payments to affiliated parties is permitted to the degree that it is I -- I guess fair and reasonable and comparable to nonaffiliated parties. And -- and in -- in that regard, rent has been -- being paid long since -- long before the loan agreement was ever -- was ever executed, long before the amending agreement to that loan was ever executed. And no material changes were ever made to the rental agreement that is in place or the payments related to that rental agreement.

The second thing I would say is you're looking at the second material aspect of insiders, which would be his family. And we talked about that recently with Lauren, but there were a number of members of his family who had been working there for

the better part of a decade all of whom were working there long before the loan agreement was executed, long before the amendment to that loan agreement was executed and all of which were paid from what I can see. And -- and Lauren testified the same that were fair and reasonable, had bona fide positions and the -- and comparable comp to similar people working in similar roles.

And so these were not changed. And they would comprise part of the $3.87 million that is being referred to by Peter in his affidavit. And as a result of that, the -- that -- and those are the three biggest payments that you could consider insider, I failed to see how he would be in default, but the -- I'm just giving you the -- some delineation and disaggregation of that number and -- and in light of how the loan reads and the parties that would be in play as related to it.

The third issue that I -- I -- that I saw that came about as a result of his affidavit was in paragraphs -- I believe -- I'm just going to look at -- at the thing. Yeah. Paragraphs 26 and 27. So in 26, Peter states that he -- that, you know, the company filed and -- and -- and -- and he was not given notice in advance. But the truth is that, back on July 30th, an email was sent by the company on the --

MR. DAVIS: Objection, Your Honor. Again, this is --

THE WITNESS: Okay.

MR. DAVIS: -- hearsay.

THE COURT: You can't testify to what the email said. You can testify if you know that notice was given. But again, the content --

MR. VERSTANDIG: Mr. McDonald --

THE WITNESS: I -- I wrote the email. I'm not sure it's hearsay.

MR. DAVIS: Yeah. If counsel wants to actually ask a question, that would probably be helpful.

THE COURT: Yeah. Mr. VerStandig, do you want to ask a question?

MR. VERSTANDIG: Sure, Your Honor.

BY MR. VERSTANDIG:

Q. Mr. McDonald, did there come a time in July when Mr. Eschmann learned that a bankruptcy may be forthcoming?

A. Absolutely. He was notified during -- through an email on July 30th --

Q. And without quoting from that email, could you explain to the Court what information was relayed to Mr. Eschmann in July?

A. Yes. That, you know, among other things, even before July 30th, obviously, the -- the -- and he refers to himself in the -- in the affidavit -- the -- the material adverse event that overtook the company that -- being the -- the listing of products at Costco.

But we -- we did, in fact, detail the -- the overall financial

ramifications of what that meant to the company, what remaining annualized sales we felt there to be, and what kind of operational cash flow could possibly be deducted from that -- that remaining revenue stream, and then compare that to the -- over $30 million of debt and the conclusion that the company came to that we relayed to him that it would be basically impossible for the company to continue on as a going concern, knowing that that debt had -- the -- the debt servicing would never be able to -- would never -- you'd never be able to service the debt out of the cash flow that could possibly be generated from $9 million of ongoing revenue.

THE COURT: Let me have -- let me have --

THE WITNESS: Then we --

THE COURT: Okay. Go ahead. Keep going.

THE WITNESS: So we talked about -- so we -- we detailed that in email and said that the board had, in fact, given a resolution allowing empowering management to make a filing in the bankruptcy court and directed the -- the management and empowered the management to go forth to try to negotiate or -- or come up with some other arrangement with -- you know, in some way that maybe could save the company and -- and allow it to be a going concern, which, of course the company then set forth to do. And so we -- we -- all of that was detailed in -- in -- to -- to Peter and relayed to him back in -- in July. So -- and -- and in several instances since

that time.

THE COURT: Okay.

BY MR. VERSTANDIG:

Q. And Mr. McDonald, did Mr. Eschmann express any views about the desirability of Chapter 7?

A. He, in fact, did not want us to make any filing and -- and in fact, went out of his way to do so, in my estimation, based on the communication that I was -- that I was part of, you know, part of it -- and the other thing I was going to say about -- about that chapter, you know, what -- sorry, the paragraphs -- I referred to two -- two paragraphs. The -- the next was that he said that he had been very -- tried to -- I -- I believe, tried to cooperate whole -- wholesomely with the company and with -- and -- and with Mr. Ross for the betterment of the -- of -- of the organization and throughout this period. And -- and -- and that is not my conclusion at all. And I think, you know, there was a plan that he put forward just, you know, the -- I think -- I think it was late, late July -- around July 29th. Go ahead.

MR. VERSTANDIG: Let's not get into anything that was offered as part of a compromise. I don't want --

A. Okay. No problem.

Q. Thank you.

MR. VERSTANDIG: Your Honor, I have nothing further for Mr. McDonald.

THE COURT: All right. I'll start in the courtroom then, Mr. Davis.

MR. DAVIS: Your Honor, just briefly.

THE COURT: All right. So he can't see you if you stand there. He can see you, if you stand on the --

MR. DAVIS: Okay. Where can he see me?

THE COURT: He can see if you stand on the side over there or up here, either one.

MR. DAVIS: I'll stand over here. Let's do that.

THE COURT: I'm a little like Judge Judy. I got my cameras in my angles, and I've figured it out.

MR. DAVIS: All right.

THE COURT: Okay. Now he can see you. There you go.

THE WITNESS: I can indeed.

CROSS-EXAMINATION

BY MR. DAVIS:

Q. All right. Mr. McDonald, you claimed, I believe, that paragraph 7 and 8 in Mr. Eschmann's declaration were misleading concerning the failure of the promissory note being paid from Boombod Limited. What is the date on which the failure to pay the promissory note delivered to ACP from Boombod Limited triggered the requirement for the pledge?

A. I believe it was the end of the fiscal year.

Q. Okay.

A. And it wasn't paid. I don't -- I don't dispute that.

Q. Correct. And you also don't dispute that no pledge was actually delivered from Mr. Ross, correct?
A. No. I dispute that. I -- I actually dispute that. There was a -- the pledge was supposed to be delivered, but there was no terms associated with it under the loan agreement and never agreed to in advance. So when it was delivered, it was not agreed to. And it was by -- by the parties. They didn't -- they simply couldn't agree on the terms that were in the draft agreement that was in fact delivered.
Q. So no pledge agreement was delivered.
A. The pledge agreement -- a draft pledge agreement was delivered, but the terms were not agreed upon by the parties. They disagreed.
Q. Okay. So only a draft pledge agreement was delivered, correct?
A. Sure.
Q. Yeah. The event of default that noted the failure to deliver the pledge, that was delivered according to paragraph 9 on February 2nd of 2026, correct?
A. That is correct.
Q. And later, you stated that you didn't understand why this was brought up, because ultimately, this was all settled in March. Doesn't paragraph 12 of Mr. Eschmann's declaration discuss the limited waiver that was granted for the events of default specified in that February 2nd events of default

notice?

A. Yes. It discusses a limited waiver, but it does not provide the details under which a -- a lender warrant agreement was negotiated between the parties and agreed to at the time -- at the time of signing the amending agreement. It leaves that out.

Q. Is it your position that at no point in time did Synergy or its affiliates default on the credit agreement?

A. Is it my -- say again?

Q. Is it your position that at no time did Synergy or its affiliates default on the credit agreement?

A. This is a holistic question --

Q. Yes.

A. -- not just referring to this specific thing. No. I've never -- I've never claimed that.

Q. Okay. Who would have been responsible for providing notice to Mr. Eschmann of this bankruptcy filing on September 4th?

A. I don't know who would have been responsible. I'm not sure that anybody would have been responsible. I -- I don't know.

Q. Do you know if Mr. Eschmann or ACME were provided with a copy of the petition before it was filed on September 4th?

A. To the best of my knowledge, they were not.

Q. Do you know if Mr. Eschmann or ACME were provided with any

of the schedules for sofas that were filed on September 4th?

MR. VERSTANDIG: I'm sorry, Your Honor. I object on ambiguity grounds. And I'm not being a smart Alec here. The way it's asked, he didn't delineate if it was before or after. And I would suspect there's a very different answer depending on whether the question is before the filing or after the filing.

BY MR. DAVIS:

Q. Yes. Before they were filed, was Mr. Eschmann or ACME provided with the schedules or statements of financial affairs that were put on the record on September 4th?

A. They were not. Not to my knowledge.

Q. At any point, prior to the September 4th filing, was Mr. Eschmann told that Synergy or its affiliates would file for bankruptcy on September 4th?

A. They were not specifically told that we would be filing on September 4th. No.

Q. At any point in time, was Mr. Eschmann or ACME provided notice that the entity, Synergy Reorg, had been created in Washington, D.C.?

MR. VERSTANDIG: Your Honor, the same objection. I think he means before the filing, but he asked at any point in time and the same problem, I think --

BY MR. DAVIS:

Q. At any point in time -- at any point in time prior to the

filing, was Mr. -- oh, actually, I'm sorry. At any point in time, prior to the formation of Synergy Reorg, LLC, in Washington, D.C., was Mr. Eschmann or ACME made aware of the creation of that company?

A. Not to my knowledge.

Q. At any point in time was ACME or Mr. Eschmann given notice that the company, Synergy, and its affiliates plan to file for bankruptcy in Washington, D.C.?

A. Not to my knowledge.

Q. At any time prior to the filing, was Mr. Eschmann or ACME provided notice that Synergy or its affiliates intended to file for Chapter 11?

A. Not to my knowledge.

MR. DAVIS: No further questions, Your Honor.

THE COURT: All right. Any other party on the Zoom wish to question Mr. McDonald? No one has reached for their mute button.

Mr. VerStandig, any redirect?

MR. VERSTANDIG: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Mr. McDonald, in the days preceding the bankruptcy filing, did you learn that ACME attempted to intercept monies from merchants due to one or more of the Debtors?

MR. DAVIS: Objection to characterization.

THE COURT: Sustained as to characterization.

BY MR. VERSTANDIG:

Q. All right. Mr. McDonald, in the days preceding the bankruptcy filing, did you learn if ACME had taken any actions concerning third-party merchants?

A. Yes, I did.

Q. And what did you learn?

A. I learned that they had sent a --

MR. DAVIS: Your Honor, this is outside the scope of cross.

MR. VERSTANDIG: No, it's not. The question was why we didn't give them notice. And the answer is going to be because they were running around trying to interfere with the Debtor's business operations, and it would have invited prohibitive peril to give them --

THE COURT: Okay. Well, that's an argument to be made for later.

MR. DAVIS: Yeah. You can make that argument, Mr. VerStandig. The objection is to --

MR. VERSTANDIG: Well, that's the objection. I'm explaining what the relevance is.

MR. DAVIS: It's outside the scope of cross.

THE COURT: Wait. Stop, both of you. Stop talking over each other.

MR. DAVIS: Apologies.

THE COURT: I have teenagers. I usually can follow, but I can't follow the two of you when you're nipping at each other.

Okay. Your objection is outside the scope of cross. What's your response other than the --

MR. VERSTANDIG: Your Honor, the legal --

THE COURT: -- legal argument associated therewith?

MR. VERSTANDIG: Well, that the legal arguments were within the scope, right? Cross covered the fact that no notice was given. And this goes to the rationale for why no advance notice was given.

THE COURT: So why don't we start with that question as opposed to asking something that doesn't start with the, why didn't you give notice? Because then it is within the scope of cross?

BY MR. VERSTANDIG:

Q. Okay. Mr. McDonald, did the actions of ACME pre-filing inform the absence of notice?

A. It did.

Q. Okay. And what actions in particular were those?

A. They had -- we learned in the days preceding that the week prior, they had sent communication to our customers -- to the customers of the organization that had amounts outstanding or could have amounts outstanding that were due to the company to direct such payments to them -- to their entity directly and

not into the bank account owned by the organization -- by Synergy CHC.

MR. VERSTANDIG: Your Honor, nothing further.

THE COURT: All right. Thank you, Mr. McDonald. You can go back on mute.

THE WITNESS: Thanks.

THE COURT: Any other rebuttal evidence, Mr. VerStandig?

MR. VERSTANDIG: No, Your Honor.

THE COURT: All right. How do you want to take up the arguments? Because while I've got the evidence for both, I think they're going to be very, very different. And frankly, given the time restrictions and what is more than likely the more important of the two questions if we have limited argument time, my guess is we take up the interim cash collateral first.

MR. VERSTANDIG: Yeah. And Your Honor, let me suggest that I'm not trying to be underhanded and presumptuous in doing this, but for limited cash collateral, it may make sense to clear a second hearing date first because that will inform just how limited the use of cash collateral is. Again, I'm not suggesting it's going to be granted. We'll obviously argue for that. But if we're arguing for two weeks of cash collateral versus three weeks versus hopefully not seven weeks, that may make it an even more limited argument.

THE COURT: Well, how much time are you asking me for?

That will depend on how much time I can find on my calendar.

MR. VERSTANDIG: Your Honor, we would be content with two weeks cash collateral usage on a limited basis. If we can then come back and rely on the record established here, obviously, with everyone's right to supplement it and re-argue with -- I'm guessing, in this case, everything's going to be longer than expected. So I'm going to say we need half a day.

THE COURT: All right.

(Pause)

MR. VERSTANDIG: I'll also point out that, as long as we don't go less than two weeks, we will be three weeks post-petition when we come back.

THE COURT: Yeah.

MR. VERSTANDIG: Although I think we filed over the weekend, so we may want to go at least two weeks plus a couple days.

THE COURT: All right. With that caveat, I think what we're looking at is the afternoon of the 29th. I have a 9:30 that morning, which will probably run to 11:30 or 12, and then I have the rest of the afternoon open.

MR. VERSTANDIG: Your Honor, that works for the Debtor, unless Ms. Berret starts nodding her head violently. Okay. She is doing so.

MS. BERRET: Yeah. I apologize. That -- that day doesn't work for me.

THE COURT: Okay. I can't do the 30th because I have a full docket that day. I do have 10/1. I will --

MR. VERSTANDIG: Your Honor, unfortunately, I can't do 10/1. I can do 10/2.

THE COURT: I can do 10/2. 10/2, it's a Friday.

MR. DAVIS: If the hearing is held, we can do October 2nd. Yes.

THE COURT: Okay. Okay. If we have a hearing, it'll be October 2nd. All right.

MR. COHEN: Oh, Your Honor, sorry. Just one question. I just want to confirm that you will also allow Zoom appearances for that hearing.

THE COURT: I have my Zoom for pretty much anything, Mr. Cohen. I'm a happy go --

MR. COHEN: Okay.

THE COURT: -- lucky girl over here. Besides if you --

MR. COHEN: Okay. Thank you.

THE COURT: -- if you appear by Zoom, then you got a name in the box, and I remember, and I don't screw it up. All right.

MR. COHEN: Fair enough. Thank you.

THE COURT: Okay. All right. So we're looking at 10/2 in the morning for a time frame for a continued hearing. And when there is one which gives you a time frame for argument, which would be about three weeks.

MR. VERSTANDIG: Okay. Thank you, Your Honor. With that in mind, I mean, we believe both should go today. Obviously, cash collateral is an absolute necessity or we run into 1112 problems. But I don't want that to be to the prejudice of the 9019. I would say perhaps we argue cash collateral, and then maybe we find some Zoom time in the next

week or so hopefully --

THE COURT: Yeah. I don't think we're getting to the 9019. I honestly don't think we're getting to the 9019 today. I think cash collateral is determinative, and we need to get through that.

MR. VERSTANDIG: Okay. Your Honor, can we set a time for the 9019, though, that is well before 10/2 and just have that be a remote hearing --

THE COURT: I don't know.

MR. COHEN: -- hopefully the next week.

THE COURT: Maybe. Let's get through -- let's get through cash collateral first.

MR. VERSTANDIG: Okay. Thank you, Your Honor. Your Honor, I'll be brief. The testimony in front of the Court shows a methodically compiled cash collateral budget by someone who has carefully studied the Debtor's books and records and put together a budget that is admittedly conservative in nature and who chose to emphasize the conservatism of it to make sure that this is a case that could succeed.

The testimony also establishes, in an unrebutted fashion, that the ongoing use of cash collateral is necessary to the maximization of the value of the Debtor's assets, and also in an unrebutted fashion, that the replacement lien being offered is on Chapter 5 litigation claims that have a value of not less than $1.9 million.

Again, no rebuttal evidence, no contradictory evidence, no cross-examination as to the valuation of the Chapter 5 claims. So we have established adequate protection through a replacement lien, and we have established a necessity for the ongoing use of --

THE COURT: Wait. And I've been looking at this since I got into this after the first hearing. Is the argument that a offered replacement lien in a yet to be filed litigation, which does have testimony, won't be collected, at least in the first thirteen weeks of the budget is a dollar for dollar adequate protection for the use of cash collateral?

MR. VERSTANDIG: Your Honor, we're saying that it's a replacement lien. And by the way, we're not limiting the replacement lien to the Chapter 5 claims, but we emphasize those because those clearly are not subject to anyone senior lien to the extent of any diminution.

And if there ends up being a diminution, I think the Court's question, and I'm not trying to evade it, is one that is resolved when we come back and argue what the extent of that replacement lien is on a dollar for dollar, or $2 for $1, $1.87 for $1 Canadian dollar basis when we are trying to figure out what the administrative obligations are necessary to successfully exit Chapter 11.

But we are offering such a large basis for that replacement lien juxtaposed to such a minimal use of cash

collateral that even if you were to ultimately determine that it had to be $12 to $1, there is enough in the unrefuted and unrebutted valuation of the Chapter 5 asset to offer adequate protection.

THE COURT: Has this been ---

MR. VERSTANDIG: Your Honor, did that answer the question?

THE COURT: I mean, have you seen a case where the granting of a replacement or a lien on -- I'm not even going to limit it to Chapter 5 claims pending litigation owned by the Debtor was, in some way, held to be adequate protection for the diminution of value under 364.

MR. VERSTANDIG: Yes, but with a massive caveat because I'm not about to give you a citation. I have seen plenty of cases where there exists a senior secured creditor who has a blanket UCC, much like we do here. And you know, here, we only have one secured creditor, but whether there's only one or senior is immaterial.

So we have a secured creditor who has a UCC with a prototypical language we all learn in law school that gives them a lien on everything and anything that can be leaned on. And I've seen plenty of cases anecdotally in practice where a judge nonetheless allows the use of cash collateral with a replacement link.

And the question is, if it's a replacement lien, what

are you covering? It's not already subject to that lien. And there's a bit of a 552 argument. I understand that we don't have that as cleanly here, but there's also the obvious. It's Chapter 5 claims, and it's the reason that -- well, I don't want to put words into Mr. Trache's mouth and Mr. Freeman's mouth or Department of Justice's mouth, but one of the reasons you often see the U.S. Trustee and other parties so zealously barred a lien on Chapter 5 claims with a dip facility roll-up any sort of post-petition anything is because there's a need for an estate to have access to some causes of action that are not encumbered, but also do you one better? And this is a really, really, really self-serving argument. Assuming the 9019 is granted, we have $100,000 in unliened collateral that can serve as that replacement lien as well.

THE COURT: Go ahead. Go ahead.

MR. VERSTANDIG: Thank you. Judge, you know, adequate protection, there is case law that I think goes on ad infinitum that establishes it's a case by case determination, right? Is it a replacement lien? Is it a rolling replacement lien. Is it some de minimis cash payment. Is it some significant cash payment? Is it a pledge of something new that isn't necessarily a replacement lien? I think we've all seen seem creatively furnished cash collateral and gardened variety cash collateral.

And what the evidence here establishes is that the

cash collateral is being used to maximize the liquidation value of the assets on which this very secured creditor has a lien. It is being done for their benefit, which, to be clear, is also for the benefit of the estate and ultimately consistent with the Debtor's fiduciary charge, which creditor base writ large.

But because this is being done for the benefit of the very party whose cash collateral is being utilized, even though they wish to be somewhat obstructionist and try to stop us from doing so shows that a minimalistic form of adequate protection is appropriate.

Now, again, I don't think at least $1.9 million of replacement liens is minimalistic. I think that is overly abundant, overly conservative, and establishes more than enough foundation. But it's also not a case where there's a great deal of sensibility, otherwise.

There isn't a suggestion in the papers that we should instead be paying them $12.38 a week or some other number. They have simply taken the position in the papers that we ought to be damned for having the temerity to seek to liquidate, in the manner contemplated by the U.S. Constitution and Title 11 of United States Code, and the cash collateral utilization should be for aid and prohibited.

And that is a way to euthanize a Chapter 11 case at the outset that does not benefit other creditors, but does market violence to Mr. Cohen's clients' interests and the

interests of all the other unsecured creditors who, as Ms. Eustis has very eloquently pointed out, do not have counsel to represent their interests here today, and whether or not there's going to be a committee to do so remains to be seen.

So we have a need to use cash collateral. We are offering the only adequate protection that is sensible. And the unrefuted and unrebutted record in front of you is that that adequate protection is sufficient in nature.

We're also asking for two weeks or four weeks or whatever the date is that we just came up with. We've indicated the professional fees procedurally cannot possibly be taken between now and then, even if they do show up on there, just based upon the rules in this Court and the objection periods.

And the utilization of monies being requested in the variance associated therewith is basically an ongoing operation of the Debtor's business so as to maximize a return to creditors. That is what Chapter 11 is for. That's what cash collateral utilization is for. And that is why the adequate protection we're proposing is entirely appropriate in nature. Happy to answer any other questions you may have.

THE COURT: Not at the moment. All right. I think it probably makes sense if I go to the secured lender next, and then you get to make all the big points, and then I'll go to other parties to add anything that you all haven't made.

MR. DAVIS: Thank you, Your Honor. Again, Kevin Davis, Caplin & Drysdale, for ACME Partners for the record.

I think that the question that the Court asked to Mr. VerStandig is really the perfect one, which is --

THE COURT: No.

MR. DAVIS: -- is there any case that can be cited where a replacement lien on unfiled litigation held by the Debtor has served as adequate protection? And while Mr. VerStandig had a lot of words in his answer, none of them were yes. And that is because, to our knowledge, there is not a single case in which a court has allowed a Debtor to essentially use cash collateral to go gamble on some unfiled litigation.

I have a list of cases right here. We have Rocco v. J.P. Morgan Chase Bank, which is 255, Appendix 638641. It's a Third circuit case from 2007, saying in general, when affirming a decision to lift a stay because of a lack of adequate protection, bankruptcy courts have held that a lawsuit is too speculative in nature to offer adequate protection. In general, and in this specific instance, we agree with that conclusion.

We have In Re: Turner 362 B.R. 563, 577 to 78. That's a bankruptcy decision from the Western District of Pennsylvania from 2005. Litigation is highly speculative. It is uncertain when and at what pace the litigation will proceed and what the

outcome will be.

Lifting the stay due to a lack of adequate protection -- excuse me -- they lifted the stay due to lack of adequate protection, where the only protection offered was pending litigation -- that was pending litigation, not yet to be filed litigation. In Re: Ziegler, this is 88 B.R. 67 at 70. This is the Eastern District of Pennsylvania Bankruptcy Court as far back as 1988.

Debtor claims that the pending lawsuit adequately protects Hill's interests. We hold that such a speculative funding source is insufficient to provide adequate protection.

Courts have noted that even absent consideration of the merits of the claims, the time requirements to conclude the proceeding that's being offered must also be considered. That's from, again, the Rocco case in Third Circuit -- or excuse me -- that was affirmed by the Third Circuit. That was the Western District of Pennsylvania Bankruptcy Court's decision at 319 B.R. 411 at 419.

So even if the merits are to be considered of these matters, the fact that these have not been filed, there is nothing in this thirteen-week budget for even starting that litigation, much less concluding it.

And furthermore, we have the bankruptcy court of the Northern District of California in 2010, In Re: Aniel 427 B.R. 811 at 812, where the Court said it is unsympathetic with

Debtors shedding crocodile tears about making adequate protection payments.

If you want to gamble in the casino and hope to hit the jackpot, you can't expect to win by using house money. You've got to put a little skin in the game. Because these Debtors have refused to do so, relief from stay could hardly be more appropriate.

All of the cases that we found where a debtor had attempted to provide adequate protection by an interest in litigation, even pending litigation, even litigation that was close to a conclusion have been refuted. That is not adequate protection there. It is not adequate protection here.

Mr. VerStandig also made a number of references to unrebutted testimony of Ms. Berret about the value of those claims, but that testimony, while, I guess, technically unrebutted is totally without any foundation. Ms. Berret is not an expert here. This is a layperson's decision about the value of claims following -- we'll give her since, you know, two weeks of investigation, which also included all of the other efforts that she stated she needed to take up starting from her appointment.

Regardless of the amount, it doesn't matter. A replacement lien on speculative proceeds from litigation is wholly inappropriate as adequate protection, and we would submit as much.

It is also unquestioned that my client has a perfected pre-petition lien on all or substantially all of the Debtor's assets, including all of the cash collateral that the Debtor wishes to use here. It is uncontested, and the Debtors concede as much in their motion.

This creates a straightforward issue. While the code contemplates a debtor's use of cash collateral, the code specifies that the Debtor is foreclosed from doing so absent consent of the lien holder or this court's approval. And as Section 363(e) makes clear, the Court shall prohibit the use of cash collateral absent adequate protection for the lien holder where it is requested.

The lien holder here is ACME, and it is requesting that the Court deny the motion for at least want of adequate protection. Adequate protection is mandatory, and the Debtor does not and cannot offer it here. Indeed, in their motion, they offered liens on the proceeds coming from inventory to which ACME already holds liens under 552.

ACME already has liens on those proceeds as they come in. That is not an additional or a replacement lien. Indeed, in the motion, that was the only replacement lien offered, and it was specified that no lien would be offered on the sub-Chapter 5 claims.

It seems that the Debtor has conceded that the replacement lien on proceeds is illusory, or is at least not

additional or replacement, and has now moved to the sub-Chapter 5 claims again, where no court has ever held that that can constitute adequate protection.

Consequently, the Debtors cannot and have done nothing here to suggest that they can provide adequate protection at any point in this case, whether it is for thirteen weeks or three weeks or one day. Even when adequate protection is proposed -- excuse me, Your Honor.

I also want to point to the budget. This is the budget that Ms. Berret prepared. This is the budget that is in the record. And this is the budget that the Debtor is determined to come into this Court with this evidence to show that their cash collateral is somehow for the benefit of the estate.

This budget shows operation at a deficit. There is less money available at the end of this budget than there is at the beginning. And I will note that the budget is padded. I don't say that to mean that it's nefarious. But if we look at the budget, the cash inflows under other cash inflows are the $100,000 from the settlement, which we submit should not be granted under any scenario, and certainly, not on the record before the Court. That is highly speculative, and we don't believe that that should come in or that it will.

But put that aside, the only other cash inflow under other cash inflows is the 56, almost $57,000 listed in that

row. That amount is from, apparently, according to Ms. Berret, a bank account that is going to have those funds released at that time.

So this is not money that is being generated by the estate existing or by any action that the estate is taking. If we take Ms. Berret's -- sorry, I keep wanting to say Berret. I apologize, Ms. Berret.

If we take Ms. Berret's word at face value, and we have not looked into exactly, you know, at this point in time the veracity of this, but just accepting it, that is money that comes in regardless and doesn't require the use of cash collateral to get it.

If we then go down to the release of restricted cash at the bottom, this is also in week four, that's the $83,295. That money only becomes released, if I understand it, upon the entry of the cash collateral order because this is money that is already subject to a DACA account that my client has control over according to its pre-petition agreements with the Debtor.

And so this money coming in is only generated by the granting of the cash collateral account. There is nothing about the existence of this estate that creates that money. So let's just grant -- let's say that that DACA never was put on, and let's say that this 500 -- or sorry, the $56,000 was not part of an account that will be unfrozen at some point in time, what that would do to this budget is it would make the starting

cash number, instead of $49,545, it would make it $189,708. That would be the change to the budget.

That means that over this thirteen weeks, there would be a diminution in cash alone of $120,613. So they are asking my client to give up -- well, they're asking this Court to interject itself into my client's collateral for the estate over thirteen weeks to bleed out over $100,000. And that's including the $100,000 that comes in from the settlement. If that doesn't come in, we're almost at a quarter million dollars that this estate loses over thirteen weeks in cash. This is not a prudent use of cash collateral even if adequate protection were to be attained here. And I want to talk about that just a little bit more, because I think it really gets to the heart of something that Mr. VerStandig noted, which is that this cash collateral order being denied, I think he said it euthanizes this Chapter 11. Well, I would submit that this Chapter 11 should never even have been conceived of. This Debtor has come into Chapter 11 without providing notice of the Chapter 11 filing to its senior secured lender. At no point in time was there an attempt to work out, or at least there is no cash collateral agreement.

They came into this case looking for relief from even the basic notice and reporting requirements of Chapter 11. They have no assets under which are not liened, none whatsoever, other than potentially these speculative Chapter 5

claims. But this is not this is not an appropriate Chapter 11. As Mr. VerStandig said yesterday, admitted on the record, there is no value for equity here. There is only an intent to liquidate. And I would note that there is case law noting that even where adequate protection is proposed, courts must consider what the Debtors are going to do with the money when they determine that the cash collateral can be used. And in general, they look at, are the Debtors using this to create a reasonable chance of reorganizing before permitting that cash collateral to becoming jeopardy.

THE COURT: Yeah. But that case law also goes very close to or before the big changes which switched Chapter 11 from a reorganization to glorified liquidations after Bob Seifer (phonetic) for the most part. I mean, a lot of that case law is older, isn't it?

MR. DAVIS: Well, these are from 2014.

THE COURT: Yeah.

MR. DAVIS: So we have that. But I will say this is that if what we're doing here is liquidating my client's collateral, why are we asking to use my client's collateral to liquidate that collateral for less money for a lower recovery? That is what is being asked here. It is being asked to use this cash collateral to pay professionals of the estate to end up with less cash than they started with, and ultimately the proceeds of the liquidation of any of this inventory, the

proceeds of any sale are almost certainly going to be swept up by my client's lien. It is approximately $19 million that is owed. None of the numbers on this budget touch that. I think if you added them all up together, they wouldn't get close.

So the idea that this is somehow for my client's benefit is simply laughable. This is my client's collateral. They want to take a risk with that collateral to provide lower returns. That is why this should be in Chapter 7. At the very least, Your Honor, the Bankruptcy Code provides very clearly that relief from the automatic stay should be granted to allow a secured creditor to foreclose on its collateral when there is no chance of reorganization, and there is no possible recovery from equity. The Debtor has already admitted both of those.

THE COURT: That's not before me today, right?

MR. DAVIS: That's not before you today.

THE COURT: All right.

MR. DAVIS: But I use it for just a reference point, that if we were to make that motion, the Debtor has already admitted that those circumstances exist. And so now we're in a situation where my client is simply foreclosing on all of this collateral. So all that will have happened before that motion being granted is professional fees will have been spent. The estate will have been diminished.

The Debtors are not proposing any kind of reorganization at all. They're only talking about liquidation.

And as discussed, their budget for doing so reveals that liquidation will diminish rather than maximize the estate. I would also note, and again, this is for reference. This is not before Your Honor, but we've made a number of references to our desire to convert this case. And of course, under 1112(B), the Court shall dismiss or convert a case where there is cause, and that includes continuing diminution of the estate and no reasonable likelihood of rehabilitation. And we submit that the only evidence in the record as to the health of the estate being this budget shows continuing diminution and no reasonable likelihood of rehabilitation.

So again, this case should not be in Chapter 11. This is a Chapter 7. This is attempting to say that my client should pay someone else to foreclose their collateral.

I just want to touch on briefly because I know that we're not going to argue this today, but it really comes to the conclusion of or comes to the question of why has this been filed? Why has this been filed this way? Why did according to Mr. McDonald, who I guess, when he was questioned by me said -- or questioned at first said that notice was provided of the bankruptcy, but then later said that no notice was provided or there was a reason not to provide notice or whatever. I guess they were talking about Chapter 7 before and ultimately went to Chapter 11. But why? What is the benefit to this estate? What is the benefit to equity? What is the benefit to anyone

who's part of that company to choose an 11 rather than a 7?

We would submit that the only thing about this case is the settlement with Mr. Ross. If a Chapter 7 trustee came in, and by the way, I think yesterday it was made note that because we were opposing the appointment of a CRO, it was because we were scared of being investigated. A Chapter 7 trustee is going to look at us first. That's fine with us. What we do not want here is having this estate being administered by someone who was hired by Mr. Ross and already agreed to a settlement with him, that we believe is incredibly inadequate in many terms, but we'll leave that for another time. The actual merits of the settlement. But again, it just shows that this bankruptcy as a Chapter 11 is largely a farce.

Again, what they ask for you to do here is to take my client's collateral to diminish it, to take my client's collateral, which they will ultimately have a right to simply foreclose on and use it for a little while before that happens. And to do what? Again, all of this is diminution of the estate.

I also want to note, Your Honor, that in the motion for cash collateral, there were a number of, in our view, gratuitous jabs at Acme suggesting --

THE COURT: Well, there's been gratuitous jabs from both sides. I --

MR. DAVIS: I don't disagree. Well, mine weren't

gratuitous. Mine were very well earned.

THE COURT: Well, then, he's going to tell me -- he's going to tell me that his weren't gratuitous either.

MR. DAVIS: I meant the jabs to me were not gratuitous.

THE COURT: Uh-huh. Yeah. Well, everybody put your mouth guards in.

MR. DAVIS: But I just want to note that there were a number of statements made about my client and my client's pre-petition actions. Nothing about post-petition actions, but pre-petition actions, suggesting that there was some sort of violation of the automatic stay or that there was something nefarious going on. Unless the Court has questions about that, we'll rest on our response in the papers, but I just wanted to make sure that Your Honor didn't want us to address that specifically.

THE COURT: No.

MR. DAVIS: With that, Your Honor, we think that the cash collateral motion fails on all grounds. There is no source of adequate protection, which is mandatory. Even if there were adequate protection here, there is simply no benefit to anyone, including my client, including the estate, other than perhaps the professionals who will get paid out of the cash to approve this cash collateral. And for that reason, Your Honor, we think -- and Your Honor could do this sua

sponte.

THE COURT: Hey, you really think I'm going to go there on the second day of the case?

MR. DAVIS: Your Honor, they asked for this hearing. They noticed this hearing. They came to you with this record asking for this relief. So I think that Your Honor should convert the case today. I recognize that you may not want to do that, but we think that that's appropriate. If not, we would be happy to put on a motion as soon as possible and would ask for it to be heard as soon as possible, and we can request that relief.

But we think honestly -- Your Honor, we think that you have to deny this cash collateral motion. And then, the question is, what is there? There's conversion. So we can have them hang around for two or three weeks with nothing to use and then convert it. Or we can decide to convert it now because there is literally no standard for cash collateral usage here that has been met. With that, Your Honor, we'd ask you to deny it and convert the case.

THE COURT: All right. Thank you. Mr. Cohen, I'm cognizant of the time. I'm hoping we were a little overzealous on our selection of 3 p.m. Pacific. And I might convince you that we have maybe at least another half an hour to try and get through argument and -- but I will hear from you next.

MR. COHEN: Thank you, Your Honor. And yes, I

appreciate that and absolutely. And I'm not going to need much time at all on this. So first of all, my client is not taking a position officially on the cash collateral motion. But we do have some concerns that I want to go over very quickly that I think that what you do with the cash collateral motion will, will bear on that.

Ms. Berrett testified that it's unlikely that there will be a monetization of the assets, a sale during the 13-week period, which is I think what we're talking about here. That's the question whether or not this case should go on for that purpose. And my client is very concerned that as time passes here without there being some ultimate disposition, the value is going to get worse, the typical melting ice cube analogy. And as Mr. Davis pointed out, the budget does show that there's a negative cash flow. That means that the estate will be worse off at the end of thirteen weeks than it is today.

And again, the concern is that there hasn't been -- the Debtor hasn't said anything about exactly what they plan to do to try to get some kind of sale or exit strategy here other than, oh, we're planning on liquidating the assets. So I just want to get that on the record. The only thing I would add is that there's also this emphasis on the Chapter 5 claims. Obviously, those can be pursued irrespective of whether the case is in Chapter 11 or Chapter 7. Thank you.

THE COURT: All right. Thank you.

All right. Ms. Eustis, go ahead.

MS. EUSTIS: Thank you, Your Honor. I won't belabor the points made by Mr. Cohen and counsel in the courtroom. However, I will note, I thought perhaps I had misheard earlier today that with regard to the proposed adequate protection in the form of a lien on avoidance actions, when the motions that were before the Court specifically state that the Debtor's proposed ACP be given a replacement lien on post-petition revenues and monies, but not Chapter 5 claims or the proceeds thereof. And that's something that our office, quite frankly, again, there's been no notice of this first day hearing on unsecured creditors. There hasn't even been an attempt to serve the 20 largest, albeit that Mr. Cohen is here and he is one of the -- his client is one of the largest unsecured creditors in this case.

However, to the extent that certain unsecured creditors did catch wind of this and were not here today, they would not know that the proposed adequate protection is in the form of Chapter 5, causes of action. And the United States Trustee would object to that being the proposed adequate protection, notwithstanding the fact that it is argued by the secured creditor that it is not sufficient, adequate protection in their view. However, given that we have not had the opportunity to solicit for a committee, we would want to preserve and preserve any rights that they may have in those

causes of action. Thank you, Your Honor.

THE COURT: Thank you.

All right. Mr. VerStandig?

MR. VERSTANDIG: Thank you, Your Honor. Let me start with what we're asking for today. We're asking for the use of cash collateral through October 2nd. So there were some arguments directed at the payment professionals. That can't happen between now and October 2nd. And absent a shortening of time, which we all know is not going to be asked, much less granted, that's a legal and logistical impossibility. There were concerns expressed about what happens during the latter end of the budget, and in fairness, we elicited testimony on that.

So I'm not criticizing my friends on the other side for bringing that up. It is a thirteen-week budget. We did not bring you a four-week budget, but obviously those are things that can be addressed between now and October 2nd. Those are things that we can look at, take the poll of our constituents and our major stakeholders and come back to you on. We're asking for cash collateral use through October 2nd today. Nothing further.

And the numbers are actually pretty positive between now and October 2nd. Ms. Berrett's conservatism seems to have dictated how the latter half of the schedule is handled. And as we see what collections look like, as we see what AR

collections look like, which, by the way, is not something that would autonomously happen during the pendency of this case. We can tweak things and report back accordingly, and we'll be in a better position. It is first days. We're trying to do what's necessary.

My client's products on shelves the nation over. In fact, the world over. And I don't want to be overly simplistic about that. But of course, this is an appropriate Chapter 11 case. It is an operating business with all of the delicacies and intricacies associated therewith. The Arguments being made by some of my friends on the other side today suggest that this is an undeveloped piece of land in the middle of Kansas.

THE COURT: But that wasn't the testimony that notwithstanding the fact that its operating, everything that's on a shelf was prepaid or is not an income stream, and that the only real income stream is going to be either payment of inventory -- or sale of inventory in a warehouse, which at this point is not till week five, or recovery of pre-petition receivables, which may or may not associate with some of that stuff. But it's not a one for one. Just because somebody bought something today at Walgreens, that might have already been prepaid to the freight manager or whatever. And so that doesn't actually come into the estate?

MR. VERSTANDIG: Your Honor, I think that's correct and incorrect. So the Court's core question, which does jive

with Ms. Berrett's testimony, is this doesn't appear to be a consignment case, meaning there's not testimony in front of the Court that the Debtor owned a great deal of the product sitting on store shelves.

But at the same time, what we heard from counsel for Acme is that the only receipts in the first four weeks would be the 100,000 and the 56,000 and change. And the problem is, he strategically omitted the word other, because those are not the only receipts. If you look above that on the budget, we have operating receipts. And we have operating receipts that start modestly and then move up. And again, it's somewhat of a coincidence because we didn't know October 2nd would be the date when the budget was created, but you will notice they do start to tick up significantly right about that time. And that is partially from ongoing sales and partially from the collection of product that was sold yesterday.

Now, we agree whether the product was sold yesterday, meaning the day before we filed or sold the day after we filed, it is subject to Acme's lien. We dispute Acme's claim. We are going to have to deal with their claim as the case goes on, but we do not dispute that they are the first position lien holder. There was no objection introducing the UCC records into evidence. The UCC records clearly establish that every other lien has been satisfied, and that Acme has the only lien. And significantly, it also means that Cedar either never recorded a

lien or never recorded a lean in the proper jurisdiction. I did not do a nationwide search.

But I think a business of this sophistication and complexity necessarily calls out for Chapter 11. And Ms. Berrett's testimony explained how we will be able to maximize values for the Chapter 11 process. That's not just cash on hand. Cash on hand is not one of the Debtor's largest assets, and is not going to be one of the Debtor's largest assets unless and until major assets are sold, meaning intellectual property and product on hand. And then, I suppose it is cash on hand until it's disbursed to creditors. That is hopefully a vanishingly small window of time.

Ms. Berrett also testified that we are looking to operate so we can liquidate for a higher recovery. And yeah, perhaps there needs to be more polished on what we're going to do, who we're going to hire, and how it is that we are looking to maximize that return, but we're here on first day motions. There's a lot that's going to come. We are going to have to propose the retention of a broker and auctioneer, or a plan of reorganization that provides for that in the coming days, and we're going to have to come back to you to address that.

What we're asking for today is cash collateral use to keep us alive so we can continue to do that. Mr. Davis and his client have not sought estate relief. His client has a disputed claim. There are serious concerns his client acted in

bad faith and potentially tortiously. I appreciate the arguments that were made there, but I'd also point out, and I get that this is a little bit of potato, potato. But the case law that was cited uniformly informs motions for relief from the stay, not motions for the utilization of cash collateral, and I get adequate protection is adequate protection. These are cousins so close that they ought not be permitted to marry under any state's laws, but it is not exactly the same thing.

I also want to point out we filed with full schedules, and that's not something you normally see in a case of this size or complexity. We came in with as much information as we could possibly provide. So that is not a pig in a poke today. And we know that not just because they're on the record, but because questions were asked based upon their schedules. Ms. Berrett's testimony as to the value of the MCA claims is unrefuted. Her testimony as to her expertise with MCA claims is undefeated. Now, we did not move her admission as an expert witness, but she established a pretty solid foundation for her working knowledge of MCA claims and the valuation thereof.

And I think that is a meaningful distinction, especially in this day and age in the bankruptcy field, where MCA recoveries are part and parcel of so many cases. These are not exotic, esoteric claims where we are hoping to undo a fraudulent conveyance in favor of an Argentinian prince who may or may not have expended the monies in Chile. But we are

trying to recover monies from an MCA in Miami, Florida.

And finally, I'd point out the Chapter 7 bits. I trust this court's not going to convert a case on day 1. I'll avoid snark about which courts may or may not be prone to do that, but a Chapter 7 trustee's commissions would eviscerate the Chapter 5 recovery in a manner that does significant violence to unsecured creditors. And I'm not going to preview anything today, and I don't want to seed things today, but we have three buckets of assets. We have inventory, we have intellectual property, and we have litigation rights.

The third bucket is not subject to anyone's lien. The third bucket is potentially the most valuable bucket. The third bucket is the one that cries out most apparently for Chapter 11 based on the commission savings. The first two buckets are reliant, to some degree, to maximize value upon ongoing operations as a going concern. There are numerous problems if we don't continue to operate as a going concern, logistically, legally, and financially.

So we ought to be afforded use of cash collateral for a scant three weeks to continue as a going concern operations, and assuredly not even Ms. Eustis is going to argue that we shouldn't be able to take money to pay for insurance premiums while we are in bankruptcy, or the other items on there. No one takes issue with any of the expenses in the first three weeks. And I think that speaks volumes. I'm happy to answer

any questions the Court may have.

THE COURT: So clarify to me exactly what's being offered is adequate protection because what's been argued today and what's been discussed is not consistent with what's necessary. And I was looking when you were finishing up, I went back and repulled the motion.

MR. VERSTANDIG: It's a fair point, Your Honor. I think counsel noted it fairly. We are suggesting a replacement lien to the extent of diminution that would cover Chapter 5 claims, but I want to be clear only to the extent of diminution. So we are not offering a blanket lien on Chapter 5 claims.

THE COURT: Right. But let me go back to the first part, which is you still want to use the cash collateral in addition to diminution. And that piece is use the money to bring in new money? I mean, you said to the extent the munition. There's supposed to be some sort of protection. Maybe I'm asking a stupid question.

MR. VERSTANDIG: Your Honor, I certainly don't think there's ever been a stupid question in this -- well, there's never been a stupid question from the bench in this Court. Will --

THE COURT: Oh, there have. There are plenty of stupid questions from the bench in this Court. Usually, I am the one that asked them. I know.

MR. VERSTANDIG: Your Honor, if I understand the question correctly, if you're asking how Acme is adequately protected for the expenditure of monies that are its cash collateral, we are saying it's adequately protected in two ways. One, is those monies are being expended to maximize the value of its noncash collateral, right? Its collateral and intellectual property and its collateral in inventory so that we can maximize the sale there. But two, we are saying to the extent there is a diminution and we're trying to figure that out is going to be quite the math problem at the end of this case, but that's why there are so many smart people here.

We will give them a replacement lien on the Chapter 5 claims, because we know that is a big enough pot of money. It is grotesquely outsized relative to the amount of money we're looking to spend in the interim. We don't think there's going to be a diminution. Again, probably ended up with experts and way too much argument over what things were worth before we kept operating, what things are worth, where we ended up operating, how much did they actually sell for and this and that. But that's a bridge to cross another day.

So we're offering adequate protection in the fact that we continue as a going concern that protects our other more valuable collateral. Cash, it's one of the smallest assets in this estate, but we're also offering adequate protection in the more traditional sense of a replacement lien. And you're

right, it was ambiguous in the papers, and I apologize to Ms. Eustis for that, and I apologize to others for that. We had said not to cover Chapter 5 claims, and what I meant is, it's not a blanket lien on them, and I should have been far more expressed, and I should have used different language. We are fine with it encompassing or encumbering Chapter 5 claims, but only to the extent of a dollar for dollar diminution. You have to figure out what dollar for dollar is. We recognize that there's a time value of money.

Your Honor, I don't know if that answered your question or just complicated it eight times over.

THE COURT: Oh, it answered the question I posed.

Anything further from the Debtor?

MR. VERSTANDIG: Your Honor, only to point out that if you look at the budget, the ending cash at the beginning is $64,545. The ending cash on October 1st is $252,724.

THE COURT: Yeah, but minus one hundred and minus eighty-three and minus fifty-six, which last time I checked, is most of that. Like, I haven't heard the settlement.

MR. VERSTANDIG: Your Honor --

THE COURT: So that's contingent. The two other accounts are already subject to the liens, which means that's not new cash in the budget so.

MR. VERSTANDIG: Your Honor, I appreciate that. I appreciate that's the Court's prerogative to approve or not

approve the 9019, but I also point out we came to you basically saying we have two ways to fund this case. We put both of them on the table. We believe they should be complementary. We don't believe it's one or the other, but it is particularly rich for Acme to object to the settlement, to hold up our ability to consummate it and then say, look, they don't have access to cash to operate without using our cash collateral. I'm not saying that's quite the doctrine, but we are very close to someone shooting their parents and begging for mercy on the grounds that they're an orphan.

THE COURT: Anything further?

MR. VERSTANDIG: That felt like a really good point to end on.

THE COURT: Anything further from you all?

MR. DAVIS: Your Honor, I'll just note our problem with the settlement isn't the idea that there are claims against Mr. Ross that the estate would have. It's that they are being settled for a pittance of what they are worth. So it is an unfair and unreasonable settlement. So our problem is not that this number exists, is that the number is actually too small.

I appreciate Your Honor, pointing out exactly what portion of $252,000 is made up of contingent or already extant cash assets. And so what we actually see is over the four weeks and this is rough, but I think that there will

essentially be four weeks and we'll lose $40,000 in cash, because the weeks we start with 64,000 and we'll end, if we subtract the 100, the 86, and the 56, something around 25. So they're asking for permission to use $40,000 to spin wheels. They're digging a hole and they're asking us to pay for the shovel to dig it even deeper.

And I will point to Mr. VerStandig's idea of three buckets. Those first two buckets are our collateral, and the last bucket is nothing more than hope. It's hope that something's going to happen, that they're going to be able to sell something. Again, none of the costs of that sale, none of the costs of the litigation are in this budget. There's really nothing other than like, well, maybe we'll do this and maybe we'll do that. I mean, they might as well ask you their cash collateral to buy a bunch of lottery tickets and give us adequate protection through whatever proceeds come out of that. It's simply not appropriate. Like I said, this is all diminution even over four weeks. There is zero appropriate adequate protection whatsoever. 552 already means that the proceeds are our collateral. These bank account amounts that are coming in are already our collateral.

And the adequate protection, again, offering these Chapter 5 claims, there is not a single court that has held that that would be appropriate. Your Honor didn't want to blaze a trail by converting this case on day one. I'm not sure

you want to blaze a trail by creating a whole new basis for cash collateral. And in fact, I think that if you did, it would have a very bad effect, and that every Debtor could come in and say, well, we've got these Chapter 5 claims, we'll just adequately protect you with those. We think they're worth $1 billion. It blows the idea of adequate protection out of the water.

We would say, however, that if, Your Honor, were willing to blaze the trail of converting this case today, that that would actually --

THE COURT: Well, touché. That was well done. I'll tip a hat when something's well done.

MR. DAVIS: That would --

THE COURT: That was well done.

MR. DAVIS: That would actually create a much better precedent here, where a Debtor who comes in asking again for us to pay for them to lose our collateral, should not be allowed, should not be spared.

THE COURT: All right.

MR. DAVIS: With that, Your Honor.

THE COURT: I have had very few contested, especially to this level, cash collateral hearings in this Court. And I'm sure, although I don't know for sure, but I'm sure I have a reputation of being a judge who wants to give Debtors an attempt to reorganize and will allow them, if there's a legal

way to do so, to work through a reorganization process. My problem here, is that this is a contested cash collateral hearing by a lender who has everything sewn up.

And really the only source of potential adequate protection is what -- and I'm not going to make -- these are not legal findings, but I'm just going to use some terms we throw around in bankruptcy law, contingent, unfiled. Look, MCA litigation is the, the hottest litigation going out there. And there's been a lot of recent cases which are very successful for those seeking to make recoveries on MCA's. But nonetheless, it is still a very, very speculative recovery, one that will take there more and more being defended and one that will not come in, at least in this case, in the first four weeks of the case.

I too did a quite extensive search to determine whether -- and I didn't limit it to just MCA litigation. I didn't limit it to preference. I didn't limit it to 548. We cast a very large net on the research to find if there'd been any situation in which claims any kind of litigation claims, even ones that are slam dunk litigation claims like a preference, clear preference of the estate was held to be in any form an adequate protection replacement lien for a cash collateral motion.

I will admit to Mr. Davis' credit, I didn't go down the motion for relief rabbit hole. Maybe that's because I've

been on the bench more than I've been off the bench the last three days and didn't have a chance to go down that rabbit hole, but in the context of 364, we didn't find anything. The closest we found, it was a couple of small cases where in a dip lender was given an interest, which I've seen and been contemplating. And it's in my local rules that if you want to ask for that, you got to tell me about it, but that I don't have a dip lender here. And that was really -- or something consensually was worked out and people were -- it was a consensual agreement. But other than that, we didn't find it either.

And so I'm faced here with a catch 22 because I do take Ms. Berrett's testimony as credible on the fact that this collateral is worth more if it's properly marketed and they can market the IP and the inventory can be worked -- can be sold and that the -- the -- that there's more value not having a fire sale. And frankly, there's also the very high Chapter 7, what will be -- what would be attorney's fees and commissions that would eat into all of that as well. But I also have no consent of the secured lender. And I, really, based upon all the evidence before me today, absent some sort of dip loan capital contribution, outside funding, I don't have a source of adequate protection that can be offered to this lender for the use of cash collateral post-petition that it doesn't already hold a lien in.

Now, I can see, while there's been implication that the entire reason of the 9019 was to get Mr. Ross in and out quickly at the beginning of the case, that this might be an -- might also have been a creative attempt to find $100,000 that could be used as a replacement lien. That wasn't something that was already liened by the lender, but that's also speculative at this point. There's vociferous objections to the settlement. We're looking at maybe a hearing date next week, which means even if I granted that next week, I wouldn't have something to find for adequate protection today in support of the lender.

And so I find myself at a crossroads where the question is, what can the Debtor -- what could the Debtor do? The other thing is the budget. If I look in week one, there's no outflow. So we're good through yesterday, and there's no use because they had the hearing today.

The main outflow in the second week is, is just primarily payment to a probably a key employee, but nonetheless just payment to an employee. And a quarterly payment for IT systems and software. Could the Debtor squeak through next week without making those payments and push them off to week 3 to see if we can hear the settlement agreement? I don't know. Or could there be something that where an agreement is cut between the parties given that the outflows because while it is operating, it's operating on a shoestring and the next real

payment that goes to the operations -- well, one is insurance, which is in week three. And the real big operational payment isn't until week four, which is inventory handling and fulfillment.

I find today that I don't think a replacement lien in a contingent filed speculative litigation claim, while it may be as close to a slam dunk as you can get, can serve as what is required for me to find as adequate protection under 364. To the extent there are not any other assets for which to give a replacement lien, at this point, I'm not sure I can find that the Debtor has offered adequate protection for the use of cash, as requested in the first four weeks of the budget. I don't think it's a death nail today, given how the budget is set up. I do think it could result in a settlement, a consensual use of cash collateral of some sort, maybe if the parties can come to that.

I do think there is benefit to this Debtor to do a more fulsome liquidation process. There's certainly a strong reduction when it comes to the Chapter 7 Trustee trying to liquidate these things and doing that. And there's a lot of product, there's a lot of monies. And to the extent that these are conservative, there may be a lot of monies that could come in on collections in the next few weeks that could be negotiated in one way or the other.

But based upon the record I have before me, I can't

find an offer on a lien on a litigation claim, while not the same adequate protection as a motion for relief, it is still the same terms. And a lot of that same analysis applies here, which is just if it's that speculative it's just not concrete enough to provide an objecting creditor with the protection that's required by Section 364.

And to the extent that the two accounts that would be other cash inflows or restricted cash are already subject to the lien of the secured lender, that doesn't really give any additional because it was a pre-petition lien that's already been executed, things like that. If there's going to be dip funding, if there can be capital contribution, if there can be something else which is not already subject to the lien, the Court's willing to consider that. I mean, there's other opportunities to find a way to do this, to move it forward.

But based upon the record before me today, I simply can't grant the interim use of cash collateral because I don't find that there's any adequate protection for this lender. Now, that can be handled in two ways, I can issue an order on that, or I can simply deny the use for the moment and continue the hearing out to see if there's a further interim or modified request put on notice to parties and to which can be more fully fleshed out to assets or adequate protection that's not something I've ruled on today. But I don't make the rule -- I don't make that finding lightly or with any great aplomb or

glee.

Chapter 11 is mostly used for liquidations these days. And there's a lot of benefit to utilizing it. They're 363 sales. You get higher and better values on a lot of things for people that go through the system. But based upon the limited record I have before me today and the fact that there just isn't -- there isn't consent of the lender, and there isn't anything that's not fully liened or is not overly speculative. I simply can't grant the relief that's being requested today.

So I turn to you, Mr. VerStandig, based upon that. Do you want me to continue this out for a couple of days? Do you all think you can cut a deal? Do you want to refile? I don't know what you want me to do here. I can still reserve the 2nd. That's obviously not a problem. But to get back in here, we can try and get you back in in short order, if necessary. But as of the record today, I just can't grant the relief.

MR. VERSTANDIG: Your Honor, I'm confident a deal is not forthcoming. However, there is a plan B that's going to involve a very different type of emergency motion, and I think it is one that will reveal to the lender the folly of their actions yesterday and today, and we're inclined to let them enjoy every moment of that.

Can we get some time on Tuesday or Wednesday for something that will be filed over the weekend?

I'm sorry. I realize Charlottesville is next week.

THE COURT: That's all right. I can get there late. I can do one on Wednesday. I will tell you I have something at 3:30 though I need to step out for. So I'll be able to have 2.5 hours at least on Wednesday.

MR. VERSTANDIG: Your Honor, I'm in the District Court in Richmond Wednesday morning. I share that only because we'd asked that it be virtual, or at least hybrid, with Debtor's counsel being welcomed virtually.

THE COURT: That's fine. One on Wednesday?

MR. COHEN: Your Honor, does that mean that there isn't any availability on Tuesday? I'm supposed to be on a -- I'm going to be on a plane at that time.

MR. VERSTANDIG: I'm happy to forecast and I need to talk about it with my client, but I suspect we're going to move to abandon the secured assets. I'd like to liquidate them. They can liquidate them themselves. We'll retain all the Chapter 5 claims, obviously.

THE COURT: Hold on, hold on. Okay. I can move that. Mr. Cohen, be careful what you wish for because you just might get it. All the time I have is at 6 a.m. Pacific time or 9 a.m. Eastern that morning.

MR. COHEN: That's fine. It worked out well earlier this week or yesterday, I guess it was so.

THE COURT: Having grown up on the West Coast, that's the exact answer I always give to people. I was like, you all,

everything happened at 6 in the morning, because the East Coast people just don't understand. But what you don't understand, people, is we get football at 5:30 when we get off work so, okay?

MR. COHEN: Right, right.

THE COURT: That's my --

MR. COHEN: And by the way, I'm used to this because there are, you know, the Chapter 11s out here in California are not as numerous as they are on the East Coast.

THE COURT: Yeah, I just -- I always like to look at my West Coast friends and go, man, I grew up with it. I'm used to it. You get used to it too.

All right. Okay. So yes, we could do 9 a.m. I have a hard stop at 11:30. So again, I can give you 2.5 hours.

MR. COHEN: Your Honor, that's --

THE COURT: Go ahead.

MR. DAVIS: We can be available Tuesday, obviously reserving our rights to --

THE COURT: Yeah. Right.

MR. DAVIS: -- to whatever emergency, assuming that that's not necessary.

THE COURT: Yeah. Okay. You'll need to file your motion. You file your motion to expedite. You'll need to use it as 9:30. And to the extent it affects you -- you need to get the top 20 served.

MR. VERSTANDIG: I'm sorry, Your Honor. Did you say 9:30 or 9?

THE COURT: 9.

MR. VERSTANDIG: Okay. Your Honor, we will be filed by the end of Sunday. We have email addresses for, I believe, 19 of the 20. And the 30th is Internal Revenue. Which good news, Ms. Eustis has the same employer as Internal Revenue, so we can argue vicarious notice that way.

THE COURT: Please send it to Mr. McDaniel (phonetic) and Ms. Goforth Koenig (phonetic). If you need their information, we'll let you know. But those are the two IRS attorneys I have appear in this Court.

MR. VERSTANDIG: I have Oliver's email, and I'll reach out to someone for the other.

THE COURT: All right. It probably would be Mr. McDaniel, but I'd like to make sure we also give Ms. Goforth Koenig notice.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: All right. Okay. So I'm going to ask the counsel for secured lenders send me a proposed order on the motion for cash collateral and the denial.

MR. VERSTANDIG: And I'd like to endorse.

THE COURT: Yes. You can get Mr. VerStandig to review it.

MR. DAVIS: That's fine, Your Honor. Should be short.

THE COURT: Because she's smart. So be love Judge Gunn. I'm pretty sure that's not what I was going to say.

Yes. That's fine. Anybody else wish to review the order before the Court considers it for entry? Okay. Make sure Mr. VerStandig gets an opportunity to review that.

To those of you who celebrate Shana Tova, and have a nice holiday and New Year. And 9 a.m. on Tuesday will be what will happen if and when motions are filed and we get notice.

MR. COHEN: Thank you, Your Honor.

THE COURT: I guess, we have to talk about the date for the FDIC accounts or the hearing, I think, which are the ones -- we were looking for a date for the FDIC hearing and a motion in the 9019. Am I calling all of those -- or I'm calling those Tuesday as well, or?

MR. VERSTANDIG: Your Honor, 9019 is going to stand regardless. I don't want to preview anything until I talk to my client and get informed consent. I need to be careful not to get --

THE COURT: I'm going to carry them over to Tuesday. Bring a calendar because we don't have time today. I want to get Mr. Cohen off to his holiday. We're going to carry them over later. We won't take up -- well, I mean, if we have time, maybe we take up the argument on the 9019. I don't know what's going to get filed. We'll use all 2.5 hours to the extent we can. And the FDIC is you can talk about dates if you need to.

MR. VERSTANDIG: Thank you. I can assure you we're not arguing that on Tuesday.

THE COURT: No, no, no. That one will just be for scheduling. But I don't -- it's -- it's the end of the day and I don't have the brainpower to schedule anything else. And then to the extent that the 9019 is -- we have time, I don't know how that's going to play into whatever's filed. So we will take up both of them if we can. And if not, we'll do scheduling on the 9019 at that point.

MR. DAVIS: Just very quickly, Your Honor, on logisticals. Just if they're going to file Sunday night, and the hearing will be Tuesday morning, we'll obviously do the best that we can to get you some sort of written response, assuming we want to make one.

THE COURT: You'll be able to respond at the hearing to the extent you want to file something.

MR. DAVIS: Thank you, Your Honor.

THE COURT: As you saw, I look, I got, I got through the 20 pages, I just didn't get through the 900 pages of the other stuff so. It helps if you do it, like -- if you file it before midnight. I see it in the morning. If you file it like at 1:00 in the morning, if you can just kick a copy to hearings to the normal hearings email box because I don't always see those when I -- I get a report at midnight. But if it's -- whatever is fine, I'll find it.

MR. DAVIS: Thank you, Your Honor. We'll accommodate that.

THE COURT: Okay. All right. Anything further this afternoon/evening?

MR. VERSTANDIG: Nothing from the Debtor, Your Honor.

THE COURT: All right. And if you don't know, it's gunn_hearings@dcb.uscourts.gov. And Tuesday, I'll be here in person, but hybrid versions are optional depending on how y'all want to do it, but it's always nice to -- it's nice to have real people in real courtroom so.

All right. Have nice weekend everyone.

MR. VERSTANDIG: Thank you, Your Honor.

MR. DAVIS: Thank you, Your Honor.

MR. COHEN: Thank you, Your Honor. Appreciate it.

THE COURT: Thank you. Happy New Year.

THE CLERK: Thank you, Judge. That concludes the matters on our calendar for today. This Court stands adjourned.

(Whereupon, at 6:38 p.m., the hearing was adjourned.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/
______________________________ Date: September 15, 2026
ESCRIBERS LLC

I N D E X

E X A M I N A T I O N S


| WITNESS | EXAM BY | PAGE | LINE |
|---|---|---|---|
| Lauren Berret | Mr. VerStandig | 7 | 7 |
| Lauren Berret | Mr. Cohen | 32 | 25 |
| Lauren Berret | Ms. Eustis | 49 | 24 |
| Lauren Berret | Mr. Liesemer | 57 | 6 |
| Lauren Berret | Mr. VerStandig | 67 | 20 |
| Trent McDonald | Mr. VerStandig | 74 | 23 |
| Trent McDonald | Mr. Davis | 88 | 15 |
| Trent McDonald | Mr. VerStandig | 92 | 20 |


E X H I B I T S


| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtor's Exhibit B, Nevada UCC search | 11 | 3 |
| Debtor's Exhibit A, Proposed budget | 13 | 21 |
| Debtor's Exhibit C, Proposed settlement agreement | 24 | 15 |